UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

QUANTUM CORPORATE FUNDING, LTD.,

                           Plaintiff,

            -against-

WESTWOOD DESIGN/BUILD INCORPORATED,
DAVID R. WARFIELD, NATIONAL CITY
MORTGAGE INC., and PENN LYON HOMES
CORPORATION,

                          Defendants.
-------------------------------------------------------------X

NATIONAL CITY MORTGAGE,

                  Third-Party Plaintiff,

            -against-

MICHAEL CONRAD a/k/a MICHAEL CONRAD
BROWN,

                  Third-Party Defendant.
-------------------------------------------------------------X

Civil Action
Docket No. 08 CV00539 (LAK)(HBP)

**DECLARATION IN
OPPOSITION TO MOTION
TO VACATE JUDGMENT
AND FOR OTHER RELIEF
AND TO ORDER TO SHOW
CAUSE TO STAY
<u>ENFORCEMENT</u>**

BERNARD KOBROFF, pursuant to 28 U.S.C. 1746, under the penalties of

perjury declares that the foregoing is true and correct:

      1.    I am an attorney admitted to practice in this Court and am associated with

the law firm of Goetz Fitzpatrick LLP, attorneys for the plaintiff, Quantum Corporate

Funding, Ltd. ("Quantum"), in the above captioned matter.

      2.    I make this Declaration in opposition to: (a) the Motion of defendant Penn

Lyon Homes Corporation ("Penn") for orders: (i) vacating the final judgment entered

against defendant Penn on Quantum's motion for summary judgment; (ii) upon vacatur

denying Quantum's motion for summary judgment; (iii) granting reconsideration of the

court's grant of summary judgment to Quantum and, upon reconsideration, denial of Quantum's motion; (iv) alternatively, granting Penn an extension of time to file opposition to Quantum's motion for summary judgment; and (v) alternatively, adjourning Quantum's motion to allow Penn to engage in discovery so that it may oppose Quantum's motion; and (b) the Order to Show Cause of Penn for orders: (i) permanently staying enforcement of the judgment; and (ii) staying all discovery pending the determination of Penn's motion to vacate and other relief.

3.    On July 3, 2008 Quantum moved this court for summary judgment against defendant Penn in the amount of $112,168.28, with applicable interest, which amount Penn either converted and/or was unjustly enriched by when Quantum wired said amount in payment for the Pollydore Residence and Penn neither applied the monies to that purpose, nor shipped the Pollydore Residence, nor returned the monies to Quantum. Annexed hereto as Exhibit "1" is a copy of Quantum's Statement Pursuant to Local Rule 56.1 which was submitted in support of its motion. Annexed as Exhibit "2" is a copy of the Affidavit of Craig Sheinker, with exhibits, sworn to July 3, 2008, which was also submitted in support of Quantum's motion. Annexed as Exhibit "3" is a copy of Quantum's Memorandum of Law which was also submitted in support of its motion.

4.    On July 7, 2008, this court granted defendant/third-party plaintiff National City Mortgage ("NCM") judgment by default against defendants Westwood Design/Build Incorporated ("Westwood") and David Warfield ("Warfield") and against third-party defendant Michael Conrad a/k/a Michael Conrad Brown ("Conrad") "jointly and severally, in the amount equal to any loss, liability or expense that may be imposed

upon, or incurred by NCM on account of plaintiff Quantum Corporate Funding, Ltd.'s claim against NCM". A copy of this default judgment is annexed as Exhibit "4".

     5.    On July 30, 2008, this court granted Quantum judgment by default against defendants Westwood and Warfied "jointly and severally, in the amount of $347,000.00." A copy of the Court's order and judgment are annexed as Exhibit "5".

     6.    On July 30, 2008, this court also on default, granted Quantum's motion for summary judgment against Penn. A copy of the court's order is annexed as Exhibit "6".

     7.    On July 31, 2008, the clerk entered final judgment against Penn. A copy of this final judgment is annexed as Exhibit "7".

     8.    On July 31, 2008, defendant Penn's counsel, Scott H. Goldstein, Esq., "submitted a letter to the Court which explained the reasons for the delay, attached the consent stipulation to extend time to answer, and requested an out of time extension of defendant's time to respond to Quantum's motion for summary judgment." A copy of Mr. Goldstein's letter is annexed as Exhibit "O" to his August 5, 2008 Affirmation submitted in support of Penn's motion to vacate and for other relief.

     9.    In response to Mr. Goldstein's letter, declarant on August 1, 2008 submitted a letter to the court "to set forth the facts from Quantum's side". A copy of Declarant's letter is annexed as Exhibit "8".

     10.    On August 8, 2008, the court temporarily restrained Quantum's enforcement of the default judgment entered against Penn. A copy of the court's order is annexed as Exhibit "9".

     11.    On August 7, 2008, pursuant to counsels' conference with Magistrate Judge Henry Pittman, plaintiff Quantum responded to Penn's document demands and

interrogatory requests and its counsel, Mr. Goldstein, attended and questioned Quantum's employees, Maria DeSouza and Craig Sheinker, whose depositions Penn noticed.

12.    On August 8, 2008, Quantum's President, Craig Sheinker, was deposed by defendants' Penn and NCM's attorneys. A copy of Mr. Sheinker's deposition is annexed as Exhibit "10".

13.    As regards Penn's motions, it is emphasized that: (a) Penn is "conceding (for the purpose of this motion only) that all of the facts contained in plaintiff's motion were undisputed" (Penn Memo of Law, p.2); (b) Penn has not submitted any affidavit from anyone with personal knowledge of the facts which presents evidence of any facts which if proven at trial would constitute a complete defense to Quantum's unjust enrichment and/or conversion causes of action; (c) Penn has not alleged that it has a complete defense to Quantum's causes of action; (d) Penn has not stated what, if anything, it expected to "discover" that would constitute a complete defense to Quantum's summary judgment motion; and (e) Penn's motion to stay discovery is moot.

Dated: New York, New York
　　　　August 18, 2008

Bernard Kobroff (BK 0101)

W:\bkobroff\Quantum\Westwood\Declaration in Opposition.doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
QUANTUM CORPORATE FUNDING, LTD.,           Civil Action
                                           Docket No. 08 CV00539(LAK)(HBP)
                          Plaintiff,

        -against-                          **STATEMENT PURSUANT
                                           TO LOCAL RULE 56.1**

WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID B. WARFIELD,
NATIONAL CITY MORTGAGE INC., and
PENN LYON HOMES CORPORATION,

                          Defendants.
----------------------------------------------------------X
NATIONAL CITY MORTGAGE,

                 Third-Party Plaintiff,

        -against-

MICHAEL CONRAD, a/k/a MICHAEL CONRAD
BROWN,

                 Third-Party Defendant.
----------------------------------------------------------X

        Plaintiff, Quantum Corporate Funding, Ltd ("Quantum"), contends that there is no

genuine issue to be tried as to the following material facts:

        1.      Plaintiff Quantum is a corporation organized and existing under the laws

of the State of New York, maintaining its principal place of business at 1140 Avenue of

the Americas, New York, New York 10036 and is engaged in the business of commercial

finance. Affidavit of Craig Sheinker, sworn to July 3, 2008 (hereafter "Sheinker

Affidavit"), para. 3 and Exhibit J, para. 1.

        2.      Defendant Westwood Design/Build Incorporated ("Westwood") is a

corporation organized and existing under the laws of the State of Maryland maintaining

its principal place of business at 12109 Gordon Avenue, Beltsville, Maryland 20705.

Sheinker Affid. Exs. A and J, para. 2.

3.       Defendant National City Mortgage Inc. ("National") is a corporation organized and existing under the laws of the State of Ohio, maintaining is principal place of business at 3232 Newmark Drive, Miamisburg, Ohio 45342. Sheikner Affid. Ex. J, para. 4.

4.       Defendant Penn Lyon Homes Corporation ("Penn") is a corporation organized and existing under the laws of the State of Pennsylvania, maintaining its principal place of business at 195 Airport Road, Selinsgrove, Pennsylvania 17870. Sheinker Affid. Ex. J, para. 5 and Ex. K, para. 5.

5.       In or about January, 2007 Mr. and Mrs. Eustace Pollydore, as owners, entered into contracts with defendant Westwood, as contractor, and with defendant National, as construction lender, pursuant to which Westwood contracted to construct a new home at 6117 Elm Street, Lanham, Maryland for the Pollydores (the "Pollydore Residence"). Sheinker Affid. para. 4 and Exhibits A and B.

6.       By virtue of the work and materials allegedly furnished by Westwood for the Pollydore Residence there became due to Westwood from National pursuant to the second draw-down on the Pollydore construction loan the sum of $347,000.00 for which an invoice was rendered by Westwood to National (the "Invoice"). Sheinker Affid. para. 5 and Exhibits B and C.

7.       In or about December, 2007, in order to induce Quantum to purchase the Invoice and in payment thereof to wire $130,731.72 to Westwood and $112,168.28 to Penn, Westwood forged an invoice allegedly from Penn in the amount of $112,168.28, allegedly in payment for the construction of the modular Pollydore Residence. Sheinker Affid. paras. 11 and 17 and Ex. G and Ex. K, paras. 37-44.

8.    Westwood made an assignment to Quantum of the moneys due it from National on account of the Invoice (the "Assignment"). Sheinker Affid. para. 10 and Exhibit E.

9.    Pursuant to Westwood's Assignment on December 21, 2007, Quantum wired from its account at Sterling National Bank to Penn's account No. 40224230 at Omega Bank, $112,168.28 in payment for the "Pollydore Residence." Sheinker Affid. para. 11 and Exs. E, F, G, H and K para. 41.

10.    Penn's Account No. 40224230 received the $112,168.28 wire transfer from Quantum on or about December 24, 2007. Sheinker Affid. Exs. H and K para. 41.

11.    Penn had no contract with Westwood to supply the Pollydore Residence. Sheinker Affid. para. 17 and Ex. K, para. 39.

12.    Penn did not credit the $112,168.28 received from Quantum against the Pollydore Residence. Sheinker Affid. Ex. K, para. 43.

13.    Notwithstanding Penn's receipt of the $112,168.28 from Quantum in payment for the Pollydore Residence, Penn never shipped the Pollydore Residence. Sheinker Affid. paras. 17 and 19 and Ex. K, paras. 39, 43 and 44.

14.    Notwithstanding Penn's receipt of the $112,168.28 from Quantum in payment for the Pollydore Residence, Penn credited the $112,168.28 against monies owed it by Westwood for the "Harris Residence". Sheinker Affid. paras. 11, 16 and 17 and Ex. K, paras. 42-44.

15.    On January 15, 2008, Quantum demanded that Penn return the $112,168.28 it had received in payment for the Pollydore Residence. Sheinker Affid. para. 18 and Ex. I.

16.    Penn refused and continues to refuse to uncredit the $112,168.28 received from Quantum which it credited to the Harris Residence and to return the $112,168.28 to

Quantum. Sheinker Affid. para. 20 and Ex. J.

Dated: New York, New York
        July 3, 2008

GOETZ FITZPATRICK LLP

By: _____
    Bernard Kobroff (BK 0101)
    Attorneys for Plaintiff
    Quantum Corporate Funding, Ltd.
    One Penn Plaza, Suite 4401
    New York, New York 10119
    (212) 695-8100

W:\bkobroff\Quantum\Westwood\Statement Pursuant to Local Rule 56.1.doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

QUANTUM CORPORATE FUNDING, LTD.,        Civil Action
                                        Docket No. 08 CV00539(LAK)(HBP)
                    Plaintiff,

        -against-                       **AFFIDAVIT IN SUPPORT**
                                        **OF MOTION FOR**
WESTWOOD DESIGN/BUILD                   **SUMMARY JUDGMENT**
INCORPORATED, DAVID B. WARFIELD,
NATIONAL CITY MORTGAGE INC., and
PENN LYON HOMES CORPORATION,

                    Defendants.
----------------------------------------------------------X
NATIONAL CITY MORTGAGE,

                    Third-Party Plaintiff,

        -against-

MICHAEL CONRAD, a/k/a MICHAEL CONRAD
BROWN,

                    Third-Party Defendant.
----------------------------------------------------------X

CRAIG SHEINKER, being duly sworn, deposes and says:

1.      I am the President of Quantum Corporate Funding, Ltd. ("Quantum"), the

plaintiff herein, have examined Quantum's records and have personal knowledge of the

facts and circumstances hereinafter set forth and submit this Affidavit in support of

Quantum's motion for summary judgment against defendant Penn Lyon Homes

Corporation ("Penn") in the amount of $112,168.28 together with interest from January

15, 2008.

2.      Quantum seeks in this action to recover from defendant Penn the sum of

$112,168.28 of Quantum's monies which Penn either converted and/or was unjustly

enriched by, when Quantum wired said sum in payment for the Pollydore's Residence

and Penn neither applied the monies to that purpose, nor shipped the goods, nor returned the monies to Quantum.

## BACKGROUND

3.      Quantum is in the business of accounts receivable factoring. Headquartered in New York City, New York. Quantum is one of the largest purchasers of contractor receivables in the United States.

4.      On or about January, 2007, Mr. and Mrs. Eustace Pollydore, as owners, entered into contracts with defendant Westwood Design/Build Incorporated ("Westwood"), as contractor, and with defendant National City Mortgage Inc. ("National") as construction lender, pursuant to which Westwood contracted to construct a new home for Mr. and Mrs. Pollydore at 6117 Elm Avenue, Lanham, Maryland (the "Pollydore Residence"). A copy of the Westwood/Pollydore contract is annexed hereto as Exhibit "A". A copy of National/Pollydore construct loan agreement is annexed hereto as Exhibit "B".

## THE TRANSACTION

5.      In 2007, defendant Westwood, by defendant David R. Warfield ("Warfield") approached Quantum to obtain cash by selling Quantum an account receivable. To implement this arrangement, Westwood, by Warfield, offered to assign to Quantum a $347,000.00 invoice (the "Invoice") which it represented was monies due it from defendant National pursuant to its second draw-down of the Pollydore's construction loan. A copy of the Westwood Invoice to National is annexed hererto as Exhibit "C". The construction loan draw-down schedule is annexed as part of Exhibit "B".

6.    Since Quantum has no independent way of knowing if the contractor offering to sell its accounts receivable has, in fact, performed work and furnished materials of the amount invoiced, Quantum contacts the account debtor, in this case the construction lender, defendant National, and requests from the account debtor, a written acknowledgment of and an estoppel certificate for the debt.

7.    Accordingly, in December 2007, Quantum contacted defendant National's Branch Manager, Christopher Washburn, at National's office in Greenbelt, Maryland, and requested confirmation that the Invoice (Exhibit "C" hereto) was correct, forwarding to defendant National an estoppel certificate covering the Invoice.

8.    In response, defendant National, by its Mr. Washburn, signed the estoppel certificate in the amount of the $347,000.00 second draw-down of the Pollydore construction loan and returned it to Quantum. A copy of the estoppel certificate executed by defendant National, citing Westwood's Invoice, is annexed hereto as Exhibit "D".

9.    In reliance upon defendant National's estoppel certificate, Quantum agreed to purchase the Invoice.

10.    The assignment of the Invoice by Westwood to Quantum was made by an agreement entitled Purchase & Sale Agreement (the "Agreement"). A copy of the Agreement is annexed hereto as Exhibit "E".

11.    Pursuant to the Agreement, on December 21, 2007, Quantum paid defendant Westwood $242,900.00 for the Invoice pursuant to Westwood's, by defendant Warfield's, specific instructions, by wiring: (a) $130,731.72 to Westwood and; (b) wiring $112,168.28 to defendant Penn, in payment of Penn's invoice No. 850 representing the balance outstanding on its shipment of the "Pollydore Residence". A copy of Westwood's wiring instructions to Quantum is annexed hereto as Exhibit "F". A copy of

3

the Penn "Pollydore Residence" Invoice No. 850 is annexed hereto as Exhibit "G". A copy of Quantum's wire transfers to Westwood and to Penn are annexed hereto as Exhibit "H".

12.     In early January 2008, Quantum contacted defendant National's main office in Miamisburg, Ohio to confirm that pursuant to the assignment payment of the Invoice would be made by National directly to Quantum, as assignor, rather than to assignee Westwood.

13.     Additionally, Quantum attempted to contact defendant Westwood to advise it that if defendant National paid the Invoice to it, instead of to Quantum, that the payment was required to be turned over to Quantum.

14.     However, despite several attempts to reach Westwood by telephone, Quantum was unable to made contact with Westwood and this raised concerns.

## THE FRAUD AND PENN REFUSES TO RETURN THE PAYMENT OR SHIP THE POLLYDORE RESIDENCE

15.     Quantum then contacted the Pollydores' and was advised by Mrs. Pollydore that not only had the residence not been set on the foundation, but that there was no foundation and that no materials had been delivered to the site.

16.     After receiving this information, I contacted defendant Westwood's supplier, defendant Penn, to confirm that it had in fact shipped Mr. and Mrs. Pollydore's modular home for which Quantum had paid it.

17.     Defendant Penn advised me on January 11, 2008 that: (a) it had never heard of Pollydores; (b) had not shipped the Pollydore Residence, and; (c) that the $112,168.28 Penn invoice No. 850 (Exhibit "G") which Quantum had paid was ficticious.

18.     On January 15, 2008, by e-mail, I demanded that defendant Penn return to Quantum the $112,168.28 which Quantum had wired in payment for the Pollydore

4

Residence. A copy of my January 15, 2008 e-mail to Penn's President, David Reed, demanding the immediate return of the $112,168.28 is annexed hereto as Exhibit "I".

19.    Notwithstanding my aforesaid demand and further conversations between defendant Penn and Quantum's attorney, Charles A. Shea, III, Esq., of Wetzel, Caverly, Shea, Phillips & Rodriguez, Penn refused to either return the $112,168.28 to Quantum or to ship the Pollydore Residence.

20.    As a result, Quantum amended its Complaint herein to add Penn as a defendant asserting against it claims for conversion and unjust enrichment. A copy of Quantum's Corrected Amended Complaint is annexed hereto as Exhibit "J".

21.    A copy of defendant Penn's Answer, wherein it admits in pertinent part that:

        (a)    "Penn Lyon has never entered into any contracts or transactions with Westwood or Warfield for the production and manufacture of modular custom-built home units to be delivered to 6117 Elm Street, Lanham, Maryland on property owned by Mr. and Mrs. Eustace Pollydore (the "Pollydore Project")" (para. 39); and

        (b)    On or about December 24, 2007, Penn Lyon received a wire transfer in the amount of $112,168.12 (sic)..." (para. 41);

but denies that it either converted Quantum's $112,168.28 transfer to it and/or was unjustly enriched by that transfer (paras. 16 and 18), is annexed hereto as Exhibit "K".

22.    Notwithstanding defendant Penn's denials, the undisputed facts evidence that Quantum on December 21, 2007 wired $112,168.28 from its account at Sterling National Bank to Penn Lyon's account at Omega Bank in payment for the "Pollydore Residence" and that at no time did Penn either credit that payment to the "Pollydore Project" (Exhibit "K" para. 39) or ship the Pollydore Residence or return Quantum's $112,168.28, despite Quantum's demand for its return.

**WHEREFORE,** I respectfully request that the Court grant this motion, as well as such other and further relief as may be just and proper.



CRAIG SHEINKER

Sworn to before me this
3rd day of July , 2008

_____
Notary Public

LEONARD KOBROFF
NOTARY PUBLIC, State of New York
No. 4603478
Qualified in Westchester County
Commission Expires May 31, 20

W:\bkobroff\Quantum\Westwood\Aff. in Sup. of Motion for Summary Judgment.doc

6

A



# CONTRACT

**THIS AGREEMENT**, Made as of **December 18th,** In the Year of **2006,**

Between the Owner:    **Mr. & Mrs. Eustace Pollydore**
**5300 Gallatin Street**
**Hyattsville, MD 20781**
**301-277-1455**

And the Contractor:    **Westwood Design/Build Incorporated**
**License # 16054316**
**P.O. Box 105**
**Beltsville, MD 20704**
**301-813-2626 Office**
**301-937-2359 Fax**

For the Project:    **New Home Construction**
**6117 Elm Street**
**Lanham, MD 20706**

Construction Lender:    **National City Mortgage**

## ARTICLE 1.    CONTRACT DOCUMENTS

**1.1**    The contract documents consist of this agreement, general conditions, construction documents, specifications, allowances, finish schedules, construction draw schedule, all addenda issued prior to execution of this agreement and all change orders or modifications issued and agreed to by both parties. All documents noted herein shall be provided to the Contractor by the Owner. These contract documents represent the entire agreement of both parties and supersede any prior oral or written agreement.

## ARTICLE 2.    SCOPE OF WORK

**2.1**    The Owner agrees to purchase and the Contractor agrees to construct the above mentioned structure and fixtures attached thereto in **Lanham, county of Prince George's in the state of Maryland** according to the construction documents, allowances, finish schedules, all addenda, change orders, modifications and specifications set forth in the specification booklet.

## ARTICLE 3.    TIME OF COMPLETION

**3.1**    The approximate commencement date of the project shall be **January 1st , 2007.** The approximate completion date of the project shall be August 31st, 2007, however, building permits and any change orders and/or unusual weather might delay or otherwise affect the completion date. Barring inclement weather, factory delays or owner related delays, the Contractor shall complete the home within 3 months upon receipt of the building permit. The contract execution date shall be **December 19th , 2006.**

## ARTICLE 4.    THE CONTRACT PRICE

**4.1**    The construction contract shall be calculated on a cost plus coordination basis, with all labor, materials, permits and insurance figured as costs.

1

Initialed by: Owner _____ Contractor _____

**4.2**     Pre-construction estimates for construction costs and coordination are **Three-Hundred-Twelve-Thousand, Eight-Hundred-Fifty ($312,850.00)**, Closing costs shall be paid by the Owner.

## ARTICLE 5.     PROGRESS PAYMENTS

**5.1**     The Owner will make payments to the contractor through four (4) separate draws based on invoices for labor, materials and modular units submitted.

| | | |
|---|---|---|
| Lot Premium | $ 149,000.00 | .26 Acre / 11,200 Sq/Ft Lot Purchase |
| Builder Deposit: | 10% of the Construction Cost is required when Prince Georges County releases permit. | |
| Foundation Draw: | 20% of the Construction Cost is required at foundation completion. | |
| Modular Home Set: | 60% of the Construction Cost is required at Modular Delivery and Set. | |
| Finishing and Closing: | 10% of the Construction Cost is required at punch-out completion. | |

Owner shall make payments to contractor within **5 business days** after approved inspection by owner.  Inspection by Owner must correspond with Addendum A attached. Should the owner fail to make payment, contractor may charge a penalty of **18%** annually upon the unpaid amount until paid.

**5.2**     If payment is not received by the Contractor within **10** days after delivery of payment demand for work satisfactorily completed, contractor shall have the right to stop work or terminate the contract at it's option.  Termination by Contractor under the provisions of this paragraph shall not relieve the Owner of the obligations of payments to Contractor for that part of the work performed prior to such termination.  Termination by Owner under the provisions of this paragraph shall not relieve the Owner of the obligations of payments to Contractor for that part of the work performed prior to such termination.

## ARTICLE 6.     DUTIES OF THE CONTRACTOR

**6.1**     All work shall be in accordance to the provisions of the plans and specifications.  All systems shall be in good working order.

**6.2**     All work shall be completed in a workman like manner, and shall comply with all applicable national, state and local building codes and laws.

**6.3**     All work shall be performed by licensed individuals to perform their said work, as outlined by law.

**6.4**     Contractor shall obtain all permits necessary for the work to be completed. The contractor is required to pay any and all impact fees charged by Prince George's County.

**6.5**     Contractor shall remove all construction debris and leave the project in a broom clean condition.

**6.6**     Upon satisfactory payment being made for any portion of the work performed, Contractor shall furnish a full and unconditional release from any claim or mechanics' lien for that portion of the work for which payment has been made.

## ARTICLE 7.     OWNER

**7.1**     The Owner shall communicate with subcontractors only through the Contractor.

**7.2**     The Owner will not assume any liability or responsibility, nor have control over or charge of construction means, methods, techniques, sequences, procedures, or for safety precautions and programs in connection with the project, since these are solely the Contractor's responsibility.

**7.3**     Contractor shall provide all engineering and surveying required by Prince George's County.

| | | |
|---|---|---|
| a. Horizontal and Vertical Control | e. Stormwater Management Plan | i. Limits of Disturbance |
| b. Topography | f. Sediment Control Plan | j. Foundation Stake Out |
| c. Boundary Survey | g. Utility Coordination | k. Wall Check |
| d. Site Grading and Landscape Plan | h. TCP Waiver | l. All Certifications |
| m. Public Water/Sewer Connection | n. Geotechnical Report | |

2

7.4    Contractor shall obtain all construction permits necessary for the work to be completed.

7.5    Contractor shall build access road, per Prince Georges County specification, to Owner's parcel.

## ARTICLE 8.    CHANGE ORDERS AND FINISH SCHEDULES

8.1    A Change Order is any change to the original plans and/or specifications. All change orders need to be agreed upon in writing, including cost, additional time considerations, approximate dates when the work will begin and be completed, a legal description of the location where the work will be done and signed by both parties. 50% of the cost of each change order will be paid prior to the change, with the final 50% paid upon completion of the change order. A 12% fee shall be added to all change orders and overages in excess of initial allowances. Additional time needed to complete change orders shall be taken into consideration in the project completion date. **NO CHANGE ORDERS WILL BE ACCEPTED AFTER FINAL HOME ARCHITECTURAL DRAWINGS HAVE BEEN REVIEWED AND APPROVED BY THE OWNER.**

8.2    Completed Finish Selection Schedules shall be submitted to the Contractor as follows:

    8.2.1    Schedule #1 within four weeks after site clearing begins.

    8.2.2    Schedule #2 within eight weeks after site clearing begins.

8.3    Any delays or changes in finish selection schedules will delay the projected completion date.

## ARTICLE 9.    INSURANCE

9.1    The Owner will keep in force a Builder's Risk Insurance Policy on the said property to protect both owner's and contractor's interests until construction is completed. The Owner will maintain property insurance to the full and insurable value of the project, in case of a fire, vandalism, malicious mischief or other instances that may occur.

9.2    The Contractor shall purchase and maintain needed Workman's Compensation and Liability insurance coverage as required by law and deemed necessary for his own protection.

## ARTICLE 10.    GENERAL PROVISIONS

10.1    If conditions are encountered at the construction site which are subsurface or otherwise concealed physical conditions or unknown physical conditions of an unusual nature, which differ naturally from those ordinarily found to exist and generally recognized as inherent in construction activities, the Owner will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost, and/or time required for, performance of any part of the work, will negotiate with the Contractor an equitable adjustment in the contract sum, contract time or both.

## ARTICLE 11.    HAZARDOUS MATERIALS, WASTE AND ASBESTOS

11.1    Both parties agree that dealing with hazardous materials, waste or asbestos requires specialized training, processes, precautions and licenses. Therefore, unless the scope of this agreement includes the specific handling, disturbance, removal or transportation of hazardous materials, waste or asbestos, upon discovery of such hazardous materials the Contractor shall notify the Owner immediately and allow the Owner/Contractor to contract with a properly licensed and qualified hazardous material contractor. Any such work shall be treated as a Change Order resulting in additional costs and time considerations.

## ARTICLE 12.    ARBITRATION OF DISPUTES

12.1    Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Construction Industry Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

## ARTICLE 13.    WARRANTY

13.1    At the completion of this project, Contractor shall execute an instrument to Owner warranting the project for **10 Years** against defects in workmanship or materials utilized. The manufacturers warranty will prevail. No legal action of any kind relating to the project, project performance or this contract shall be initiated by either party against the other party after **10 Years** beyond the completion of the project or cessation of work.

3

## ARTICLE 14.  TERMINATION OF THE CONTRACT

14.1    Should the Owner or Contractor fail to carry out this contract, with all of its provisions, the following options and stipulations shall apply:

14.1.1    If the Owner or the Contractor shall default on the contract, the non-defaulting party may declare the contract is in default and proceed against the defaulting party for the recovery of all damages incurred as a result of said breach of contract, including a reasonable attorney's fee.  In the case of a defaulting Owner, the Earnest money herein mentioned shall be applied to the legally ascertained damages.

14.1.2    In the event of a default by the Owner or Contractor, the non-defaulting party may state his intention to comply with the contract and proceed for specific performance.

14.1.3    In the case of a defaulting Owner, the Contractor may accept, at his option the earnest money as shown herein as liquidated damages, should earnest money not cover the expenses to date, the Contractor may make claim to the Owner for all work executed and for proven loss with respect to equipment, materials, tools, construction equipment and machinery, including reasonable overhead, profit and damages applicable to the property less the earnest money.

## ARTICLE 15.  ATTORNEY FEES

15.1    In the event of any arbitration or litigation relating to the project, project performance or this contract, the prevailing party shall be entitled to reasonable attorney fees, costs and expenses.

## ARTICLE 16.  ACCEPTANCE AND OCCUPANCY

16.1    Upon completion, the project shall be inspected by the Owner and the Contractor, and any repairs necessary to comply with the contract documents shall be made by the Contractor.

16.2    The Owner shall not occupy the property until final payment has been received by the Contractor and a Certificate of Occupancy has been obtained.

16.3    Occupancy of the project by the Owner in violation of Article 16.2, shall constitute unconditional acceptance of the project and a waiver of any defects or uncompleted work.

WITNESS our hand and seal on this _____17th_____ day of _____January_____, 2007.

Signed in the presence of:

Witness

_____
Michael Conrad

Witness

_____
Mr. Eustace Pollydore

_____
Mrs. June Pollydore

4

**B**

# National City Mortgage

## Modular Home (delivered to site)
## Draw Schedule

Owner: Pollydore #0005351534

| | | |
|---|---|---|
| 20% | Foundation complete. Well is drilled and acceptable. | $ 99,200.00 |
| 70% | **Payment of modular package, delivery to site. Unit to be removed from truck and/or trailer set on foundation.** | $ 347,200.00 |
| | Completion of permanent roof, windows set in place, all exterior doors hung, exterior walls complete, interior drywall complete, taped and spackled, all interior carpentry complete, kitchen cabinets and all fixtures have been set, deck complete and insulation installed. | |
| 10% | Exterior Siding Complete | $ 49,600.00 |
| | Final seaming of carpeting and/or flooring walls completed, finishing touches regarding fixtures and kitchen cabinets completed, septic tank installed. Dwelling complete. Driveway, rough grading and top soil complete. All owner responsibilities **MUST** be completed. | |

Builder/Contractor:                                      Borrower(s):

_____                    _____
(Signature)                                                      June Pollydore
                                                                          Owner

                                                                   _____
                                                                   Eustace Pollydore

**Please allow at least 10 business days after closing before contacting NCM's Draw Department for you first draw.**

A Division of National City Bank of Indiana

DS-05 Modular Home Delivery to Site Draw Schedule                    Revised 3/2005

NOV-08-2007 12:22                                                                                    P.10

FMMC a division of
National City Bank

11/08/2007

JUNE A POLLYDORE
EUSTACE A POLLYDORE
5300 GALLATIN STREET
HYATTSVILLE, Maryland 20781

We are pleased to inform you that your application for a
Construction/Permanent first mortgage loan on the property located
at 6117 ELM ST, LANHAM, Maryland 20706                                    has
been approved subject to the terms and conditions presented in this
Commitment.

Summary of Terms and Conditions:

You have elected:

[  ] A Fixed Rate Mortgage with interest rate limitations as set
     forth in your Construction/Permanent Capped Floating Rate
     Agreement.

[✓] A Fixed Rate Mortgage with interest rate lock.

[  ] An Adjustable Rate Mortgage as set forth in the Adjustable
     Rate Mortgage Program Disclosure you were provided.

The term of this loan includes a set period of time to complete
construction of the premises. You will pay interest only on
principal amounts disbursed during the construction period.
Payments on your permanent loan will not begin until the earlier of
completion of the premises or the set period for construction
completion.

Construction draws will be made in accordance with the Construction
Loan Agreement provided for your signature at the loan closing.
You must deposit with us, at the time of closing, the difference
between the loan funds available and the total cost of the
construction. We estimate your deposit will be $ 4,747.30      .

The following are important terms of your loan.

| Loan Amount | $ 496,000.00 | Loan Type | CVIN |
| Initial Interest Rate | 7.000 | Loan Sub Type | Fixed |
| Term of Loan | 360 | Discount Points | % |
| Origination Fee | 1.000 % | Construction Fee | % |

Commitment Letter
Page 2

Estimated Principal and Interest due after completion of construction:

Monthly Payment (P&I)  $ 1,993.87
Monthly Taxes          $ _____
Monthly Insurance      $ _____
Monthly PMI            $   247.50

Estimated Total Monthly Payment $     4,241.37

If your loan is an Adjustable Rate Mortgage and [  ] if this box is checked, you will have the opportunity to convert your loan to a fixed rate loan for the remainder of your original loan term on the (check as applicable): [  ] first, second, third, fourth and fifth interest rate change date, or [  ] first and second interest change dates if you are not then in default and have not made a payment 30 or more days after the payment due date at any time within the twelve-month period immediately preceding the Change Date.

Additional Conditions of This Commitment to Be Submitted Prior To Closing:


Additional Conditions of This Commitment to Be Presented At Closing:


Other Terms and Conditions of This Commitment:

1.    An escrow account for real estate taxes and insurance premiums will be required. Therefore, one-twelfth of the annual payment for these items is to be included in your monthly payment.

2.    In the event that there is any change in the property to be mortgaged, your financial condition, or your employment status between the date of application and the final closing of this loan, FHMC a division of National City Bank            at its option, may withdraw this commitment.

CONST02

(12/04)

Commitment Letter
Page 3

3.  The loan and the closing shall be in compliance with the
    requirements of the federal, state and local governments now
    in effect or hereinafter to be enacted.

4.  All documents, mortgages, and other matters connected with
    this loan shall be subject to our approval in form and in
    substance, and our decision shall be final and conclusive.

5.  The Note, Construction Loan Agreement, Mortgage, Construction/
    Permanent Loan Agreement and all other documents pertaining to
    the loan are to be signed by all the Borrower(s) listed above.
    Therefore, all the Borrower(s) must be present at the time of
    the closing.    Additionally,  the  seller(s)  and/or  the
    Contractor  must  execute  certain  documents.    If  the
    Seller/Contractor will not be present at the closing, please
    notify the Closing Agent when you schedule your closing.

6.  A completed application must be signed at the time of closing.

7.  In order to have a smooth closing of this transaction, the
    Closing Agent must have the following items at least five (5)
    banking days prior to the day you wish to close your loan:

    A.  An ALTA Mortgage Title Insurance Commitment, in form and
        through a company acceptable to us, insuring against loss
        or damage in the amount of your loan, showing the
        mortgage to be a good and valid first lien on the
        property.  The policy must insure, in addition to other
        items, against material and mechanic's liens of record
        and eliminate survey exceptions.  The proposed mortgagee
        should read _____.

    B.  Fire and extended coverage insurance including vandalism
        and malicious mischief (Builder's Risk coverage) and to
        cause to be provided to Lender evidence of workers
        compensation and general liability insurance in the
        amount, form and in companies satisfactory to the Lender,
        which insurance shall be payable to Borrower with
        standard mortgage endorsement attached making loss
        payable to the Lender or its assigns or mortgagee.  A
        policy must be provided to the closing agent along with
        evidence that the first year's premium has been paid in
        full.

Commitment Letter

Lender reserves the right to refuse to make the loan under the terms and conditions set forth in this commitment where it is discovered that any facts represented by applicant(s) are false in any respect, where any credit reporting information is found to be inaccurate, or where bankruptcy or other laws would prevent or inhibit the Lender's ability to make the requested loan.

THIS COMMITMENT EXPIRES BY MARCH 1, 2008 . YOUR LOAN MUST CLOSE ON OR BEFORE THIS DATE. IF YOUR LOAN DOES NOT CLOSE BY THE COMMITMENT EXPIRATION DATE FOR ANY REASON, EVEN REASON BEYOND YOUR CONTROL, OR YOU REQUEST TO CHANGE THE AMOUNT OR ANY OTHER TERMS OF YOUR LOAN, WE MAY CHANGE ANY OF THE TERMS OF YOUR LOAN, INCLUDING INTEREST RATE, POINTS AND FEES OR WE MAY WITHDRAW YOUR COMMITMENT. IF WE ELECT TO EXTEND YOUR COMMITMENT, WE MAY REQUIRE THAT THE INFORMATION NEEDED FOR YOUR APPLICATION BE UPDATED SINCE SUCH INFORMATION IS ONLY VALID FOR NINETY DAYS.

Sincerely,

By: _____
         (Type Name)

Title: Branch Manager / VP

CONST74 (02/04)

C



# WESTWOOD
## DESIGN/BUILD INC.

# INVOICE

| Date | Invoice # |
|------|-----------|
| 12/18/2007 | 10084 |

## BILL TO:

National City Mortgage/National City Bank
Christopher Washburn, Vice President
9852 Walker Drive, Suite 400
Greenbelt, MD 20770

## REMIT TO:

Westwood Design/Build Inc.
P.O. Box 105
Beltsville, MD 20704

| Terms | P.O. No. | PROJECT |
|-------|----------|---------|
| Net 45 | | Pollydore Residence |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | Construction Draw | 347,000.00 | 347,000.00 |
| | Pollydore Module Delivery - #0005351534 | 0.00 | 0.00 |
| | Curbside Delivery Completed Amount Due and Owing | | |
| | This invoice has been sold, assigned and transferred to: Quantum Corporate Funding, Ltd. Make all checks payable and mail to: Quantum Corporate Funding, Ltd. 1140 Avenue of the Americas, 16th Floor New York, New York 10036 | | |

| Modules Delivered | | Total | $347,000.00 |
|---|---|---|---|

D

## *Quantum Corporate Funding, Ltd.*

*1140 Avenue of the Americas, 16th Floor*
*New York, N.Y. 10036*
*Tel. 212 768-1200*
*800 352-2585*
*Fax 212 944-8216*

12/18/07

Mr. Christopher Washburn
Branch Manager
National City Mortgage Company
7852 Walker Drive, Suite 400
Greebelt, MD 20770

Re: Our Transaction#    25914   Client: Westwood Design Build Incorporated
Our Debtor#:  32772.       Our Client#:    5999

| P.O.#/Contract# | Job# / Project# | Controllers# | Contract/ P.O.Date | Invoice# | Inv.Date | Terms | Invoice Amount |
|---|---|---|---|---|---|---|---|
| | Project: Pollydora Residence. Construction Draw. Pollydore module delivery-#0005351534. | | | 10084 | 12/18/07 | 45 | ****$347,000.00 |

--------------------

********$347,000.00

Dear Mr. Washburn:

We are the assignee of payment of the above captioned company. Attached is a
letter from it authorizing all payments on the captioned invoices to be
sent directly and solely to Quantum Corporate Funding, Ltd.

The undersigned Account Obligor acknowledges to Quantum Corporate Funding,
Ltd. that the above invoice Amount(s) are correct and owing by us; that the
work and or merchandise has been ordered from and completed by the
captioned Client, and accepted by us; that there are not now, nor will
there be, any claims, setoffs, or defenses beyond 20% of the Invoice
Amount(s); Neither Quantum nor its agents made any representations except
as herein set forth.  This estoppel is not subject to modification. New
York law, jurisdiction and venue shall apply hereto.

Very truly yours,

*Maria Luiza deSouza*

Shelley Simmonds
Senior Account Exec.

Agreed & Accepted

Authorized Signature _____  Title _____
  Account Obligor:   National City Mortgage Company
                     Print Name:

E

Transaction#_____ Client#_____ Rebate Class_____ Advt____

PURCHASE & SALE AGREEMENT → $112,108.28 to Penn Lyan Homes Corp.
→ $130,731.72 to Westwood Design

In consideration of the sum of $ ~~~~~~~~~~~242,900.00~~ paid by purchaser to seller,

                                                    Westwood Design Build Incorporated
receipt of which is hereby acknowledged, the undersigned
("Seller") hereby sells, transfers and assigns to Quantum Corporate Funding, Ltd. ("Purchaser"), its
successors and assigns all Seller's right, title and interest in and to Seller's account(s) receivable
(including the proceeds of any surety, payment bond or guaranty thereof) owing by various account debtors
described in Exhibit "A" attached hereto and made part hereof, together with all rights of action accrued,
or to accrue thereon, including, without limitation, full power to collect, sue for, compromise, assign,
or in any other manner enforce collection thereof in Purchaser's name or otherwise.

Seller represents, warrants and agrees that:

(a) The Seller is the sole and absolute owner of said account(s), and has full legal right to make
said sale, assignment, and transfer, and that said sale transfer or assignment does not conflict with
the terms of any other agreement, or instrument to which Seller is a party.

(b) The correct total amount of said account(s) is $~~~~~~~~~~~242,900.00~~.

(c) Said account(s) are presently due and owing to Seller and the amount(s) thereof are not and will
not be in dispute; and the payment of said account(s) are not and will not be contingent upon the
fulfillment of this, or any other contract(s), past or future.

(d) There are not and will not be any set-offs or counterclaims against said account(s), and said
account(s) have not been previously assigned or encumbered by Seller in any manner whatsoever.

(e) Purchaser has right of endorsement on all payments received in connection with said account(s),
and Seller hereby appoints Purchaser its attorney in fact for said purpose. In order to accommodate the
accounting needs of its clients, Seller hereby directs purchaser, as agent, to accept and deposit all
checks received from sellers clients whether or not they represent assigned accounts.

(f) Seller will promptly advise Purchaser, in writing, if Seller's place of business and record keeping
is changed or a new place is added.

(g) At Purchasers request, Seller hereby agrees to file a Notice of Mechanics Lien on any real property
improvement upon which it has performed labor or furnished materials, the account for which labor and/or
materials it has assigned to Purchaser. In the event Seller fails to promptly comply with such request,
Seller does hereby constitute and appoint Purchaser as its agent to execute and file in the name of Seller
a Notice of Mechanic's Lien to the extent of the debt due from the account debtor for and on account of
such labor and material. In connection with the filing of such Notice of Mechanic's Lien, the Seller
agrees to periodically advise the Purchaser of the amount or amounts owed by the account debtor in
connection with each real improvement so that the Notice of Mechanic's Lien will be accurate in all
respects. Seller further agrees not to provide the account debtor with a "Waiver of Right to File a
Notice of Mechanic's Lien" without the prior written consent of Purchaser.

(h) Should any of the warranties expressed by Seller be inaccurate and it becomes necessary for
Purchaser to utilize an attorney to enforce its rights against Seller, Seller agrees that such attorney
fees shall be borne by Seller.

(i) Purchaser further agrees that if the amount referred to in (b) above (or any portion thereof) is
not paid by the account debtor(s) thereof for any reason other than a breach of the representations,
warranties and covenants contained herein, Seller shall not be liable to repay to Purchaser any amount
paid by Purchaser to Seller in consideration of the sale, transfer and assignment herein contained.

(j) Purchaser warrants that it will use its best efforts to collect the amounts due under this agreement
and Seller agrees that Purchaser may, in its sole discretion, settle, compromise, or otherwise accept
payment of less than the full amount, if in its judgement such action is necessary to effect collection,
by reason of a violation of any of the representations and warranties contained in this agreement.

(k) In the event it should become necessary for the Purchaser to enforce its rights hereunder against
Seller, the Guarantor(s) or the Account Debtor(s), Seller agrees that Purchaser may apply up to maximum
of thirty third and one third (33 1/3%) of clause (b) for Purchaser's attorney's fees therefor.

(l) To secure the representations and covenants made by Seller in this agreement, but not the credit
risk of the Account(s), Seller hereby grants to Purchaser a continuing security interest in all personal
property and fixtures in which Seller has an interest, now or hereafter existing or acquired, and
wheresoever located, tangible or intangible, including but not limited to, all present or hereafter
existing or acquired tools, goods, (including without limitation, all equipment), inventory, furniture,
receivables, accounts, security agreements, notes, bills, acceptances, instruments, installment paper,
chattel paper, documents, certificates of deposit, tax refunds, insurance proceeds, conditional sale or
lease contracts, cash or cash equivalents, chattel mortgages or deeds of trust, general intangibles, all
intellectual property including, without limitation patents, trademarks and copyrights (and applications
for all of the foregoing), contract rights, and all other hypothecation, and promises or duty to pay
money, now or hereafter owned or acquired by Seller (including without limitation all rights of Seller
as an unpaid vendor), and all proceeds and collections thereof, all guarantees and other security
therefor, and all right, title and interest of Seller in any returned repossessed, rejected or un-shipped
goods, together with all of Sellers books of accounts, ledger cards and records, all vehicles, all
computer programs, and systems owned or operated in connection therewith, all of the above securing
present and future advances and all proceeds, products, returns add-ons, accessions and substitutions of
and to pay any of the foregoing. Further to this purpose, Seller hereby grants Purchaser and its
agents power of attorney to sign it's name on any applicable financing statement (UCC-1 and otherwise)
in order to effectuate filing(s) on the aforementioned assets of Seller. Upon any default in Sellers
representations, warranties, and covenants Purchaser may enforce said security agreement in accordance
with the provisions of the Uniform Commercial Code.

(m) No failure or delay on the part of Purchaser in exercising any right power or remedy granted to
purchaser hereunder shall constitute a waiver thereof. No amendment, modification or waiver of, any
provision of this Agreement shall be effective unless the same shall be in writing and signed and
delivered by Purchaser.

(n) Purchaser shall have the right to deduct the amount of any allowance(s), discount(s), returns(s),
defense(s), or offset(s) taken by the Account Debtor(s) from any other accounts receivable or other
billing rights purchased by purchaser from Seller or demand reimbursement from Seller based upon
representations made by Seller in this agreement as to the Account and Purchaser shall have such other
rights and remedies against Seller as shall be available to Purchaser at law or in equity, all of which
rights and remedies are hereby expressly reserved.

\quancorp\wesin\purchase.agc

PLEASE FAX THIS PAGE BACK ALSO

12/20/2007 17:38 FAX 212 398 8610    CORPORATE OFFICE    @003

(o) The Account(s) shall be the property of Purchaser, solely and shall be collected by Purchaser, but if for any reason any moneys, thereon should be paid to Seller, Seller shall notify Purchaser immediately of such payment(s), shall hold any check(s), note(s), draft(s), monies or other instruments for the payment of money so received in trust for the benefit of Purchaser, and shall pay over such monies and transmit such check(s) or draft(s) to Purchaser in kind, at its office within 2 days of receipt thereof. SELLER ACKNOWLEDGES THAT FAILURE TO PAY OVER SUCH PAYMENTS WITHIN 2 DAYS TO PURCHASER SHALL BE A DEFAULT HEREUNDER AND FURTHERMORE SHALL CAUSE SELLER TO FORFEIT ANY RIGHTS IT MAY HAVE WITH RESPECT TO ANY OTHER PAYMENTS DUE OR TO BECOME DUE TO SELLER UNDER THIS AGREEMENT.

(p) The paragraphs of this Agreement are severable, and in the event that any paragraph or portion of this Agreement is declared illegal or unenforceable, the remainder of this Agreement will be effective and binding upon the parties.

(q) This agreement shall be governed by the laws of the State of New York applicable to contracts executed in and to be performed solely within the State of New York. Seller hereby submits, at the election of Purchaser, to personal jurisdiction in the State of New York and consents to the enforcement of this agreement or object to such jurisdiction, and hereby waives any and all rights under the Laws of any foreign jurisdiction to object to such jurisdiction. Any claim by Seller against Purchaser shall be brought in the State of New York only. In any suit or proceeding relating to this Agreement, the parties mutually waive trial by jury.

(R) SELLER IRREVOCABLY & UNCONDITIONALLY WARRANTS THAT IT WILL AT ALL TIMES REMAIN CURRENT ON ANY AND ALL STATE OR FEDERAL TAXES AND ANY OTHER TAXES.

(S) Seller hereby grants Quantum authority to sign its name on any forms required by any governmental entities (including but not limited to financing) or similarly required government forms for the purpose of perfecting the notification of an assignment and transfer of payment to Purchaser and/or to recover from a breach of the security agreement provided for in (1) above.

Seller (assignor) covenants that he will receive any moneys advanced hereunder as trust funds to be first applied to the following expenditures arising out of the improvement of real property and incurred in the performance of said contract:

A] Payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen;

B] Payment of the amount of taxes based on payrolls including such persons and withheld or required to be withheld or required to be withheld and taxes based on the purchase price or value of materials or equipment required to be installed or furnished in connection with the performance of the improvement;

C] Payment of taxes and unemployment insurance and other contributions due by reason of the employment out of which such claims arose;

D] Payment of any benefits or wage supplements, or the amounts necessary to provide such benefits or furnished such supplements, to the extent that the trustee, as employer, is obligated to pay or provide such benefits or furnish such supplements by any agreement to which he is a party;

E] Payment of premiums on a surety bond or bonds filed and premiums on insurance accrued during the making of the improvement.

Nothing in this covenant shall be considered as imposing upon the Purchaser (assignee) any obligation to see to the proper application of moneys advanced under such assignment by the assignee.

SELLER AGREES TO HOLD PURCHASER HARMLESS FROM ANY BREACH OF SELLER'S REPRESENTATIONS, WARRANTIES, AND AGREEMENTS CONTAINED HEREIN WITHOUT ANY EFFECT WHATSOEVER FOR SET-OFFS, DEDUCTIONS OR COUNTERCLAIMS.

ACCEPTED AND AGREED    )Dated this day of (20 DEC 2007)
By: _Simmonds, Sr. Acct Exec._    X By is _Name R Wafer_ President
QUANTUM CORPORATE FUNDING LTD.    SIGNATURE AND TITLE

Guarantee: The undersigned (not including the Seller) hereby personally guarantee(s) and shall be jointly and severally liable for the warranties, representations and covenants made by Seller set forth above.

By, _____    By: X _Name R Wafer_ (no title given)
SIGNATURE ONLY

Affirmation and Certification:
State of _____    County of _____
Sworn to before me this _____    day of _____ 20____

Signature of Notary Public

WE ARE PURCHASING OUTRIGHT THE GROUP OF ACCOUNTS ANNEXED HERETO FOR THE PRICE SUBSCRIBED ON THE REVERSE SIDE HEREOF. WE ARRIVED AT THE PRICE BY ANALYZING THE CREDIT RISK THAT WE ARE ASSUMING AS WELL AS THE TIME THAT ELAPSES BEFORE WE COLLECT THE PROCEEDS OR THOSE ACCOUNTS THAT DO ULTIMATELY PAY US. AS AN INDUCEMENT TO OUR CLIENTS TO SELL US THE "HIGHEST QUALITY" ACCOUNTS, (I.E., THOSE THAT WE PAID QUICKLY) WE ARE PLEASED TO OFFER REBATES ON THE DISCOUNT THAT WE APPLIED IN ARRIVING AT THE PURCHASE PRICE, PROVIDED THAT WE SHALL HAVE FIRST RECOVERED OUR PURCHASE PRICE IN FULL WITHIN 180 DAYS OF THE DATE OF THE PURCHASE. THE FOLLOWING SCHEDULE SHOWS THAT AMOUNT OF REBATES THAT YOU MAY BE ENTITLED TO IN EXCESS CASES WHERE THE ACCOUNTS SHOULD BE PAID TO US MORE QUICKLY THAN WE HAD ANTICIPATED WHEN WE CALCULATED THE DISCOUNT. THERE SHALL BE NO REBATE OF INVOICES COLLECTED BEYOND 180 DAYS. NOTWITHSTANDING ANYTHING CONTAINED HEREIN THERE ARE NO CIRCUMSTANCES SHALL THE DISCOUNT EARNED BY PURCHASER AMOUNT TO LESS THAN $250.00.

## T# 25914

| | |
|---|---|
| Accounts of the bulk paid within 1 to 14 days ....@ | 87. per hundred of the Account Amount. |
| Accounts of the bulk paid within 21 to 45 days ....@ | 36. per hundred of the Account Amount. |
| Accounts of the bulk paid within 45 to 55 days ....@ | 15. per hundred of the Account Amount. |
| Accounts of the bulk paid within 51 to 65 days ....@ | 24. per hundred of the Account Amount. |
| Accounts of the bulk paid within 65 to 70 days ....@ | 23. per hundred of the Account Amount. |
| Accounts of the bulk paid within 71 to 80 days ....@ | 28. per hundred of the Account Amount. |
| Accounts of the bulk paid within 81 to 90 days ....@ | 21. per hundred of the Account Amount. |
| Accounts of the bulk paid within 91 to 100 days ....@ | 20. per hundred of the Account Amount. |
| Accounts of the bulk paid within 91 to 110 days ....@ | 19. per hundred of the Account Amount. |
| Accounts of the bulk paid within 111 to 120 days ....@ | 18. per hundred of the Account Amount. |
| Accounts of the bulk paid within 121 to 130 days ....@ | 15. per hundred of the Account Amount. |
| Accounts of the bulk paid within 131 to 140 days ....@ | 16. per hundred of the Account Amount. |
| Accounts of the bulk paid within 141 to 150 days ....@ | 17. per hundred of the Account Amount. |
| Accounts of the bulk paid within 151 to 160 days ....@ | 14. per hundred of the Account Amount. |
| Accounts of the bulk paid within 161 to 170 days ....@ | 15. per hundred of the Account Amount. |

12/18/2007  17:33     4108132828                WESTWOOD CUSTOM HOME                    PAGE  03
  12/18/2007  16:27     4108591196

     12/18/2007  17:21     4108132828          WESTWOOD CUSTOM HOME          PAGE  02/02
        12/18/2007 17:11 FAX 212 768 1251     QUANTUM FUNDING                PAGE  01
                                                                            ☒002

1 /18/07

EXHIBIT A TO PURCHASE & SALE AGREEMENT
BETWEEN
QUANTUM CORPORATE FUNDING, LTD (PURCHASER)
&
Westwood Design Build Incorporated     (Seller)

Transaction#   25914   Clitran#:

| ) Date Invoice# | Trx/ Acct.Debtor | PWB Debtor# Clidebt# Chgpaycllerge# P.O.# Publicworks#/ | Job# | Contract Invoice Amount |
|---|---|---|---|---|
| : /10/07 10094 | 48 National City Mortgage Company | NX1 52772. | Project: Pollydore woldohac. Construction DGBM, pollydore module delivery-#80031 52834. Curbside delivery completed amount due and owing | ****$347,000.00 ********** 4144***$347,000.00 |

Page0:  ) Transaction#:   25914

                                                  TOTAL INVOICE:     $347,000.00

Seller hereby verifies the accuracy of the above:

By _David R. Wayfield_ Title _President_

F

12/21/2007  13:17    4108132828                    WESTWOOD CUSTOM HOME                    PAGE  05
  12/20/2007  16:53    4108591196
  12/20/2007  17:53    4108192828                    WESTWOOD CUSTOM HOME                    PAGE  01/01
                                                                                            PAGE  01



**WESTWOOD**
Design / Build Inc.

Quantum Corporate Funding, Ltd.                                December 20, 2007
1140 Avenue of the Americas, 16th Floor
New York, NY 10036
Ms. Shelley Simmonds

Ref:    Payment Authorization

Dear Ms. Simmonds,

Pursuant to your request, this letter serves as authorization to forward $112,168.28 ( One
Hundred Twelve Thousand – One Hundred Sixty Eight and twenty – eight cents) on
behalf of Westwood Design/Build Inc., to Penn Lyon Homes Corporation.

Please subtract the above listed amount from advance T #25914.

Thank you for your immediate attention in this matter.

Professionally,

David R. Warfield
President, Westwood Design/Build Inc.

Cc:    M Conrad

*INSPECTOR BALDWIN*

# <u>WIRING INSTRUCTIONS</u>

## Bank Name: **Omega Bank, N.A.**
## Wire Name: **Omega State College**
## ABA#: **031316271**

## For further credit of Penn Lyon Homes, Inc. A/C
## #40224230

P.O 107   195   Airport Rd

Selinsgrove, PA 17870

## Bank Address

## **Omega Bank**
## **366 Walker Drive**
## **State College, PA 16801**

**G**

12/20/2007  15:46    4108132828          WESTWOOD CUSTOM HOME              PAGE  03



**PENN LYON**
HOMES CORPORATION

P.O. BOX 27, AIRPORT ROAD
SELINSGROVE, PA 17870
(570) 374-4004
FAX: (570) 374-0053
Web: www.pennlyon.com

INVOICE NO.    № 850

DATE PRINTED
Dec 20, 2007

SOLD TO: 3445
Westwood Design/Build Inc.
13400 Baltimore Blvd. 2nd Floor
Laurel, MD 20707

SHIPPED TO:

| SERIAL NO. | SIZE AND MODEL | EX. COLOR | PP | COD | SALESPERSON |
|---|---|---|---|---|---|
| 11188 | | | | | ED C. |

| OPTION NO. | DESCRIPTION | AMOUNT |
|---|---|---|
| POLLYDORE RESIDENCE | | $212,168.28 |
| 212,168.28 | | |
| -50,000.00  Wire Recv'd 06/28/07 | | |
| 162,168.00 | | |
| -50,000.00  Wire Recv'd 11/19/07 | | |
| 112,168.28  Balance Due | | |

| | | |
|---|---|---|
| BASE | $ | 189,739.11 |
| OPTIONS | $ | |
| SUBTOTAL | $ | |
| SALES OR USE TAX | $ | 5,692.17 |
| SET UP (SUBCONTRACTED) | $ | |
| FREIGHT | $ | 16,737.00 |
| CARRIER DEPOSIT | $ | |
| INVOICE TOTAL | $ | 212,168.28 |
| LESS DEPOSIT OR CREDIT | $ | 100,000.00 |
| NET DUE | $ | 112,168.28 |
| CARRIER NOS. | | |

WHITE - BUILDER
GREEN - A/R
YELLOW - FILE
PINK - SALES FILE
GOLD - ACCOUNTING

Materials contained herein remain the property of Penn Lyon Homes Corporation until this invoice is paid in full with certified U.S. funds.

**H**



# STERLING NATIONAL BANK

Home Banking     Bill Payment     Options                    Contact     Help     Exit
Main | Transactions | Download | Statements | Stop Payments | Prior Day

Sterling National Bank · 650 Fifth Avenue New York, New York 10019 · (212) 760-2031

**Current Account:** QUANTUM CO S MOSS     

**Transactions from 12/21/2007 to 12/21/2007**

View Transactions Since: Last statement     Total Transactions This Page: 36

NOTE: Click on a column name to sort transactions by that column in ascending (△) or descending (▽) order.

| Date ▽ | Check# | Description | Debits | Credits | Balance |
|--------|--------|-------------|--------|---------|---------|
| 12/21/2007 | | OT: OMEGA STATE COLLEGE FURTHER CREDIT: PENN LYON HOME | (112,168.28) | | 2,305,012.77 |
| 12/21/2007 | | OT: WESTWOOD DESIGN BUILD INCO | (130,731.72) | | 2,417,181.05 |

I

**From:** Craig Sheinker
**Sent:** Tuesday, January 15, 2008 1:35 PM
**To:** 'dreed@pennlyon.com'
**Cc:** Shelley Simmonds; Maria DeSouza
**Subject:**


Dear Mr. Reed:

Pursuant to our conversation on Friday, I am attaching hereto a scanned copy of an invoice purported to be invoice #850 from Penn Lyon to Westwood. As you will recall, you have advised me that such invoice is bogus, and that your records indicate your actual invoice #850 is for a completely different project then the one we intended to pay you for (i.e. Pollydore residence)

As you also know, we wired your company $112,168.28 on December 21, 2007 for erection services at the Pollydore Residence. Therefore, Inasmuch as it now appears that we have been defrauded, we must demand that you immediately return the payment we made to your firm due to a total lack of consideration for such payment.

I invite you or your legal consel to call me to further discuss any questions you may have.


Craig Sheinker
President
Quantum Corporate Funding, Ltd.
1140 Avenue of the Americas
16th Floor
New York, NY 10036
800-352-2535 X..20
Fax: 212-944-8216
craigs@quantumfunding.com

**J**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
QUANTUM CORPORATE FUNDING, LTD.,



Civil Action
Docket No. 08 CV00539 (LAK) (HP)

Plaintiff,

-against-

### CORRECTED AMENDED
### COMPLAINT

WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID R. WARFIELD,
NATIONAL CITY MORTGAGE INC., and
PENN LYON HOMES CORPORATION,

Defendants.
----------------------------------------------------------X

Plaintiff, Quantum Corporate Funding, Ltd., by its attorneys, Goetz Fitzpatrick,

LLP, as and for its Complaint against the defendants alleges, upon information and belief,

as follows:

### THE PARTIES

1.      Plaintiff Quantum Corporate Funding, Ltd. ("Quantum") is a corporation

organized and existing under the laws of the State of New York, maintaining its principal

place of business located at 1140 Avenue of the Americas, New York, New York 10036

and is engaged in the business of commercial finance.

2.      Defendant Westwood Design/Build Incorporated ("Westwood") is a

corporation organized and existing under the laws of the State of Maryland maintaining

its principal place of business located at 12109 Gordon Avenue, Beltsville, Maryland

20705.

3.      Defendant David R. Warfield ("Warfield") is a natural person, a citizen of

the State of Maryland whose address is 715 East Maple Road, Linthicum Heights,

Maryland 21090.

4.     Defendant National City Mortgage Inc. ("National") is a corporation organized and existing under the laws of the State of Ohio, maintaining its principal place of business located at 3232 Newmark Drive, Miamisburg, Ohio 45342.

5.     Penn Lyon Homes Corporation ("Penn") is a corporation organized and existing under the laws of the State of Pennsylvania maintaining its principal place of business at 195 Airport Road, Selinsgrove, Pennsylvania 17870.

## JURISDICTION AND VENUE

6.     There is original jurisdiction in this Court pursuant to 28 U.S.C. §1332 since there is diversity of citizenship between plaintiff Quantum and each of the defendants and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

7.     Venue lies in this Court pursuant to 28 U.S.C. §1391(a) since a substantial part of the events or omissions giving rise to the claim herein occurred in this district.

## FIRST CAUSE OF ACTION AGAINST
## NATIONAL FOR BREACH OF CONTRACT

8.     On or about January, 2007 Mr. and Mrs. Eustace Pollydore, as owners, entered into a contract with defendant Westwood, as contractor, with defendant National, as construction lender, pursuant to which Westwood contracted to construct a new home at 6117 Elm Street, Lanham, Maryland for the Pollydores ("the Project").

9.     By virtue of the work and materials furnished by defendant Westwood to the Pollydores for the Project there became due to Westwood from defendant National the sum of $347,000.00 for which an invoice was rendered by Westwood to National (the "Invoice").

10.    Defendant Westwood made an assignment to plaintiff Quantum of the moneys due to Westwood from defendant National on account of the Invoice (the "Assignment").

11.    Simultaneously with the Assignment or within a short time thereof, plaintiff Quantum and defendant Westwood each gave notice of the Assignment to defendant National, and National acknowledged receipt of the Assignment.

12.    By virtue of the Assignment, there was assigned by defendant Westwood to plaintiff Quantum, the sum of $347,000.00.

13.    By virtue of the foregoing, there became due and owing to plaintiff Quantum from defendant National, the sum of $347,000.00.

14.    Defendant National has refused to pay the Invoice, leaving due and owing to plaintiff Quantum the amount of $347,000.00 for which demand has been duly made.

**SECOND CAUSE OF ACTION AGAINST
NATIONAL FOR BREACH OF CONTRACT**

15.    Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "14" of this Complaint with the same force and effect as if fully set forth at length hereat.

16.    Defendant National issued an estoppel certificate to plaintiff Quantum that the Invoice was correct and owing and that the work and materials invoiced had been completed and accepted (the "Estoppel Certificate").

17.    Plaintiff Quantum relied upon the Estoppel Certificate in purchasing the Invoice from Westwood.

18.    The $347,000.00 Invoice amount was acknowledged by defendant National to plaintiff Quantum as being due and owing.

19.    By virtue of the foregoing, there was due and owing to plaintiff Quantum from defendant National $347,000.00.

20.    Defendant National has refused to pay Quantum the $347,000.00 amount due pursuant to the terms of the Estoppel Certificate leaving due and owing to Quantum the amount of $347,000.00 for which demand has been made.

## FIRST CAUSE OF ACTION AGAINST
## WESTWOOD FOR BREACH OF CONTRACT

21.    Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "20" of this Complaint with the same force and effect as if fully set forth at length hereat.

22.    On December 20, 2007, in conjunction with the Assignment made by defendant Westwood to plaintiff Quantum, a Purchase and Sale Agreement (the "Agreement") was made, executed and delivered between Westwood and Quantum.

23.    The Agreement set forth certain warranties, representations and covenants by defendant Westwood to plaintiff Quantum regarding the Assignment.

24.    Defendant Westwood has breached the warranties, representations and covenants made by it in the Agreement, including those stating that the Invoice was presently due and owing and that were no set-offs or defenses against the assigned Invoice.

25.    Defendant National asserts that the Invoice was not due and owing and that it has set-offs or defenses against the assigned Invoice.

26.    As a result of defendant Westwood's breach of the Agreement, plaintiff Quantum has been damaged in the sum of not less than $347,000.00.

27.    Plaintiff Quantum has incurred and will incur attorneys fees in the prosecution of its claims, the extent of which is not yet known, for which defendant Westwood agreed, pursuant to the Agreement, to pay.

28.    Due to defendant Westwood's breach of the Agreement, plaintiff Quantum has incurred damages, including attorney's fees, the final amount to be determined at trial.

## FIRST CAUSE OF ACTION AGAINST
## WARFIELD FOR BREACH OF CONTRACT

29.    Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "28" with the same force and effect as if fully set forth at length hereat.

30.    In conjunction with the Assignment and the Agreement, defendant Warfield made, executed and delivered to plaintiff Quantum a guarantee (the "Guarantee") in writing whereby he personally guaranteed defendant Westwood's performance of the Agreement's warranties, representations and covenants.

31.    Defendant Warfield has failed to perform defendant Westwood's Agreement's warranties, representations and covenants.

32.    Defendant Warfield breached his Guarantee of defendant Westwood's Agreements warranties, representations and covenants.

33.    As a result of defendant Warfield's breach of this Guarantee, plaintiff Quantum has been damaged in the sun of not less than $347,000.00.

34.    Plaintiff Quantum has incurred and will incur attorneys fee in the prosecution of its claims against defendants Westwood and Warfield, the extent which are not yet known, but for which Warfield agreed, pursuant to his Guarantee, to pay.

35.    Due to defendant Warfield's breach of his Guarantee, plaintiff Quantum has incurred damages of not less than $347,000.00 exclusive of attorneys' fees, the final amount to be determined at trial.

### SECOND CAUSE OF ACTION AGAINST
### WESTWOOD AND WARFIELD FOR FRAUD

36.    Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "35" of this complaint with the same face and effect as it fully set forth herein at length hereat.

37.    In or about December 2007, defendants Westwood and Warfield fabricated the Invoice to defendant National, falsely stating that defendant Westwood had performed the work required of it pursuant to its contract with the Pollydores.

38.    In or about December 20, 2007, in order to induce plaintiff Quantum to accept from defendant Westwood an assignment of the Invoice and in payment to wire transfer $130,731.72 to Westwood and $112,168.28 to defendant Penn allegedly in payment for supplies and materials used in the construction of the Project, defendants Westwood and Warfield represented to Quantum that Penn had supplied materials for the Project and that the Invoice was presently due and owing and represented an account receivable not subject to any defenses.

39.    The representations made by defendants Westwood and Warfield were false, and in truth, the Invoice was worthless and not, in fact a good account receivable and defendant Penn had not delivered supplies and materials for the Project.

40.    When the representations were made by defendants Westwood and Warfield, each knew them to be false and made then with the intent to deceive and defraud plaintiff Quantum and to induce Quantum to accept and to pay for the assignment of the Invoice.

41.    Plaintiff Quantum at the time the representations were made, did not know the truth regarding them but believed them to be true, relied upon them and was, thereby induced to accept an assignment of the Invoice and to pay to or on behalf of defendant Westwood $242,900.00.

42.    Plaintiff Quantum did not know the true facts regarding the Invoice until or about January 11, 2007.

43.    The Invoice is worthless and was so at the time it was assigned to Quantum.

44.    As a result of the false representations made by the defendants Westwood and Warfield, plaintiff Quantum has been damaged in the sum of $242,900.00.

### THIRD CAUSE OF ACTION AGAINST
### WESTWOOD AND WARFIELD FOR CONVERSION

45.    Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "44" of this Complaint with the same force and effect as if fully set forth at length hereat.

46.    Defendants Westwood and Warfield converted $242,900.00 belonging to plaintiff Quantum.

## FIRST CAUSE OF ACTION AGASINST PENN FOR CONVERSION

47.     Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "46" of this Complaint with the same force and effect as if set forth at length hereat.

48.     On December 21, 2007, defendants Westwood and Warfield unlawfully took $112,168.28 of plaintiff Quantum's monies, converted it to their own use, and transferred it to defendant Penn allegedly in payment for supplies and materials used in the construction of the Project.

49.     In truth and in fact defendant Penn had not supplied materials to the Project.

50.     In January, 2008, plaintiff Quantum demanded that defendant Penn return the $112,168.28 to Quantum, but Penn has refused and still refuses to return the $112,168.28 to Quantum.

51.     Defendant Penn has retained the $112,168.28 and has converted it to its own use.

52.     By reason of the foregoing, plaintiff Quantum has sustained damages in the amount of $112,168.28, plus interest from the date of conversion.

## SECOND CAUSE OF ACTION AGAINST PENN FOR UNJUST ENRICHMENT

53.     Plaintiff Quantum repeats and realleges each and every allegation set forth in paragraphs "1" through "52" of this Complaint with the same force and effect as if set forth at length hereat.

54.     Defendant Penn has been unjustly enriched as a result of the $112,168.28 of plaintiff's Quantum's monies transferred to it.

55. By reason of the foregoing, plaintiff Quantum has sustained damages in the amount of $112.168.28.

**WHEREFORE**, the plaintiff, Quantum Corporate Funding Ltd., demand judgment as follows:

1. On the First Cause of Action against defendant National City Mortgage Inc., in the sum of $347,000.00.

2. On the Second Cause of Action against defendant National City Mortgage Inc., in the sum of $347,000.00.

3. On the First Cause of Action against defendant Westwood Design/Build Incorporated not less than the sum of $347,000.00.

4. On the First Cause of Action against defendant David R. Warfield not less then the sum of $347,000.00.

5. On the Second Cause of Action against defendant Westwood Design/Build Incorporated and David R. Warfield, jointly and severally, in the sum of $242,900.00 together with punitive and exemplary damages in the sum of $500,000.00.

6. On the Third Cause of Action against defendants Westwood Design/Build Incorporated and David R. Warfield, jointly and severally, in the sum of $242,900.00 together with punitive and exemplary damages in the sum of $500,000.00.

7. On the First Cause of Action against defendant Penn Lyon Home Corporation in the sum of $112,168.28.

8. On the Second Cause of Action against defendant Penn Lyon Homes Corporation in the sum of $112.168.28.

9. Pre-judgment and Post-judgment interest.

10.     Costs, disbursements and reasonable attorney's fees in an amount to be determined at trial.

11.     Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       February 15, 2008

                              GOETZ FITZPATRICK LLP

                              By:_____
                                    Bernard Kobroff (BK 0101)
                              Attorneys for Plaintiff
                              Quantum Corporate Funding, Ltd.
                              One Penn Plaza, 44th Floor
                              New York, New York 10119
                              (212) 695-8100

K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
QUANTUM CORPORATE FUNDING, LTD

               Plaintiff,

         -against-

WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID R. WARFIELD,
NATIONAL CITY MORTGAGE, INC. and PENN
LYON HOMES CORPORATION

               Defendants.

Docket No. 08 CV 00539(LAK) (HP)
**ANSWER TO COMPLAINT**

Defendant Penn Lyon Homes Corporation ("Penn Lyon"), by and through its attorneys, Bonner Kiernan Trebach & Crociata, LLP as and for its Verified Answer to Plaintiff's Corrected Amended Complaint, sets forth upon information and belief as follows:

## RESPONSE TO THE PARTIES

    1.   Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 1-4 of the Corrected Amended Complaint.

    2.   Defendant Penn Lyon admits the allegations contained in paragraph 5 of the Corrected Amended Complaint.

## RESPONSE TO JURISDICTION/VENUE

    3.   Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 6-7 of the Corrected Amended Complaint.

## RESPONSE TO FIRST CAUSE OF ACTION AGAINST NATIONAL

4.    Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 8-14 of the Corrected Amended Complaint.

## RESPONSE TO SECOND CAUSE OF ACTION AGAINST NATIONAL

5.    Defendant Penn Lyon repeats and realleges its responses to each and every allegation set forth in paragraphs 1 through 14 of this Complaint with the same force and effect as if fully set forth at length herein.

6.    Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 16-20 of the Corrected Amended Complaint.

## RESPONSE TO FIRST CAUSE OF ACTION AGAINST WESTWOOD

7.    Defendant Penn Lyon repeats and realleges its responses to each and every allegation set forth in paragraphs 1 through 20 of this Complaint with the same force and effect as if fully set forth at length herein.

8.    Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 22-28 of the Corrected Amended Complaint.

## RESPONSE TO FIRST CAUSE OF ACTION AGAINST WARFIELD

9.    Defendant Penn Lyon repeats and realleges its responses to each and every allegation set forth in paragraphs 1 through 28 of this Complaint with the same force and effect as if fully set forth at length herein.

10.    Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 30-35 of the Corrected Amended Complaint.

### RESPONSE TO SECOND CAUSE OF ACTION AGAINST WARFIELD

11.    Defendant Penn Lyon Penn repeats and realleges its responses to each and every allegation set forth in paragraphs 1 through 35 of this Complaint with the same force and effect as if fully set forth at length herein.

12.    Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 37-44 of the Corrected Amended Complaint.

### RESPONSE TO THIRD CAUSE OF ACTION AGAINST WARFIELD

13.    Defendant Penn Lyon repeats and realleges its responses to each and every allegation set forth in paragraphs 1 through 44 of this Complaint with the same force and effect as if fully set forth at length herein.

14.    Defendant Penn Lyon denies knowledge or information sufficient to form a belief as to the allegations contained in paragraph 46 of the Corrected Amended Complaint.

### RESPONSE TO FIRST CAUSE OF ACTION AGAINST PENN

15.    Defendant Penn Lyon repeats and realleges its responses to each and every allegation set forth in paragraphs 1 through 46 of this Complaint with the same force and effect as if fully set forth at length herein.

16.    Defendant Penn Lyon denies the allegations contained in paragraphs 48-52 of the Corrected Amended Complaint.

## RESPONSE TO SECOND CAUSE OF ACTION AGAINST PENN

17.     Defendant Penn Lyon repeats and realleges its responses to each and every

allegation set forth in paragraphs 1 through 52 of this Complaint with the same force and

effect as if fully set forth at length herein.

18.     Defendant Penn Lyon denies the allegations contained in paragraph 54 of

the Corrected Amended Complaint.

### AS AND FOR A FIRST AFFIRMATIVE DEFENSES

19.     Recovery is barred in this action by the failure of the Complaint to state

claim upon which relief can be granted against Defendant Penn Lyon.

### AS AND FOR A SECOND AFFIRMATIVE DEFENSES

20.     Plaintiff has no privity of contract with Defendant Penn Lyon.

### AS AND FOR A THIRD AFFIRMATIVE DEFENSE

21.     Plaintiff has not sustained any damage by virtue of any act or omission of

Defendant Penn Lyon or any of its agents or employees.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

22.     Plaintiff has failed to mitigate damages reasonably as a matter of law.

### AS AND FOR AN FIFTH AFFIRMATIVE DEFENSE

23.     Any damage sustained by the Plaintiff which was not caused by the

culpable conduct of Plaintiff was caused by the culpable conduct of persons and entities

over which Defendant Penn Lyon had no control.

### AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

24.     Pursuant to the provisions of Article 16 of CPLR, should Defendant Penn

Lyon be found liable to Plaintiff for damages, such liability being fifty percent or less of

the total liability assigned to all persons liable, the liability of Defendant Penn Lyon for non-economic loss shall not exceed its equitable share determined in accordance with the relative culpability of all persons liable.

### AS AND FOR AN SEVENTH AFFIRMATIVE DEFENSE

25.    In the event that the Plaintiff has settled or should in the future settle any portion of their claim arising from the allegations contained in the Plaintiff's Complaint with any currently named or to be named Defendants, the respective rights of the remaining parties should be determined pursuant to Section 15-108 of the General Obligations Law.

### AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

26.    Any funds obtained by Defendant Penn Lyon were received as part of a bona fide good faith transaction.

### AS AND FOR AN NINTH AFFIRMATIVE DEFENSE

27.    Defendant Penn Lyon was authorized by co-defendant Westwood to assume ownership of the funds at issue in this litigation.

### AS AND FOR A TENTH AFFIRMATIVE DEFENSE

28.    Plaintiffs' claims are barred due to the insufficiency of service of process.

### AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

29.    Recovery is barred in this action as to this Defendant by reason of the applicable Statute of Limitations.

### AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

30.    Defendant Penn Lyon has not been unjustly enriched.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

31.    Any recovery by Plaintiff is subject to the doctrine of set-off.

## AS AND FOR AN FOURTEENTH AFFIRMATIVE DEFENSE

32.    The plaintiff lacks standing to bring these claims.

## AS AND FOR A FIFTEENTH AFFIRMATIVE DEFENSE

33.    These defendants adopt and incorporate by reference as if the same were set forth at length herein, all other affirmative defenses which have been or will be asserted by any other parties in this action, except those which may contain allegations of liability against these defendants, to the extent that such defenses are applicable to these defendants.

## AS AND FOR A SIXTEENTH AFFIRMATIVE DEFENSE

34.    This party reserves the right to supplement these affirmative defenses up to an including time of trial.

## AS AND FOR A FIRST CROSS-CLAIM AGAINST CO-DEFENDANTS WESTWOOD, NATIONAL AND WARFIELD, DEFENDANT PENN ALLEGES AS FOLLOWS:

35.    That if the Plaintiff sustained the injuries and damages in the manner and at the time and place alleged in the complaint, all of which are specifically denied, such damages were sustained by reason of the acts, conduct, negligence, misfeasance or nonfeasance of co-defendants Westwood, National and Warfield, their agents, servants and/or employees, and not by defendant Penn Lyon, and if it is found that defendant Penn Lyon is liable to Plaintiff herein, all of which is specifically denied, then defendant Penn Lyon, on the basis of apportionment of responsibility, is entitled to contribution from co-defendants Westwood, National and Warfield to pay for all or part of any verdict or judgment that Plaintiff may recover against Defendant Penn Lyon proportionate to the co-

defendants' actual liability, together with attorneys' fees and the costs and disbursements of this action.

## AS AND FOR A SECOND CROSS-CLAIM AGAINST CO-DEFENDANTS WESTWOOD, NATIONAL AND WARFIELD, DEFENDANT PENN LYON ALLEGES AS FOLLOWS:

36.    That if the Plaintiff sustained the injuries and damages in the manner and at the time and place alleged in the Complaint, and if it is found that Defendant Penn Lyon is liable to Plaintiff herein, all of which is specifically denied, then Defendant Penn Lyon, on the basis of common-law indemnification, is entitled to recovery from the co-defendants, Westwood, National and Warfield to pay for all or part of any verdict or judgment that Plaintiff may recover against Defendant Penn, together with attorneys fees and the costs and disbursements of this action.

## AS AND FOR A THIRD CROSS-CLAIM AGAINST CO-DEFENDANTS WESTWOOD AND WARFIELD, DEFENDANT PENN ALLEGES AS FOLLOWS:

37.    Assuming, arguendo, that plaintiff establishes that the funds it sent to Penn Lyon were intended as payment for the "Pollydore Project" Penn Lyon is not liable to plaintiff and should not be required to return the funds to plaintiff because it was fraudulently induced by Westwood and Warfield to accept the funds in payment for the "Harris Transaction."

38.    Defendants Westwood and Warfield represented and warranted to Defendant Penn Lyon that it would be receiving a sum of $112,168.12 in connection with a transaction between and among Penn Lyon and Westwood for the production and manufacture of modular custom-built home units to be delivered to 14101 Old Stage Road, Bowie, Maryland owned by Samuel J. Harris. (the "Harris Transaction").

39.    Penn Lyon has never entered into any contracts or transactions with Westwood or Warfield for the production and manufacture of modular custom-built home units to be delivered to 6117 Elm Street, Lanham, Maryland on property owned by Mr. and Mrs. Eustace Pollydore (the "Pollydore Project").

40.    Prior to December 24, 2007, Westwood informed Penn Lyon that it would soon be sending a wire transfer payment to Penn Lyon to be applied to the Harris Transaction.

41.    On or about December 24, 2007, Penn Lyon received a wire transfer in the amount of $112,168.12 as promised by Westwood.

42.    On or about December 26, 2007, Westwood contacted Penn Lyon to confirm that its wire transfer in the amount of $112,168.12 for the Harris Transaction was received and appropriately applied to reduce the balance due on that transaction

43.    In accordance with Westwood and Warfield's representations and warranties, Penn Lyon applied the funds it received on December 26, 2007 to the Harris Transaction.

44    Westwood and Warfield's false representations were material to Penn Lyon's acceptance of the funds and application of the funds to the Harris Transaction for which Penn Lyon had already provided modular custom-built home units.

45.    Westwood and Warfield's false representations to Penn were made with the knowledge that Penn Lyon would rely on it, which it did to Plaintiff Quantum and Penn Lyon's detriment, and as a result thereof, Quantum and Penn Lyon have been damaged.

WHEREFORE, Defendant PENN LYON demands judgment dismissing Plaintiff's Complaint and all Cross-Claims and/or other claims which may be deemed to exist against this Defendant and further demand judgment over and against Plaintiff for the amount of any judgment obtained against this Defendant by Plaintiff, or on the basis of apportionment of responsibility, and further demands that in the event that PENN LYON is found liable to Plaintiff herein, then PENN LYON, on the basis of apportionment of responsibility and indemnity as well as common law fraud/fraudulent inducement, has judgment over and against co-defendants WESTWOOD, WARFIELD AND NATIONAL for all or part of any verdict or judgment that Plaintiff may recover against said answering Defendant, in such amounts as a jury or the Court may direct, together with attorneys' fees and the costs and disbursements of this action. PENN LYON also seeks punitive damages against defendants WESTWOOD AND WARFIELD in connection with its cross-claim for fraudulent inducement.

Dated: New York, New York
April 10, 2008

Yours etc.,

By: _____

Scott H. Goldstein, Esq.
BONNER KIERNAN TREBACH
& CROCIATA, LLP
Attorneys for Defendant,
Penn Lyon Homes Corporation
State Building, Suite 3304
New York, New York 10118
(212) 268-7535

TO:    Bernard Kobroff, Esq.
Goetz Fitzpatrick, LLP
Attorneys for Plaintiff
One Penn Plaza
Suite 4401
New York, New York 10119

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
QUANTUM CORPORATE FUNDING, LTD.,    Civil Action
    Docket No. 08 CV00539(LAK)(HBP)

                Plaintiff,

    -against-

WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID B. WARFIELD,
NATIONAL CITY MORTGAGE INC., and
PENN LYON HOMES CORPORATION,

                Defendants.
----------------------------------------------------------X
NATIONAL CITY MORTGAGE,

                Third-Party Plaintiff,

    -against-

MICHAEL CONRAD, a/k/a MICHAEL CONRAD
BROWN,

                Third-Party Defendant.
----------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF
LAW IN SUPPORT OF SUMMARY
JUDGMENT AGAINST DEFENDANT
<u>PENN LYON HOMES CORPORATION</u>**

                        GOETZ FITZPATRICK LLP
                        Attorneys for Plaintiff
                        Quantum Corporate Funding, Ltd.
                        One Penn Plaza, 44th Floor
                        New York, New York 10119
                        (212) 695-8100

Bernard Kobroff, Esq.
Of Counsel

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of plaintiff Quantum Corporate Funding, Ltd. ("Quantum") in support of its motion for summary judgment against defendant Penn Lyon Homes Corporation ("Penn") pursuant to Rule 56 of the Federal Rules of Civil Procedure. Upon the proofs submitted, there is no genuine triable issue of fact or any meritorious legal defense to preclude granting judgment to plaintiff Quantum against defendant Penn for conversion and unjust enrichment.

## STATEMENT OF FACT

The facts underlying Quantum's claims against defendant Penn are set forth in the Affidavit of Craig Sheinker, sworn to July 3, 2008, and in the Statement Pursuant to Local Rule 56.1, and are incorporated herein.

## ARGUMENT

The undisputed facts establish as a matter of law that defendant Penn has been unjustly enriched and/or has converted $112,168.28 belonging to plaintiff Quantum.

### Standard of Review:

To obtain summary judgment, the movant must demonstrate that, under the undisputed material facts, movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 202 (1986); Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The substantive law underlying a claim determines if a fact is material and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Dervin Corp. v. Banco Bilbao

Vizcaya Argentina, 2004 WL 1933621 (S.D.N.Y. 2004) citing Anderson, 477 U.S. supra at 248.

**As Regards Unjust Enrichment:**

"In order to state a claim for unjust enrichment under New York laws[*] plaintiff must show that (1) defendant was enriched, (2) the enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to made restitution[th] Weisberg v. Smith, 401 F. Supp. 2d 359, 362 (S.D.N.Y. 2005) citing Harger v. Price, 204 F. Supp. 2d 669, 710 (S.D.N.Y. 2002) quoting Violette v. Armonk Associates, L. C., 872 F. Supp. 1279, 1282 (S.D.N.Y. 1995).

Herein the undisputed facts evidence that: (1) defendant Penn was enriched-since it received $112,168.28 transferred into its account at Omega bank; (2) defendant Penn's enrichment was at plaintiff's Quantum's expense – since the wire transfer came from Quantum's account at Sterling National Bank; and (3) the circumstances are such that equity and good conscience require defendant Penn to make restitution – since Penn received the transfer from Quantum in payment for a modular residence that Penn had allegedly supplied to Mr. and Mrs. Pollydore when, in fact, Penn had not and never did supply any such residence.

The controlling legal principle was discussed in Manufactures Hanover v. Chemical Bank, 160 A.D.2d 113, 559 N.Y.S.2d 704, 707 (1st Dept 1990):

> "The principal that a party who pays money, under a mistake of fact, to one who is not entitled to it should, in equity and good conscience, be permitted to recover it back is longstanding and well recognized (Ball v. Shepard, 202 N.Y. 247, 253, 95 N.E. 719) and applies even if the mistake is due to the negligence of the payor (see, e.g., Manufacturers Trust Co. v. Diamond, 17 Misc.2d 909, 186 N.Y.S.2d 917 [App.Term, 1st Dep't]; Mutual Life Insurance Co. of New York v. William B. Kessler, Inc., 25 Misc.2d 242, 242-243, 202 N.Y.S.2d 92). The rule has its

> underpinnings in unjust enrichment (see, <u>Miller</u> v. <u>Schloss</u>, 218 N.Y. 400, 113 N.E. 337) and rests 'upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. * * * 'It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money * * * under such circumstances that in equity and good conscience he ought not to retain it * * *.' (Id. at 407, 113 N.E. 337.) Noting its equitable origins, the court in <u>Byxbie</u> v. <u>Wood</u>, 24 N.Y. 607 stated, 'Having money that rightfully belongs to another, creates a debt; and wherever a debt exists without an express promise to pay, the law implies a promise * * *.' (Id. at 610.)"

Accordingly, the law in New York is clear:

> "a party who has made a mistaken payment to another based upon a unilateral mistake of fact may recover the payment unless the payee has changed his position to his detriment in reliance upon the mistaken payment." <u>Bank Saderat Iran</u> v. <u>Amin Beydoun</u>, Inc., 555 F.Supp. 770, 774 (S.D.N.Y.1983).

Herein, it is undisputed that defendant Penn did not change its position to its detriment in reliance upon Quantum's mistaken payment, i.e. unlike in <u>Bank Saderat</u>, 555 F.Supp. <u>supra</u> at 774 or in <u>Swiss Bank Corporation</u> v. <u>JLM International</u>, 1995 WL 517183 (S.D.N.Y. 1995), no goods were shipped by the recipient of the mistaken payment in reliance thereon.

Rather, herein, as in <u>Manufacturer Hanover</u> (559 N.Y.S.2d <u>supra</u> at 712) the funds always remained in the recipient's hands and have been used by the recipient to reduce it customer's, the thief's, obligation to it arising from other transactions. However, the thief is not entitled to receive such credit to its account. CF. <u>Schaffner</u> v. <u>Pierce</u>, 75 Misc. 2d 21, 347 N.Y.S.2d 411, 414 (Dist. Ct. Nassau 1973) ("To take possession of personal property where the consent of the owner is induced by a fraudulent misrepresentation is a conversion").

Therefore, since Penn did not change its position to its detriment in reliance on

Quantum's $112,168.28 mistaken payment to it, equity and good conscience requires that

Penn make restitution.

Accordingly, the undisputed facts establish as a matter of law that defendant Penn

has been unjustly enriched at plaintiff Quantum's expense in the amount of $112,168.28.

**As Regards Conversion:**

In <u>Republic of Haiti</u> v. <u>Duvalier</u>, 211 A.D.2d 379, 626 N.Y.S.2d 472, 475 (1st

Dept. 1995), the Court stated:

> "The tort of conversion is established when one who owns
> and has a right to possession of personal property proves
> that the property is in the unauthorized possession of
> another who has acted to exclude the rights of the owner
> (<u>Payne</u> v. <u>White</u>, 101 A.D.2d 975, 976, 477 N.Y.S.2d 456;
> <u>Peters Griffin Woodward, Inc.</u> v. <u>WCSC, Inc.</u>, 88 A.D.2d
> 883, 452, N.Y.S.2d 599). Where the property is money, it
> must be specifically identifiable and be subject to an
> obligation to be returned or to be otherwise treated in a
> particular manner (<u>Manufacturers Hanover Trust Co.</u> v.
> <u>Chemical Bank</u>, 160 A.D.2d 113, 124-25, 559 N.Y.S.2d
> 704)."

In addition; (a) the "negligence of an owner facilitating a common-law larceny of

tangible personal property is no defense to an action for conversion of the stolen goods

against the vendee of the thief, even though he has bought in good faith from the thief"

(<u>Harford Accident & Ind. Co.</u> v. <u>Walston Co.</u>, 21 N.Y.2d 219, 221, 287 N.Y.S.2d 58

(1967) reaffirmed on reargument, 22 N.Y.2d 672, 291N.Y.S.2d (1968)); and (b) "if

possession of the property is originally lawful, a conversion occurs when the defendant

refuses to return the property after a demand", <u>White</u> v. <u>City of Mount Vernon</u>, 221

A.D.2d 345, 633 N.Y.S.2d 369, 370 (2nd Dept. 1995).

In <u>Manufacturers Hanover</u>, 559 N.Y.S.2d <u>supra</u> at 712, the Court concluded that

plaintiff's wire transfer of a specific sum satisfied the requirement that the money be

specifically identifiable. See also <u>Payne</u> v. <u>White</u>, 101 A.D.2d 975, 477 N.Y.S.2d 456, 458 (3d Dept. 1984) ("the funds in question were clearly identifiable as the proceeds of a specific named bank account"). Herein it is undisputed that the specific sum of $112,168.28, the amount which Quantum claims in its conversion cause of action, was wired from Quantum's account at Sterling National Bank to defendant Penn's account No. 40224230 at Omega Bank.

In <u>Manufacturers Hanover</u>, 559 N.Y.S.2d <u>supra</u> at 712, the Court concluded that the wiring of the specific sum to be credited for a specific purpose, created an obligation on the part of the defendant recipient to either "treat the transfer in the specified manner or return the funds". Herein it is undisputed that the $112,168.28 was wired by Quantum in payment for the Pollydore Residence and that Penn neither credited that payment to the Pollydore Residence nor returned the payment to Quantum. See <u>Meese</u> v. <u>Miller</u>, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (4th Dept. 1981) ("Any use of such property beyond the authority which an owner confers upon a user or in violation of instructions given is a conversion").

It is also undisputed that on January 15, 2008 Quantum demanded that Penn return the $112,168.28 it had received in payment of the Pollydore Residence and that Penn refused to return this property to the funds' owner, Quantum.

Accordingly, the undisputed facts establish as a matter of law that defendant Penn on January 15, 2008 converted $112,168.28 of Quantum's property and, accordingly, that Quantum is entitled to the return of its property together with interest at the statutory rate from that date. <u>Robert R. Gibbs, Inc.</u> v. <u>State</u>. 70 A.D.2d 750, 417 N.Y.S.2d 24, 25 (3rd Dept. 1979) ("Measure of damages in conversion action is value of property at time of conversion plus interest").

## CONCLUSION

Based upon the foregoing the Court should grant summary judgment to plaintiff

Quantum Corporate Funding, Ltd. against defendant Penn Lyon Homes Corporation and

award Quantum the sum of $112,168.28 together with interest thereon from January 15,

2008.

Dated: New York, New York
      July 3, 2008

                              Respectfully submitted,

                              GOETZ FITZPATRICK LLP

                              By:_____
                                    Bernard Kobroff (BK 0101)
                              Attorneys for Plaintiff
                              Quantum Corporate Funding, Ltd.
                              One Penn Plaza, 44th Floor
                              New York, New York 10119
                              (212) 695-8100

W:\bkobroff\Quantum\Westwood\Memo of Law.doc

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

QUANTUM CORPORATE FUNDING, LTD.,

               Plaintiff,

         vs.

WESTWOOD DESIGN/BUILD INCORPORATED,
DAVID R. WARFIELD, NATIONAL CITY
MORTGAGE INC., and PENN LYON HOMES
CORPORATION,

               Defendants.
-------------------------------------------------------------

NATIONAL CITY MORTGAGE,

               Third-Party Plaintiff,

         vs.

MICHAEL CONRAD, a/k/a MICHAEL CONRAD
BROWN,

               Third-Party Defendant.
------------------------------------------------------------X

Civil Action No. 08-cv-0539
(LAK) (HBP)

**DEFAULT JUDGMENT IN
FAVOR OF DEFENDANT/
CROSS-CLAIMANT/
THIRD-PARTY PLAINTIFF
NATIONAL CITY
MORTGAGE AS AGAINST
WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID R.
WARFIELD, AND MICHAEL
CONRAD, A/K/A MICHAEL
CONRAD BROWN**

> USDS SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 7/8/08

 

Defendant/Cross-Claimant/Third-Party Plaintiff National City Mortgage ("NCM")

having filed its Answer, Separate Defenses, Cross-Claim and Third-Party Complaint on February

29, 2008 ("Cross-Claim and Third-Party Complaint"); copies of the Cross-Claim and Third Party

Complaint having been served on cross-claim defendants Westwood Design/Build Incorporated

("Westwood") and David R. Warfield ("Warfield") via Federal Express on February 29, 2008,

and proof of such service having been filed with the Court on February 29, 2008; copies of the

Cross-Claim and Third-Party Complaint and Third-Party Summons having been personally

served on third-party defendant Michael Conrad, a/k/a Michael Conrad Brown ("Conrad") on

April 26, 2008, and proof of such service having been filed with the Court on May 6, 2008; and

ME1 7301123v.2

the cross-claim defendants Westwood and Warfield and third-party defendant Conrad not having answered the Cross-Claim and Third-Party Complaint; and the time for cross-claim defendants Westwood and Warfield and third-party defendant Conrad to respond to the Cross-Claim and Third-Party Complaint having expired; and the Court having considered the Affidavit of Christopher Washburn and determined that NCM has established that cross-claim defendants Westwood and Warfield and third-party defendant Conrad are liable to NCM for fraudulent misrepresentations and fraudulent inducement; it is

ORDERED, ADJUDGED AND DECREED: That cross-claimant and third-party plaintiff NCM have judgment by default against cross-claim defendants Westwood and Warfield and third-party defendant Conrad, jointly and severally, in the amount equal to any loss, liability or expense that may be imposed upon, or incurred by, NCM on account of plaintiff Quantum Corporate Funding, Ltd.'s claims against NCM.

Dated: New York, New York
        July 7, 2008

Hon. Lewis A. Kaplan, U.S.D.J.

This document was entered on the docket on _____.

2

ML 24042352

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
QUANTUM CORPORATE FUNDING, LTD.,

               Plaintiff,

        -against-                               08 Civ. 0539 (LAK)

WESTWOOD DESIGN/BUILD, INC., et ano,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER

LEWIS A. KAPLAN, *District Judge*.

       Plaintiff's application for a default judgment against defendants Westwood Design/Build, Inc., and David R. Warfield [DI 44-46] is granted. As this resolves all of the claims against these defendants and delay in the finality and enforceability of the judgment would work a hardship, the Court finds no just reason for delay and directs the Clerk to enter final judgment in favor of plaintiff and against these defendants, jointly and severally, in the amount of $347,000.

       SO ORDERED.

Dated:     July 30, 2008

                                     _____
                                        Lewis A. Kaplan
                                 United States District Judge

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/30/08

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/15/08_

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

QUANTUM CORPORATE FUNDING, LTD.,

Plaintiff,

-against-

WESTWOOD DESIGN/BUILD, INC., et ano.,

Defendants.

------------------------------------------------------------X

08 **CIVIL** 0539 (LAK)

## DEFAULT JUDGMENT

#08,1459

Plaintiff having moved for a default judgment against defendants Westwood Design/Build, Inc. and David R. Warfield, and the matter having come before the Honorable Lewis A. Kaplan, United States District Judge, and the Court, on July 30, 2008, having rendered its Order that there is no just reason for delay, directing the Clerk of the Court to enter final judgment in favor of plaintiff and against defendants, jointly and severally, in the amount of $347,000, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Order dated July 30, 2008, there is no just reason for delay, final judgment is entered in favor of plaintiff and against defendants, jointly and severally, in the amount of $347,000.

**Dated:** New York, New York
August 15, 2008

**J. MICHAEL McMAHON**

_____
**Clerk of Court**

BY: _____
**Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
QUANTUM CORPORATE FUNDING, LTD.,

Plaintiff,

-against-                                                    08 Civ. 0539 (LAK)

WESTWOOD DESIGN/BUILD, INC., et ano,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

Plaintiff moves for summary judgment awarding it the sum of $112,168.28 together with interest thereon from January 25, 2008 as against defendant Penn Lyon Homes Corporation ("Penn"). Penn has not responded to the motion although the time within which to do so has expired.

In these circumstances, the well supported averments of plaintiff's Rule 56.1 Statement are deemed admitted. S.D.N.Y. CIV. R. 56.1(c). It therefore is plain that there is no disputed issue as to any material fact and that plaintiff is entitled to judgment as a matter of law. Accordingly, plaintiff's motion [DI 37] is granted in all respects.

As this resolves all of plaintiff's claims against Penn and any delay in the finality and enforceability of its judgment against Penn would work an undue hardship, the Court hereby determines that there is no just reason for delay and directs the Clerk to enter final judgment in favor of plaintiff and against Penn in accordance with this order.

SO ORDERED.

Dated:        July 30, 2008

_____
Lewis A. Kaplan
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

QUANTUM CORPORATE FUNDING, LTD.,

Plaintiff,

-against-

WESTWOOD DESIGN/BUILD, INC., et ano.,
Defendants.

-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/31/08

08 **CIVIL** 0539 (LAK)

**FINAL JUDGMENT**

# 08,1376

Plaintiff having moved for summary judgment awarding it the sum of $112,168.28 together

with interest thereon from January 25, 2008 as against defendant Penn Lyon Homes Corporation

("Penn"), and the matter having come before the Honorable Lewis A. Kaplan, United States District

Judge, and the Court, on July 30, 2008, having rendered its Order that there is no just reason for

delay, directing the Clerk of the Court to enter final judgment in favor of plaintiff and against Penn

in the sum of $112,168.28 together with interest thereon from January 25, 2008, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Order dated July 30, 2008, there is no just reason for delay, final judgment is entered in favor

of plaintiff and against Penn in the sum of $112,168.28 together with interest thereon from January

25, 2008.

**Dated:** New York, New York
July 31, 2008

J. MICHAEL McMAHON

Clerk of Court

BY: _____

Deputy Clerk

**THIS DOCUMENT WAS ENTERED**
**ON THE DOCKET ON** _____



**GOETZ FITZPATRICK LLP**
One Penn Plaza, New York, NY 10119 | (T) 212-695-8100 | (F) 212-629-4013

**Bernard Koboroff**
bkoboroff@goetzfitz.com

August 1, 2008

**BY HAND**
Honorable Lewis A. Kaplan
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: Quantum Corporate Funding, Ltd., v. Westwood Design/Build Inc., et al.
S.D.N.Y. No. 08 CV 00539 (LAK)(HBP)

Dear Judge Kaplan:

We represent the plaintiff Quantum Corporate Funding, Ltd ("Quantum") in the referenced matter. I am writing in response to the July 31st letter of Scott M. Goldstein, the attorney for defendant Penn Lyon Homes Corporation ("Penn Lyon"), to set forth the facts from Quantum's side.

From the Court's May 9, 2008 conference onward I attempted to engage Mr. Goldstein in settlement negotiations. However, despite my telephone calls and e-mails and Mr. Goldstein's promises of response, no response to Quantum's proposals was received.

Concluding that Quantum could not continue to wait for Penn Lyon's promised response, on July 3, 2008 (not July 8th), Quantum served its motion for summary judgment against Penn Lyon (as I said at the May 9th conference it would) and delivered two courtesy copies to Your Honor.

On July 14th at 8:06 P.M., I received an e-mail from Mr. Goldstein informing me that he wanted to work out a briefing schedule to oppose Quantum's motion. On the morning of July 15th I telephoned Mr. Goldstein, who was not in, and left a message for him to immediately return my call since I would not be in the office for the rest of the week and had to be in court that afternoon. Soon thereafter I received a call from Mr. Goldstein. Mr. Goldstein requested my consent to an adjournment of the summary judgment motion to enable Penn Lyon to depose Mr. Sheinker so that he could "test his veracity." From our conversation it became apparent that Penn Lyon had no defense to the motion and was simply seeking to delay its determination. Therefore, on July 15th, I informed Mr. Goldstein that: (a) Quantum would not consent to an adjournment; (b) Quantum would respond to whatever discovery demands Penn Lyon chose to serve; (c) I was having cataract surgery performed the next day and would be out of the office until

 GOETZ FITZPATRICK LLP

Monday, July 21, 2008; and (d) I calculated that Penn Lyon's ten business day period to respond to Quantum's motion would expire on July 21, 2008. It is disturbing that this conversation is nowhere referred to in Mr. Goldstein's letter.

By letter dated July 16, 2008, Mr. Goldstein served Penn Lyon's document demands and interrogatories.

Then, notwithstanding my advice that Quantum would not consent and that I had calculated Penn Lyon's time to oppose Quantum's motion as expiring on July 21st, at 5:38 P.M. on July 21st Mr. Goldstein sent me an e-mail requesting Quantum's consent to an extension of time for Penn Lyon to oppose Quantum's motion.

Thereafter, communications were had by counsel regarding extending the Scheduling Order's August 9th discovery cut-off date, the scheduling of the noticed depositions, and the setting of dates for document production and interrogatory responses. Pursuant thereto, on July 24th a proposed amended scheduling order was circulated amongst counsel. However, this proposed scheduling order was not executed because Mr. Goldstein insisted that it include a provision extending Penn Lyon's time to oppose Quantum's motion.

On July 30, 2008, I again spoke with Mr. Goldstein. I advised him that Penn Lyon's time to oppose Quantum's motion had expired and that Quantum continued to oppose any delay of its motion's determination and that, in any event, Mr. Sheinker's communications with Penn Lyon's President, David Reed, were set forth in an e-mail and a letter and that Mr. Sheinker's deposition would not disclose anything other than what those documents stated.

However, believing that the proposed amended scheduling order would not be stipulated to unless Penn Lyon was granted its extension, I requested that Mr. Goldstein draft a separate stipulation extending Penn Lyon's time to respond to Quantum's motion; which he did. Mr. Goldstein then signed the proposed amended scheduling order stipulation and I signed his stipulation extending Penn Lyon's time to respond to Quantum's motion. Also on July 30th, the Court granted Quantum's motion for summary judgment against Penn Lyon on default.

On July 31, 2008, I informed Quantum of the judgment's entry and of my having consented to extend Penn Lyon's time. Quantum advised me of its disapproval of my having consented to the extension, instructed me to oppose any motion to vacate the judgment (since Penn Lyon has no meritorious defense to Quantum's claims), and to again try to settle. I then spoke with Mr. Goldstein and informed him of Quantum's instructions. The result of that conversation is Mr. Goldstein's letter to Your Honor.

**G|F** GOETZ FITZPATRICK LLP
**LLP**

Thank you for your consideration of this matter.

Very truly yours,

GOETZ FITZPATRICK LLP

By:_____
        Bernard Koboroff

BK/jb

cc:    Scott H. Goldstein, Esq.
       Thomas F. Doherty, Esq.
       (by regular mail and e-mail)

W:\bkobroff\Quantum\Westwood\corr\8.1.08 ltr Hon. L. Kaplan.doc

# MEMO ENDORSED

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

QUANTUM CORPORATE FUNDING, LTD

Plaintiff,

-against-

WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID R. WARFIELD,
NATIONAL CITY MORTGAGE, INC. and PENN
LYON HOMES CORPORATION

Defendants.

Docket No. 08 CV 00539(LAK) (HP)

**ORDER TO SHOW CAUSE FOR A
STAY OF ENFORCEMENT OF
PLAINTIFF'S JUDGMENT
AGAINST DEFENDANT PENN
LYON HOMES AND DISCOVERY
PENDING DISPOSITION OF PENN
LYON HOMES'S MOTIONS
PURSUANT TO RULES 59 AND 60.**

Upon the affirmation of Scott H. Goldstein, Esq. with exhibits and the accompanying memorandum of law, and upon all prior pleadings in this case, it is

ORDERED that plaintiff Quantum Corporate Funding, Ltd. ("Quantum") show cause before a motion term of this Court at Room *12D*, United States Courthouse, 500 Pearl Street, in the City, County and State of New York, on **Sept. 3**, 2008 at **4:15 p.m.**, o'clock in the noon thereof, or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rules 26, 62(b) and 65 of the Federal Rules of Civil Procedure permanently staying enforcement of Quantum's Judgment against defendant Penn Lyon Homes Corporation ("PLH") and staying all discovery proceedings pending the disposition of PLH's motions to vacate Quantum's judgment against it and for reconsideration of this Court's Order granting summary judgment against PLH in favor of Quantum; and it is further

ORDERED that, sufficient reason having been shown therefore, pending the hearing of defendant PLH's application for a permanent stay of enforcement of the judgment and discovery pending disposition of PLH's motions, pursuant to Rules 26,

62(b) and 65. plaintiff is temporarily restrained and enjoined from enforcing its judgment

against PLH ~~and from accepting any further proceedings~~; and it is further *ORDERED*

~~that security in the amount of~~ $125,000 ~~shall be posted~~ by Aug. 13, 2008, and it is further

ORDERED that personal service of a copy of this order and annexed affirmation

upon Counsel for Quantum, co-defendant National City Mortgage, Inc on or before

August 11, 2008 at 4 p.m. ~~o'clock in the ____ noon on ____, 2008,~~ shall be deemed good and

sufficient service thereof and it is further ORDERED That answering and reply papers shall be served and filed no later than Aug. 22 and Aug. 27, respectively.

Dated: New York, New York
August __, 2008

_____
United States District Judge

Served at
2:48 pm

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2

 3       _____

 4       QUANTUM CORPORATE FUNDING,        Civil Action No.
         LTD,                              08CV00539(LAK)(HBP)
 5                       Plaintiff(s),

 6          -v-
                                           DEPOSITION UPON
 7       WESTWOOD DESIGN/BUILD             ORAL EXAMINATION
         INCORPORATED, DAVID R.                  OF
 8       WARFIELD, NATIONAL CITY           CRAIG SHEINKER
         MORTGAGE, INC., and PENN
 9       LYON HOMES CORPORATION,
                         Defendant(s).
10       _____

11       NATIONAL CITY MORTGAGE, INC.,
                         Third-Party
12                       Plaintiff(s),

13          -v-

14       MICHAEL CONRAD a/k/a MICHAEL
         CONRAD BROWN,
15                       Third-Party
                         Defendant(s).
16       _____

17

18            T R A N S C R I P T of testimony taken
         stenographically by and before LEA A. CRUZ, a
19       Certified Court Reporter and Registered Professional
         Reporter, at the offices of GOETZ FITZPATRICK, LLP,
20       One Penn Plaza, New York, on Friday, August 8, 2008,
         commencing at approximately 10:30 a.m.
21

22                    CRUZ & COMPANY, LLC
23                  Certified Court Reporters
                        120 Morris Avenue
24                 Springfield, New Jersey 07081
              Phone: (973) 467-4123  Fax: (973) 467-8822
25             E-mail: info@cruzandcompany.com
```

APPEARANCES:

GOETZ FITZPATRICK, LLP
One Penn Plaza - 44th Floor
New York, New York 10119
(212) 695-8100
by: BERNARD KOBROFF, ESQ
Attorneys for the Plaintiff(s)

McCARTER & ENGLISH, ESQ
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4056
(973) 622-4444
by: THOMAS F. DOHERTY, ESQ
Attorneys for the Defendant(s)/Third-Party
Plaintiff(s) National City Mortgage

BONNER KIERNAN TREBACH & CROCIATA, LLP
299 Cherry Hill Road - Suite 300
Parsippany, NJ 07054
(973) 335-8400
by: SCOTT H. GOLDSTEIN, ESQ
Attorneys for the Defendant(s) Penn Lyon Homes
Corporation

---

1        C R A I G   S H E I N K E R, with offices 2115

2    Linwood Avenue, Fort Lee, New Jersey, having been

3    duly sworn, testified as follows:

4    EXAMINATION BY MR. DOHERTY:

5        Q.    Good morning Mr. Sheinker.

6        A.    Hi.

7        Q.    My name is Tom Doherty and I represent

8    National City Mortgage in a lawsuit that's been

9    filed by Quantum in Federal Court here in New York,

10   and we're here this morning to take your deposition

11   in the case.

12            Have you ever had your deposition taken

13   before?

14       A.    Yes.

15       Q.    Can you estimate how many times?

16       A.    Four.

17       Q.    I'm going to give you some ground rules

18   and they may sound familiar to you, but I'll just

19   state them anyway so that we're operating on the

20   same page.

21            You're going to be asked questions

22   today, and you're to answer those questions to the

23   best of your ability. The court reporter has sworn

24   you in and you're under oath, which means you have

25   to tell the truth. Even though we're in a

---

I N D E X

WITNESS NAME                                    PAGE

CRAIG SHEINKER

    By:  MR DOHERTY                             4, 111

         MR GOLDSTEIN                           29, 145

E X H I B I T S

NO.    DESCRIPTION                              PAGE

D-14   Affidavit in support of motion           13
       for summary judgment

D-15   One-page certificate of officers         51
       agreement and corporate resolution
       dated September 20, 2001

Penn Lyon-2                                     111
       One-page document from Sterling
       National Bank

Penn Lyon 3                                     133
       One-page check/wire request

R E Q U E S T S

       PAGE        LINE

       (None)

---

                                    Sheinker - Doherty           5

1    conference room in a lawyer's office, it still has

2    the same serious nature as if we were in court. Do

3    you understand that?

4        A.    Yes.

5        Q.    If you don't know an answer to a

6    question I ask, please let me know. We don't want

7    you to guess, although an approximation or an

8    estimate is okay if you're letting us know that

9    that's what you're doing.

10           If you don't understand a question that

11   I ask, let me know and I'll try to rephrase it. If

12   you answer the question, we're going to assume that

13   you understood it. Do you understand that?

14       A.    Yes.

15       Q.    Because the court reporter is taking

16   everything down, it would be important for you and I

17   not to talk over one another, so if you can, wait

18   until I finish with the question before answering,

19   and then I'll wait before asking another question

20   while you're answering. For the same reason, your

21   answers have to be verbal. Even though it may seem

22   like we're having a conversation, it's important

23   that you not just nod or shake your head, that you

24   answer verbally so the court reporter can take that

25   down.

Sheinker - Doherty

| | | |
|---|---|---|
| 1 | | If you need to take a break to stretch |
| 2 | | your legs or get a drink or use the restroom, let's |
| 3 | | us know. It's not an endurance test. |
| 4 | | Do you understand all those grounds |
| 5 | | rules? |
| 6 | **A.** | **Yes.** |
| 7 | **Q.** | Are you taking any kind of medication |
| 8 | | that would affect your ability to testify -- |
| 9 | **A.** | **No.** |
| 10 | **Q.** | -- at this deposition? |
| 11 | **A.** | **No.** |
| 12 | | MR. KOBROFF: Let him finish the |
| 13 | | question. |
| 14 | **Q.** | Can you please let me know what your |
| 15 | | age is. |
| 16 | **A.** | **47.** |
| 17 | **Q.** | What's your marital status? |
| 18 | **A.** | **Married.** |
| 19 | **Q.** | How long have you been married? You |
| 20 | | can approximate. |
| 21 | **A.** | **About seven years.** |
| 22 | **Q.** | Can you please describe for me your |
| 23 | | educational background. |
| 24 | **A.** | **College, BS, finance and international** |
| 25 | | **business, NYU.** |

Sheinker - Doherty    7

| | | |
|---|---|---|
| 1 | **Q.** | Do you have any graduate degrees? |
| 2 | **A.** | **No.** |
| 3 | **Q.** | Do you have any training in the law? |
| 4 | **A.** | **No.** |
| 5 | **Q.** | You indicated before that you've been |
| 6 | | deposed approximately four times. Could you please |
| 7 | | describe for me very briefly what those four |
| 8 | | occasions were where you were deposed. |
| 9 | **A.** | **That was just an approximation. I** |
| 10 | | **really -- I can't give you the specifics because I** |
| 11 | | **don't recall the number of times. It's an** |
| 12 | | **approximation.** |
| 13 | **Q.** | And what kind of cases were those where |
| 14 | | you had your deposition taken? |
| 15 | **A.** | **Civil litigation.** |
| 16 | **Q.** | Were those civil litigation matters |
| 17 | | instances where you were suing somebody or you were |
| 18 | | being sued? |
| 19 | **A.** | **Collection matters.** |
| 20 | **Q.** | Were those collection matters something |
| 21 | | that you were pursuing as an individual or were they |
| 22 | | because of a business? |
| 23 | **A.** | **Corporate. Business.** |
| 24 | **Q.** | And what business was that? |
| 25 | **A.** | **Primarily the factoring business.** |

| | | |
|---|---|---|
| 1 | | **Also we do -- oh, I didn't have depositions. We** |
| 2 | | **also do real estate lending, but I don't recall any** |
| 3 | | **depositions for any of those foreclosures.** |
| 4 | **Q.** | Have you ever been arrested? |
| 5 | **A.** | **No.** |
| 6 | | MR. KOBROFF: Objection to form. |
| 7 | **Q.** | Do you have any criminal convictions? |
| 8 | **A.** | **Nope.** |
| 9 | **Q.** | In connection with the deposition this |
| 10 | | morning, have you reviewed any documents? |
| 11 | **A.** | **Yes.** |
| 12 | **Q.** | Can you tell me what you reviewed? |
| 13 | **A.** | **My affidavit.** |
| 14 | **Q.** | Which one? |
| 15 | **A.** | **Both.** |
| 16 | **Q.** | Did you review anything else? |
| 17 | **A.** | **The interrogatories.** |
| 18 | | MR. DOHERTY: Speaking of which, let |
| 19 | | me just put on the record that we've not yet |
| 20 | | received interrogatory answers from Quantum, and so |
| 21 | | once I receive them, I'd like to reserve my right, |
| 22 | | if necessary, it may not be, to continue this |
| 23 | | deposition at that point. |
| 24 | | MR. GOLDSTEIN: I join in that |
| 25 | | request. |

Sheinker - Doherty    9

| | | |
|---|---|---|
| 1 | | MR. KOBROFF: I finally have had a |
| 2 | | chance to review them, as Mr. Sheinker has noted, |
| 3 | | and I will be sending them out if not today, Monday. |
| 4 | | MR. DOHERTY: Thank you. |
| 5 | | BY MR. DOHERTY: |
| 6 | **Q.** | Besides Quantum's lawyer, have you |
| 7 | | spoken to anybody about this case? |
| 8 | **A.** | **Yes.** |
| 9 | **Q.** | Who have you spoken to about this case? |
| 10 | **A.** | **Maria.** |
| 11 | **Q.** | Who is Maria? |
| 12 | **A.** | **Maria DeSouza. I believe you deposed** |
| 13 | | **her yesterday.** |
| 14 | **Q.** | Have you spoken to Ms. DeSouza since |
| 15 | | yesterday? |
| 16 | **A.** | **Yes.** |
| 17 | **Q.** | When did you speak to Ms. DeSouza? |
| 18 | **A.** | **Last night.** |
| 19 | **Q.** | Was that by telephone or in person? |
| 20 | **A.** | **By telephone.** |
| 21 | **Q.** | And what did you and Ms. DeSouza talk |
| 22 | | about? |
| 23 | **A.** | **I just said, How did it go?** |
| 24 | **Q.** | And what did she say? |
| 25 | **A.** | **She says, I can't discuss it with you.** |

1    Q.    Did she say why she can't discuss it
2    with you?
3    A.    I believe she said that she couldn't
4    discuss it with me but that she said it went -- that
5    she felt that it was fine, but that she can't
6    really -- she was told not to discuss it with me.
7    Q.    Do you remember anything else about
8    that conversation with Ms. DeSouza?
9    A.    No.
10    Q.    Is Ms. DeSouza an employee of Quantum?
11    A.    Yes.
12    Q.    Have you spoken to any other employees
13    at Quantum about this lawsuit?
14    A.    What do you mean, about the lawsuit?
15    Q.    About the allegations.
16    A.    After the lawsuit began or --
17    Q.    Well, let's start with, have you spoken
18    to any employees at Quantum about what your
19    testimony would be here this morning?
20    A.    No.
21    MR. KOBROFF:  How does he know what
22    testimony he's going to give this morning?  I'm not
23    asking him any questions?
24    MR. DOHERTY:  I'm not being deposed
25    here.  I don't have to answer your questions.

1    I'm asking if he had any discussions
2    with people about at Quantum about questions he
3    anticipated being asked this morning.
4    THE WITNESS:  No.
5    MR. DOHERTY:  Or subject matters he
6    anticipated being asked about.
7    THE WITNESS:  No.
8    MR. DOHERTY:  Thanks.
9    BY MR. DOHERTY:
10    Q.    Have you had any discussions at any
11    time with any employees of National City Mortgage
12    concerning Westwood?
13    A.    Yes.
14    Q.    Who have you spoken with at National
15    City Mortgage?
16    A.    I think it was David Long.
17    Q.    Do you know what Mr. Long's position at
18    National City is?
19    A.    No.
20    Q.    Did you speak to anyone else at
21    National City besides David Long?
22    A.    No.
23    Q.    Did you ever speak to a gentleman named
24    Christopher Washburn?
25    A.    No.

1    Q.    Did you ever speak to an individual
2    named Heather Stackhouse?
3    A.    No.
4    Q.    Did you ever speak to an individual
5    named Timothy Justice?
6    A.    I may have.  I don't recall, but I may
7    have.  I'm a little confused as to who I spoke to,
8    whether it was David Long or Timothy Justice, but I
9    remember a conversation that I had, and I think it
10    was David Long.
11    Q.    When do you think that this
12    conversation with David Long took place?
13    A.    It was the day after we realized or
14    the day that we realized, maybe the day after -- the
15    day we realized that this whole transaction was a
16    fraud, that evening.
17    Q.    What transaction are you --
18    A.    The transaction at hand here, the one
19    we're being -- the purpose of this complaint.
20    Q.    Is that a transaction involving
21    Westwood Design/Build and Quantum?
22    A.    And National City and Penn Lyon.
23    Q.    And when do you think that that day was
24    when you realized the transaction was a fraud?
25    A.    I can't remember the exact date, but

1    if I looked at my affidavit with respect to Penn
2    Lyon, it was the same day that we called Penn Lyon
3    and Penn Lyon -- Mr. Reed told me that the Pollydore
4    invoice was fictitious.
5    (Exhibit D-14, affidavit in support of
6    motion for summary judgment, is marked for
7    identification.)
8    Q.    Mr. Sheinker, I'm showing you a
9    document that's been marked D-14 for identification.
10    Can you please take a look through it and tell me if
11    you recognize this document.
12    A.    Yes.
13    Q.    And just for the record, as matter of
14    housekeeping, the last two exhibits -- this is an
15    affidavit submitted in support of a motion for
16    summary judgment filed by the plaintiff, Quantum, in
17    this matter.
18    Just for the record, in the interest of
19    the environment I did not copy the last two exhibits
20    of this affidavit when I reproduced it for purposes
21    of marking it at the deposition, so it does not
22    include a copy of the Quantum complaint or a copy of
23    the Penn Lyon answer, which I believe were
24    respectively Exhibits J and K to this affidavit, so
25    if it looks a little thinner than what you may

Sheinker - Doherty

1   have looked at, that's why.

2           But other than that, do you recognize

3   this affidavit?

4       A.      Yes.

5       Q.      And on page 6 of D-14, is that your

6   signature?

7       A.      Yes.

8       Q.      Is this the affidavit you were just

9   referring to when you said that if you looked at

10  your affidavit it would help you to determine what

11  day --

12      A.      Yes.

13      Q.      With it in front of you, does it help

14  you?

15      A.      Yes.

16      Q.      What day then were you referring to?

17      A.      On or about January 11.

18      Q.      January 11 then is the day that you

19  first realized that the transaction that's the

20  subject matter of this lawsuit was fraudulent?

21      A.      On or about January 11, yeah.

22      Q.      And you think that was the day that you

23  spoke with David Long of National City?

24      A.      Yes.

25      Q.      What do you recall about that

---

1       Q.      What did Mr. Long say to you in

2   response?

3       A.      He'd look into it.

4       Q.      Do you remember anything else about

5   this conversation with David Long?

6       A.      No.  By the way, you asked me if I --

7   what was the question that started off this series,

8   if I had communication with anybody at the bank?

9       Q.      Well, I asked you I think if you spoke

10  to them.  I was going to ask you a separate question

11  about whether you had written communications.

12      A.      Okay.

13      Q.      Did you ever hear back from Mr. Long

14  after you say that he told you he'd look into it?

15      A.      Not that I can recall.

16      Q.      Did you have any written communications

17  with anyone at National City, which would include

18  e-mail or letters?

19      A.      Yes.

20      Q.      What written conversations do you

21  recall having with any employees of National City?

22      A.      I had an e-mail to and I think -- an

23  e-mail to Timothy Justice.

24      Q.      Do you remember when you sent that

25  e-mail to Mr. Justice?

---

Sheinker - Doherty                    15

1   conversation with David Long?

2       A.      I remember being on my cell phone,

3   because I had left the office.  I was headed home.

4   I pulled off into a storefront because of traffic so

5   I could hear clearly and just -- just had a

6   discussion with him about the serious consequences

7   of what I've uncovered and what the bank's

8   potential -- the bank's liability is under the

9   circumstances.

10      Q.      What were the consequences that you

11  said that -- let me ask it a different way.

12          Did you tell him what you meant by

13  serious consequences of what you uncovered?

14      A.      Yes.

15      Q.      What did you believe you uncovered?

16      A.      That we received an invoice which we

17  funded against based upon a reliance of an estoppel

18  certificate signed by an authorized representative

19  of the bank and that it now appears that the

20  invoice, which was a substantial amount of money,

21  relatively speaking, was bogus and that the bank has

22  significant liability here.

23      Q.      And all of what you've just said, this

24  is what you were telling Mr. Long?

25      A.      Yes.

---

Sheinker - Doherty                    17

1       A.      It was -- I believe it was in early

2   January.

3       Q.      Do you think it was before or after

4   your telephone conversation with David Long?

5       A.      I believe it was before, but I could

6   be wrong.

7       Q.      Do you have any tape-recordings of any

8   conversations with Mr. Long or anyone from National

9   City?

10      A.      No.

11      Q.      Do you have any voice mail messages

12  saved from anyone at National City?

13      A.      No.

14      Q.      Do you have tape-recordings from

15  conversations with any of the other parties in this

16  lawsuit, which would include Westwood, David

17  Warfield, anyone from Penn Lyon Homes or Michael

18  Conrad?

19      A.      No.

20      Q.      At Quantum, what's your title?

21      A.      President.

22      Q.      Are you also the owner of Quantum?

23      A.      Yes, partial owner.

24      Q.      What's your ownership percentage?

25      A.      One-third.

---

Sheinker - Doherty    18

1  Q.   Who are the other two-thirds owners in
2  Quantum?
3  A.   My two sisters.
4  Q.   And what are your sisters' names?
5  A.   Kerrie Sheinker, K-e-r-r-i-e, and
6  Taryn Chernin, C-h-e-r-n-i-n.
7  Q.   When was Quantum established?
8  A.   1991.
9  Q.   Where was it incorporated?
10  A.   New York.
11  Q.   Is it still in good standing as a
12  corporation in New York?
13  A.   Yes.
14  Q.   Have you always been president of
15  Quantum?
16  A.   Yes.
17  Q.   Do you hold any other titles at
18  Quantum?
19  A.   No.
20  Q.   Have you ever held any other title at
21  Quantum?
22  A.   No.
23  Q.   Can you describe for me what Quantum's
24  business is.
25  A.   Finance company.

Sheinker - Doherty    19

1  Q.   And what kind of things does Quantum
2  finance?
3  A.   What kind of things?  We do
4  asset-based lending and factoring.
5  Q.   Do you do business outside of the state
6  of New York?
7  A.   No.
8  Q.   Where are Quantum's offices currently
9  located?
10  A.   I shouldn't say that.  Now that we
11  moved we, I guess -- we just moved to New Jersey so
12  the answer to that would have to be yes, but that
13  was three weeks ago.
14  Q.   Is Quantum registered to do business in
15  the state of Maryland?
16  A.   I don't believe so.  No.
17  Q.   Does Quantum have any licenses issued
18  by the state of Maryland?
19  A.   No.
20  Q.   As president, what are your duties and
21  responsibilities?
22  A.   Chief executive.
23  Q.   As chief executive what are your
24  duties?
25  A.   Chief executive duties.

Sheinker - Doherty    20

1  Q.   Can you describe some of those chief
2  executive duties.
3  A.   Isn't that a description?
4  Q.   Well, can you give me some examples of
5  what you do as chief executive.
6  A.   Approve budget, approve hiring to some
7  degree.  I'm the chief executive.  I don't -- you
8  know, anything that rises to the level of a chief
9  executive responsibility becomes my responsibility,
10  and sometimes those matters are large
11  macro-strategic matters and sometimes they're
12  smaller.  But that would be I guess sort of like
13  asking -- you know, there are a lot of
14  responsibilities, but they change on a daily basis.
15  Q.   You mentioned that you had -- you would
16  approve hiring in some instances.  Do you recall
17  being involved in the hiring of Maria DeSouza?
18  A.   Yes.
19  Q.   What was your role in the hiring of Ms.
20  DeSouza?
21  A.   I hired her.
22  Q.   Do you know when Ms. DeSouza was hired?
23  A.   I think it was in '07.
24  Q.   Can you approximate what part of '07?
25  A.   I would say probably April, May, but

Sheinker - Doherty    21

1  that's just a rough approximation.
2  Q.   Do you know what Ms. DeSouza's
3  background was?
4  A.   Yes.
5  Q.   What was that?
6  A.   She worked for a mortgage company.
7  Q.   Did you seek any references from that
8  mortgage company before you hired Ms. DeSouza?
9  A.   No.
10  Q.   Were you involved at all in training
11  Ms. DeSouza for her work at Quantum?
12  A.   Tangentially.
13  Q.   And in what way were you tangentially
14  involved in training Ms. DeSouza?
15  A.   Occasionally I'd be asked for advice
16  and I would provide it.
17  Q.   Asked for advice by Ms. DeSouza?
18  A.   Mmm-hmm.
19  Q.   Do you know who was more involved in
20  training Ms. DeSouza since you were only
21  tangentially involved?
22  A.   Shelley Simmonds.
23  Q.   How long has Ms. Simmonds been employed
24  by Quantum?
25  A.   At least -- at least five years.

22

```
1    Q.   And what's Ms. Simmonds' title?
2    A.   Senior account executive.
3    Q.   How many account executives work at
4  Quantum?
5    A.   Two.
6    Q.   Who's the other account executive
7  besides Ms. Simmonds?
8    A.   Ms. DeSouza.
9    Q.   How many employees altogether does
10 Quantum have?
11   A.   About 12, 13.
12   Q.   Does Quantum have any written training
13 materials that it provides to new employees?
14   A.   No.  Strike that.
15        I -- as I mentioned I'm tangentially
16 involved in that aspect, so I'm sure that there may
17 be some written documents that Shelley Simmonds
18 would know about.
19   Q.   Is Ms. DeSouza paid a salary?
20   A.   Yes.
21   Q.   Does she receive any compensation based
22 on the outcome of Quantum's dealings with those
23 people that come to engage in factoring or
24 asset-based lending?
25   A.   No.
```

Sheinker - Doherty          23

```
1    Q.   Have there been any complaints made
2  about Ms. DeSouza's performance by any customers
3  since she's been working for the company?
4    A.   No.
5    Q.   Has Ms. DeSouza had any performance
6  reviews?
7    A.   No.
8    Q.   Does Quantum have a process in place
9  for conducting background checks of the people and
10 entities that seek to engage in factoring or
11 asset-based lending with it?
12   A.   Oh, on our client, you mean?
13   Q.   Yes.
14   A.   Yeah.
15   Q.   Can you describe what that process is
16 for doing a background check on a client.
17   A.   A Dun & Bradstreet report typically
18 and a UCC search.  And it really varies tremendously
19 based upon the nature of the transaction.  Sometimes
20 credit reports.
21   Q.   In what instances will you decide to
22 run a credit report besides also doing the D&B and
23 UCC search?
24   A.   It really depends upon the
25 circumstances.
```

24

```
1    Q.   What level involvement do you have in
2  doing background searches on prospective clients of
3  Quantum?
4    A.   I generally don't get involved, but
5  I'm -- you know, any decision that comes up to my
6  level, I would request what information was
7  available, and I may request additional information
8  to be provided.
9    Q.   Does Quantum have any procedures in
10 place to detect whether there's fraud going on with
11 any client?
12   A.   Absolutely.
13   Q.   What procedures does Quantum have to
14 detect fraud on the part of clients?
15   A.   The most significant one is invoice
16 verification.
17   Q.   What does that involve?
18   A.   Verifying the invoices.
19   Q.   Who do you verify invoices with?
20   A.   Account debtors, customers of our
21 clients, people that are being billed.  We need to
22 verify the invoices.
23   Q.   How do you assess who an account debtor
24 is of your prospective client?
25   A.   Generally it's the person who is
```

Sheinker - Doherty          25

```
1  paying.
2    Q.   To your knowledge, Quantum engaged in a
3  transaction with Westwood Design/Build?
4    A.   Yes.
5    Q.   Were you involved at all in any of the
6  background checking on Westwood?
7    A.   Well, I had a preliminary meeting with
8  Warfield and Conrad.  I made inquiries as to their
9  background.  I think we pulled a credit report on
10 either or both.  If I recall, the credit was not --
11 not very good, but very often people come to us
12 because they can't get financing at a conventional
13 lending institution.
14   Q.   When you say you think you ran a credit
15 report on either or both Warfield or Conrad, would
16 your records show whether you ran a credit report on
17 both?
18   A.   Not my records, my personal records,
19 no, but the company has records to that effect.
20   Q.   And would those records -- would
21 Quantum's records be kept in a folder that would be
22 attributable to Westwood?
23   A.   I'm sure they would.
24   Q.   Do you keep any personal folders, like
25 sort of a working folder, --
```

Sheinker - Doherty    28

1  A. No.
2  Q. -- In your work at Quantum?
3  A. No.
4  Q. You mentioned a preliminary meeting
5  with Warfield and Conrad. Where did that meeting
6  take place?
7  A. In my office, my conference room.
8  Q. And was that when Quantum was still
9  operating in New York?
10 A. Yes.
11 Q. Can you estimate or approximate when
12 that meeting took place, unless you know the exact
13 date?
14 A. No, I don't know the exact date. It
15 was toward the end of 2007.
16 Q. Did this meeting take place --
17 A. Was it '07 or '06?
18 MR. KOBROFF: Give your best
19 recollection.
20 A. It was the end of '07.
21 Q. Did that meeting take place before or
22 after Westwood had signed any agreement with
23 Quantum?
24 A. Pardon?
25 Q. Did that meeting take place before or

Sheinker - Doherty    27

1  after Westwood signed any kind of agreement --
2  A. Before. Before.
3  Q. Just so the record is clear, it was
4  before any agreement was signed between Westwood and
5  Quantum?
6  A. Yes.
7  Q. Who did you understand Warfield to be
8  in connection with Westwood?
9  A. I believed he was one of the
10 principals.
11 Q. And who was Conrad?
12 A. One of the principals.
13 Q. When you say principals, you mean they
14 were owners of the company?
15 A. Officers.
16 Q. Did Conrad introduce himself as Conrad?
17 A. Yes.
18 Q. Did he use any other name?
19 A. No.
20 Q. Was anyone else present for this
21 meeting with Warfield and Conrad?
22 A. Yes.
23 Q. Who else was present?
24 A. Toby Wilkins.
25 Q. Who is Toby Wilkins?

Sheinker - Doherty    29

1  A. She was the new business development
2  person responsible for introducing them to the
3  company.
4  Q. Is Ms. Wilkins still employed by
5  Quantum?
6  A. Yes.
7  Q. Was anyone else present besides you,
8  Ms. Wilkins, Warfield, and Conrad?
9  A. No.
10 Q. Can you recall how long this meeting
11 lasted?
12 A. I'd say about 40 minutes.
13 Q. Is it typical that you would meet with
14 the principals of a client before doing business
15 with them?
16 A. Depends what you mean, typical. What
17 I mean by that is typical meaning 20 percent of the
18 time? 25 percent of the time? Occasionally. I
19 would say occasionally.
20 Q. And by occasionally you mean about 20
21 to 25 percent of the time?
22 A. Yeah, approximately.
23 Q. Was there any particular reason why you
24 opted to meet with Warfield and Conrad for this
25 proposed transaction?

Sheinker - Doherty    29

1  A. It was at the request of Toby --
2  MR. KOBROFF: Objection to form.
3  Q. You can answer.
4  A. At the request of Toby Wilkins.
5  Q. Did Ms. Wilkins indicate why she wanted
6  you to meet with Warfield and Conrad?
7  A. The transaction was one that she
8  thought that required my attention, extra attention,
9  my extra attention.
10 Q. Did she say why she felt it required
11 your extra attention?
12 A. Well, it's one that we don't generally
13 do. It's not -- I don't recall having ever done a
14 modular home builder in our company.
15 Q. Was there anything else about this
16 transaction that was unusual for Quantum?
17 A. No.
18 Q. Had Quantum engaged in other
19 transactions where a construction loan was involved?
20 A. Quantum is regularly involved in
21 factoring for construction contractors.
22 Q. When Quantum is engaged in transactions
23 with construction contractors, are there instances
24 where a mortgage lender is being asked to sign any
25 kind of paperwork to verify payment?

Sheinker - Doherty    30

1    A.    Rarely.

2    Q.    Can you think of any instances where --

3    you say it's rarely.

4    A.    No, I can't think of any.

5    Q.    Do you have an understanding of how a

6    construction loan works?

7    A.    Yes.

8    Q.    What's your understanding?

9    A.    Advances are made based upon

10    completion, stages of completion.

11    Q.    And who are the advances made by?

12    A.    The lender.

13    Q.    And what's your understanding of whose

14    money is being advanced by the lender?

15    A.    The bank's.

16    Q.    You don't believe it's the borrower's

17    funds that are being advanced by the lender?

18    A.    A check is drawn on the bank, on the

19    bank's bank account, on the bank's check, to my

20    understanding and experience.

21    Q.    Do you believe that the bank winds up

22    owning the home that's being built by a construction

23    contractor?

24    A.    These days a lot of that is going on.

25    Q.    Putting aside the possibility of

Sheinker - Doherty    31

1    foreclosures, in the non-foreclosure setting, is it

2    your understanding that the bank owns the home

3    that's being -- that it's advancing funds on --

4    A.    No.

5    Q.    -- with the construction process?

6    A.    No.

7    Q.    You indicated that the meeting with

8    Conrad and Warfield lasted about 40 minutes. Can

9    you tell me as best as you can recall what was

10    discussed at that meeting?

11    A.    I basically explained to him what our

12    condition would be for being able to provide

13    factoring services.

14    Q.    And what was that condition?

15    A.    An estoppel certificate signed for by

16    the bank verifying the amount due and their

17    obligation to pay it, pay for the work, the stage of

18    work completed, come hell or high water.

19    Q.    And what did Warfield and Conrad say in

20    response to that?

21    A.    They would try and see if they could

22    get that accomplished from the bank.

23    Q.    Did you discuss with them what their

24    backgrounds were, what their experience was?

25    A.    Yes.

Sheinker - Doherty    32

1    Q.    Rather than saying they, what did

2    Warfield tell you and then what did Conrad tell you,

3    and tell me which one is telling you which?

4    A.    My recollection was that Warfield

5    said -- not Warfield, that Conrad said he was an

6    architect.

7    Q.    Did he say anything else about his

8    background?

9    A.    No, just that he's a home builder and,

10    you know, modular homes.

11    Q.    Did he tell you how long he'd been in

12    the business of home building?

13    A.    Not that I can -- I don't recall

14    whether he told me how long he'd been in the

15    business.

16    Q.    Do you know how long Westwood

17    Design/Build had been in business as of the time

18    that you met with them in 2007?

19    A.    I don't recall.

20    Q.    Is that something that you would have

21    looked into before entering into any kind of

22    agreement with Westwood?

23    MR. KOBROFF:  By "you," you mean him

24    or Quantum?

25    MR. DOHERTY:  Quantum.  I'm sorry.

Sheinker - Doherty    33

1    A.    Not necessarily.

2    Q.    Do you recall what Warfield said to you

3    about his background?

4    A.    I don't recall.

5    Q.    Can you describe what Conrad looked

6    like?

7    A.    He was black and clean cut, articulate

8    and intelligent.

9    Q.    And what did Warfield look like?

10    A.    White, less clean cut, and didn't

11    speak very much.

12    Q.    Did Conrad and Warfield tell you

13    whether they were related in any way by marriage

14    or --

15    A.    No.

16    Q.    So you said you explained the condition

17    to them upon which Quantum would engage in a

18    transaction. Conrad and Warfield said they'd try to

19    accomplish. You found out a little bit about the

20    background of Conrad. What else do you recall from

21    the meeting that you had with Warfield and Conrad?

22    A.    That was it.

23    Q.    Did they tell you why they were looking

24    to engage in this transaction with Quantum as

25    opposed to a more conventional funding source?

Sheinker - Doherty    36

1   A.    No.

2   Q.    Do you remember reviewing any kind of

3   financial statement from Westwood prior to

4   engaging -- entering into any agreement with

5   Westwood? And when I say -- I'm not saying that you

6   personally entered into a contract with Westwood,

7   but before Quantum entered into any contract, do you

8   remember reviewing any financial statements of

9   Westwood?

10   A.    **Financial statements are not a**

11   **pre-requisite for any of our clients in the**

12   **factoring business.**

13   Q.    Whether or not it's a pre-requisite, do

14   you remember reviewing any --

15   A.    **No.**

16   Q.    -- balance sheet or anything from --

17   A.    **No.**

18   Q.    -- Westwood?

19   A.    **No.**

20   Q.    Do you know if anyone at Quantum

21   reviewed any financial statement or balance sheet

22   from Westwood prior to Quantum entering into an

23   agreement with Westwood?

24   A.    **No.**

25   Q.    Did Ms. Wilkins say anything at this

1   Q.    Do you remember the names of the

2   projects that Westwood sought funding from Quantum?

3   A.    **The only one I remember is the one at**

4   **hand, Pollydore.**

5   Q.    Out of the two or three deals that

6   Quantum had with Westwood, on which ones did Quantum

7   lose any money?

8   A.    **This, the one at hand, this Pollydore**

9   **transaction.**

10   Q.    The meeting that you had with Warfield

11   and Conrad, did you take any notes from that

12   meeting?

13   A.    **No.**

14   Q.    Did you prepare any memo or e-mail to

15   any other Quantum employees regarding what took

16   place at that meeting?

17   A.    **No.**

18   Q.    Do you know if Ms. Wilkins took any

19   notes from that meeting?

20   A.    **No.**

21   Q.    Do you know if Ms. Wilkins prepared any

22   memo or e-mail to any other Quantum employees

23   regarding the meeting with Conrad and Warfield?

24   A.    **No.**

25   Q.    As a result of the meeting that you had

Sheinker - Doherty    35

1   meeting with Warfield and Conrad?

2   A.    **Of course. She said -- there was**

3   **conversation. It was a long meeting and there was**

4   **conversation. Did she say anything that was**

5   **substantive, of significance, no. I couldn't repeat**

6   **for you word for word what she said either though.**

7   Q.    Do you know how Ms. Wilkins found the

8   potential business with Westwood?

9   A.    **No, I don't recall.**

10   Q.    Do you know whether Westwood was

11   licensed in the state of Maryland to do building?

12   A.    **I don't.**

13   Q.    Have you ever spoken to an individual

14   named Angela Warfield from Westwood?

15   A.    **No.**

16   Q.    To your knowledge, did Quantum enter

17   into any agreement or agreements with Westwood?

18   A.    **Yes.**

19   Q.    Can you tell me how many agreements

20   Quantum entered into with Westwood.

21   A.    **Two or three is my recollection.**

22   Q.    On how many of those deals with

23   Westwood did Quantum actually advance any funds to

24   Westwood?

25   A.    **I believe it was three.**

Sheinker - Doherty    37

1   with Warfield and Conrad, what did Quantum do?

2   A.    **As I explained to you, we told them**

3   **that if they were to be able to accomplish getting**

4   **the bank to provide them what we require, that we'd**

5   **be able to fund. That was the result of the**

6   **meeting.**

7   Q.    In terms of the timing of the

8   agreements that Quantum had with Westwood, the

9   Pollydore one, which I believe you identified as the

10   one that's at issue in this case, was that the first

11   deal, the second deal, or the third deal?

12   A.    **Pollydore was the third deal.**

13   Q.    Your affidavit, which I think is still

14   in front of you, D-14, in Paragraph 4 you make

15   reference to a contract between the Pollydores and

16   Westwood. Do you see that in Paragraph 4?

17   A.    **Yes.**

18   Q.    And you state, and I'll just read it

19   for the record, "On or about January 2007 Mr. and

20   Mrs. Eustace Pollydore, as owners, entered into

21   contracts with defendant Westwood Design/Build

22   Incorporated as contractor, and with defendant

23   National City Mortgage Inc. as construction lender,

24   pursuant to which Westwood contracted to construct a

25   new home for Mr. and Mrs. Pollydore at 6117 Elm

Sheinker - Doherty                    38

1   Avenue, Lanham, Maryland."
2              Did I read that correctly?
3   A.    Yes.
4   Q.    Was National City a signatory to the
5   contract between the Pollydores and Westwood?
6   A.    I don't believe so.
7   Q.    Where did you get -- where did Quantum
8   get the contract from Pollydore and Westwood?
9   A.    That's not directly within my
10  knowledge. I'm sure that someone from my office got
11  that.
12  Q.    Did you review the Westwood/Pollydore
13  contract before Quantum entered into an agreement
14  with Westwood for this project?
15  A.    No.
16  Q.    At the bottom of Paragraph 4 it says,
17  "A copy of the National/Pollydore construct loan
18  agreement is annexed hereto as Exhibit B."
19             Do you know where -- who the source was
20  that gave those papers that are attached as Exhibit
21  B to your affidavit to Quantum?
22  A.    No. I assume --
23             MR. KOBROFF: Don't assume.
24  A.    Well, I don't want to assume.
25             MR. KOBROFF: Don't assume.

Sheinker - Doherty                    39

1   Q.    Did you review the documents that are
2   attached as Exhibit B to this affidavit prior to
3   Quantum entering into an agreement with Westwood for
4   the Pollydore project?
5   A.    No.
6   Q.    Have you reviewed the document that's
7   attached as Exhibit B to your affidavit at any time?
8   A.    Yes.
9   Q.    When was the first time you reviewed
10  the document that you describe as a copy of the
11  National/Pollydore construct loan agreement?
12  A.    Sometime after discovering the fraud.
13  Q.    Were you being kept apprised by any
14  employees of Quantum as to what was going on between
15  Quantum and Westwood in the year 2007 after your
16  meeting with Warfield and Conrad?
17  A.    Tangentially.
18  Q.    Who was keeping you posted on what was
19  happening with Westwood?
20  A.    Maria.
21  Q.    What do you recall Maria keeping you
22  posted about with respect to Westwood?
23  A.    The new transactions, the state of the
24  sign-off. Wilmer was updating me with respect to
25  collections, and Toby was updating me with respect

Sheinker - Doherty                    40

1   to new requests.
2   Q.    New requests by Westwood?
3   A.    Yeah.
4   Q.    Who's Wilmer?
5   A.    She's our collections person. Wilmer
6   Russell, W-i-l-m-e-r Russell.
7   Q.    Do you recall what Maria was telling
8   you when she was keeping you posted on transactions
9   with Westwood?
10  A.    Did you get the sign-off?
11  Q.    And what does that mean?
12  A.    The estoppel certificate.
13  Q.    Why do you call it an estoppel
14  certificate?
15  A.    My attorney advises me that's what it
16  is.
17  Q.    Does Quantum describe that document as
18  an estoppel certificate in its communications with
19  those entities that it wishes to have sign the
20  document?
21             MR. DOHERTY: Let the record reflect
22  that Mr. Kobroff is pointing out something in the
23  document to the witness.
24  A.    I opened the page to this. Mr.
25  Kobroff didn't point to the page that I opened. Let

Sheinker - Doherty                    41

1   the record reflect that.
2              MR. GOLDSTEIN: Just for economy's
3   sake, do you want to use the actual exhibit if he's
4   going to refer to it, or do you want to refer to it
5   within this?
6              MR. KOBROFF: What exhibit are we
7   referring to?
8   Q.    If the witness is looking at a page
9   from D-14, I'd ask him to let me know what page, and
10  I guess the easiest way to do that is identifying it
11  from the top of the page. There's indications like
12  page 23 of 70 or something along those lines.
13  A.    Page 28 of 70.
14  Q.    And what is page 28 of 70 that you're
15  looking at?
16  A.    The estoppel certificate.
17  Q.    I think I was asking, does Westwood
18  describe --
19             MR. KOBROFF: Objection. Does
20  Westwood describe?
21             MR. DOHERTY: Good point. Good
22  objection. I agree with that one.
23  Q.    Does Quantum describe a letter such as
24  which appears at page 28 of 70 within D-14, does
25  Quantum describe letters such as this as an estoppel

Sheinker - Doherty                42

1  certificate to those persons or entities that it
2  asks to sign it?
3      A.      **The last sentence refers to this as an**
4  **estoppel.**
5      Q.      Does it say anything in this document
6  that says this is an estoppel certificate?
7      A.      **It says "this estoppel."**
8      Q.      Does the word certificate appear?
9      A.      **No.**
10     Q.      Did Ms. DeSouza talk to you about any
11 conversations that she was having with anyone at
12 National City about asking National City to sign the
13 document that we're referring to, 28 of 70 within
14 D-14?
15     A.      **Most of her conversations were with**
16 **Shelley Simmonds, but my conversation with her was**
17 **to make sure that she got verification of the**
18 **authority of the person signing off, and that's it.**
19     Q.      And what did Ms. DeSouza say to you
20 about that issue that you were requesting her to
21 follow up on?
22     A.      **She confirmed that she got multiple**
23 **verifications, multiple such verifications.**
24     Q.      Did you ever direct her to confirm
25 those verifications in writing?

Sheinker - Doherty                43

1      A.      **I don't recall.**
2      Q.      Did Ms. DeSouza describe to you any
3  other information that she claims to have learned
4  from National City in phone conversations with
5  National City employees?
6      A.      **No, not that I can recall.**
7      Q.      Did you speak with Shelley Simmonds
8  about the status of the Westwood transactions?
9      A.      **Tangentially.**
10     Q.      Can you describe for me what you recall
11 of the discussions you had with Ms. Simmonds about
12 the Westwood transactions?
13     A.      **General conversations with respect to**
14 **general issues surrounding the transactions at hand.**
15     Q.      Did Ms. Simmonds recount to you any
16 conversations that she may have had with anyone at
17 National City?
18     A.      **Not that I can recall. I mean, not**
19 **that I can -- yes, but I can't recall the sum and**
20 **substance of those conversations.**
21     Q.      Were the updates that you were
22 receiving from Ms. DeSouza, Wilmer Russell, Toby
23 Wilkins and Shelley Simmonds, were those updates all
24 verbal or were any of them in writing?
25     A.      **Verbal.**

Sheinker - Doherty                44

1      Q.      To your knowledge, did Ms. DeSouza ever
2  keep you posted on the Westwood transactions by
3  e-mail or by memo?
4      A.      **Not that I can recall.**
5      Q.      Did Ms. Russell keep you posted on
6  Westwood transactions by e-mail or by memo?
7      A.      **Not that I can recall.**
8      Q.      Did Ms. Wilkins keep you posted on
9  Westwood transactions by e-mail or by memo?
10     A.      **Once again, not that I can recall.**
11     Q.      The same answer as to Ms. Simmonds,
12 e-mail or memos?
13     A.      **I guess the overall answer is that I**
14 **don't recall specific e-mails.**
15     Q.      How about memos?
16     A.      **Well, no, we don't generally do memos.**
17     Q.      The page you were just looking at, I
18 guess you're still open to it, in D-14, what you
19 call the estoppel certificate, did you review this
20 document when it came in from National City?
21     A.      **No.**
22     Q.      When was the first time you had
23 occasion to look at the document that's attached to
24 your affidavit that's 28 of 70 in this exhibit?
25     A.      **I don't recall.**

Sheinker - Doherty                45

1      Q.      The two pages prior to the page you're
2  looking at, 26 of 70, and we're still within Exhibit
3  D-14, do you recognize that document as something
4  you saw before the lawsuit in this case was filed?
5      A.      **No.**
6      Q.      So the first time you would have seen
7  this document was after the lawsuit was -- when the
8  lawsuit was being prepared?
9      A.      **Yes. Probably.**
10     Q.      Do you know who supplied that page 26
11 of 70 to Quantum?
12     A.      **I don't have personal knowledge who**
13 **supplied it to Quantum.**
14     Q.      Who do you believe supplied it to
15 Quantum?
16             THE WITNESS: Is that something you
17 want me to answer, who I believe supplied it to
18 Quantum?
19             MR. KOBROFF: Why don't you rephrase
20 the question.
21     Q.      Is it your understanding that Quantum
22 received that document from Westwood?
23     A.      **Yes.**
24     Q.      Does Quantum have a practice of
25 telephoning its clients, customers, to determine

1  whether services have been rendered or goods have
2  been furnished?
3       A.    Yes.
4       Q.    Is that a process that your employees
5  are directed to do on every transaction?
6       A.    No.
7       Q.    In what transactions are your employees
8  supposed to reach out to the customer of your client
9  by telephone?
10      A.    Heavy concentration.
11      Q.    What does that mean?
12      A.    Where you have -- as an example, if we
13 have one client that has a thousand customers and
14 the average invoice is a hundred dollars, we're not
15 calling a thousand customers and getting written
16 verification; but where you have one invoice of
17 substance with a substantial concentration such as
18 you have here, then we are almost indefinitely gonna
19 get a written verification in the form of an
20 estoppel certificate.
21      Q.    What about a telephone verification?
22      A.    Telephone verification may be done in
23 addition, and as I mentioned, where you have a
24 widely diverse schedule of accounts you may do
25 spot-checking, verbal conversations.  There are a

1  host of applicable verification procedures that
2  could be employed given the circumstances.
3       Q.    From your meeting with Warfield and
4  Conrad, was it your understanding that they were
5  building homes that would be owned by National City
6  Mortgage?
7       A.    I think we answered that already.
8       Q.    Do you know the answer?
9       A.    I think I answered the question
10 already.
11            THE WITNESS: Did I answer that
12 question already.
13            MR. KOBROFF: Yes, I think you did.
14 It's been asked and answered.  Why don't you
15 rephrase it differently.
16      Q.    Did Quantum make any effort to reach
17 out to Eustace Pollydore to determine whether
18 Westwood delivered a home to the Pollydores?
19            MR. KOBROFF: At what time are we
20 talking about?
21            MR. DOHERTY: At any time.
22      A.    Yes.
23      Q.    When did Quantum reach out to the
24 Pollydores?
25      A.    I believe it was -- -- my

1  recollection, it was the same date we discovered
2  that there was a fraud, which I think I stated
3  earlier was on or about January 11, 2008.
4       Q.    Do you know who reached out to the
5  Pollydores?
6       A.    Wilmer Russell.
7       Q.    How do you know that?
8       A.    Because she told me.
9       Q.    Did Ms. Russell tell you what she
10 learned from reaching out to the Pollydores?
11      A.    Yes.
12      Q.    What did she learn?
13      A.    That not only were there no boxes --
14 when I say "boxes" I mean the pre-fabricated modular
15 home components -- delivered, but that the land
16 wasn't cleared either and that she -- period.
17 That's the end.
18      Q.    Do you remember anything else from your
19 conversation with Ms. Russell about her conversation
20 with the Pollydores?
21            THE WITNESS: Could you read back the
22 question, two preceding questions, go back two.
23            (Last five questions and four answers
24 are read back by the court reporter.)
25      A.    You mean when was the first time

1  Quantum reached out to the Pollydores?
2       Q.    Yes.
3       A.    Okay.  That was the answer.
4       Q.    Were there additional times that
5  Quantum reached out to the Pollydores?
6       A.    Yes.
7       Q.    When were those other occasions and who
8  was involved?
9       A.    After this I had multiple
10 conversations with Mrs. Pollydore and her attorney.
11      Q.    Who was the attorney for the
12 Pollydores?
13      A.    I don't recall her name.
14      Q.    What do you recall of your
15 conversations with Mrs. Pollydore?
16      A.    That Michael Conrad is a con man and
17 that I believe he even counterfeited a building --
18 building permit or something along those lines, some
19 kind of building permit which enabled him to draw
20 perhaps on the bank's loan prior thereto, but he
21 counterfeited some kind of a county document is what
22 I was told.
23      Q.    Anything else you recall from your
24 conversations with Mrs. Pollydore?
25      A.    She was very distraught.  She was

Sheinker - Doherty                                46

1  whether services have been rendered or goods have
2  been furnished?
3      A.    Yes.
4      Q.    Is that a process that your employees
5  are directed to do on every transaction?
6      A.    No.
7      Q.    In what transactions are your employees
8  supposed to reach out to the customer of your client
9  by telephone?
10      A.    Heavy concentration.
11      Q.    What does that mean?
12      A.    Where you have -- as an example, if we
13  have one client that has a thousand customers and
14  the average invoice is a hundred dollars, we're not
15  calling a thousand customers and getting written
16  verification; but where you have one invoice of
17  substance with a substantial concentration such as
18  you have here, then we are almost indefinitely gonna
19  get a written verification in the form of an
20  estoppel certificate.
21      Q.    What about a telephone verification?
22      A.    Telephone verification may be done in
23  addition, and as I mentioned, where you have a
24  widely diverse schedule of accounts you may do
25  spot-checking, verbal conversations.  There are a

Sheinker - Doherty                                47

1  host of applicable verification procedures that
2  could be employed given the circumstances.
3      Q.    From your meeting with Warfield and
4  Conrad, was it your understanding that they were
5  building homes that would be owned by National City
6  Mortgage?
7      A.    I think we answered that already.
8      Q.    Do you know the answer?
9      A.    I think I answered the question
10  already.
11          THE WITNESS:  Did I answer that
12  question already.
13          MR. KOBROFF:  Yes, I think you did.
14  It's been asked and answered.  Why don't you
15  rephrase it differently.
16      Q.    Did Quantum make any effort to reach
17  out to Eustace Pollydore to determine whether
18  Westwood delivered a home to the Pollydores?
19          MR. KOBROFF:  At what time are we
20  talking about?
21          MR. DOHERTY:  At any time.
22      A.    Yes.
23      Q.    When did Quantum reach out to the
24  Pollydores?
25      A.    I believe it was -- -- my

Sheinker - Doherty                                48

1  recollection, it was the same date we discovered
2  that there was a fraud, which I think I stated
3  earlier was on or about January 11, 2008.
4      Q.    Do you know who reached out to the
5  Pollydores?
6      A.    Wilmer Russell.
7      Q.    How do you know that?
8      A.    Because she told me.
9      Q.    Did Ms. Russell tell you what she
10  learned from reaching out to the Pollydores?
11      A.    Yes.
12      Q.    What did she learn?
13      A.    That not only were there no boxes --
14  when I say "boxes" I mean the pre-fabricated modular
15  home components -- delivered, but that the land
16  wasn't cleared either and that she -- period.
17  That's the end.
18      Q.    Do you remember anything else from your
19  conversation with Ms. Russell about her conversation
20  with the Pollydores?
21          THE WITNESS:  Could you read back the
22  question, two preceding questions, go back two.
23          (Last five questions and four answers
24  are read back by the court reporter.)
25      A.    You mean when was the first time

Sheinker - Doherty                                49

1  Quantum reached out to the Pollydores?
2      Q.    Yes.
3      A.    Okay.  That was the answer.
4      Q.    Were there additional times that
5  Quantum reached out to the Pollydores?
6      A.    Yes.
7      Q.    When were those other occasions and who
8  was involved?
9      A.    After this I had multiple
10  conversations with Mrs. Pollydore and her attorney.
11      Q.    Who was the attorney for the
12  Pollydores?
13      A.    I don't recall her name.
14      Q.    What do you recall of your
15  conversations with Mrs. Pollydore?
16      A.    That Michael Conrad is a con man and
17  that I believe he even counterfeited a building --
18  building permit or something along those lines, some
19  kind of building permit which enabled him to draw
20  perhaps on the bank's loan prior thereto, but he
21  counterfeited some kind of a county document is what
22  I was told.
23      Q.    Anything else you recall from your
24  conversations with Mrs. Pollydore?
25      A.    She was very distraught.  She was

Sheinker - Doherty                50

1  supposed to have this house built a long time ago.
2  I think that she had put up some money, I don't
3  recall though, and that no such house ever was
4  delivered.
5         THE WITNESS:  And I think we also
6  spoke to Harris, too, didn't we?
7         MR. KOBROFF:  Don't look at me.
8         A.    All this was after, really after the
9  fraud.
10        Q.    And you said you had conversations with
11 a lawyer for the Pollydores?
12        A.    Yes.
13        Q.    Can you describe what you discussed
14 with the Pollydores' lawyer?
15        A.    I think I just did.
16        Q.    Oh, I was asking you what your
17 conversations were with Ms. Pollydore.
18        A.    They were similar conversations.  I
19 think it was the lawyer that informed me of the
20 counterfeiting of the county document, but I could
21 be wrong.  I don't remember who said which.
22        Q.    When was your last conversation with
23 Mrs. Pollydore and then when was your last
24 conversation with the lawyer for the Pollydores?
25        A.    I would say probably February or March

Sheinker - Doherty                51

1  of '08.
2         Q.    For which one, Mrs. Pollydore or the
3  lawyer?
4         A.    Both.  Both.
5         Q.    Regarding page 28 of 70 within that
6  exhibit D-14 in front of you, do you recall whether
7  you spoke with Maria DeSouza about including a
8  signature line for the Pollydores to sign?
9              I'll wait till you get to that page.
10             Do you recall having a conversation
11 with Ms. DeSouza about putting in a signature line
12 for the Pollydores to sign this document?
13        A.    I don't recall.
14        Q.    Do you recall having a conversation
15 with Ms. DeSouza about having any property owners
16 that were doing business with Westwood sign off on
17 what you call an estoppel certificate?
18        A.    No.
19             MR. DOHERTY:  Can you please mark
20 that.
21             (Exhibit D-15, one-page certificate of
22 officers agreement and corporate resolution dated
23 September 20, 2007, is marked for identification.)
24        Q.    Mr. Sheinker, I'm showing you a
25 document that's been marked D-15 for identification.

Sheinker - Doherty                52

1  I'll represent to you that this is a document that
2  was produced in discovery by Quantum's lawyers that
3  bears the label GF121 in the lower right-hand
4  corner.  Have you ever seen this document before?
5         A.    Are you talking about this particular
6  document or the form?
7         Q.    Well, let's start with the form.
8         A.    Yes.
9         Q.    What is the form of D-15?
10        A.    It's a certificate of officers
11 agreement and corporate resolution.
12        Q.    Is this a Quantum form?
13        A.    Yes.
14        Q.    And why does Quantum use a form like
15 this?
16        A.    Because my attorney told me to.
17        Q.    Now, specifically this form D-15 with
18 the text written in, have you ever seen that
19 document as filled in?
20        A.    No.
21        Q.    Mr. Sheinker, I'm going to show you a
22 document that was marked yesterday at Ms. DeSouza's
23 deposition as D-4 for identification.  Could you
24 please take a look at that document and let me know
25 if you've ever seen it before.

Sheinker - Doherty                53

1         A.    Once again, are we talking about the
2  form or this particular document?
3         Q.    That particular document.
4         A.    If you're asking me if I've ever seen
5  this prior to the transaction, the answer is no.
6         Q.    What transaction are you referring to?
7         A.    Prior to any of these transactions.
8  The answer is no.
9         Q.    On D-4 you'll notice at the bottom
10 there are signature lines that say Mr. Barry Postell
11 and Mrs. Barry Postell.  Do you see that?
12        A.    Yes.
13        Q.    Do you have any recollection of
14 speaking with Ms. DeSouza and instructing her to put
15 signature lines in for the Postells on D-4?
16        A.    I don't remember that conversation
17 with Ms. DeSouza.
18        Q.    Since the meeting that you had with
19 Warfield and Conrad, did you ever speak with either
20 of them again?
21        A.    Yes.
22        Q.    How many times have you spoken with Mr.
23 Warfield since that meeting in your office when you
24 were in New York?
25        A.    Maybe two.

Sheinker - Doherty                                          54

1    Q.    Can you approximate when those
2    conversations with Warfield took place?
3    A.    Right about the time that this
4    transaction paid, which was this -- I can get a date
5    of payment here. It would refresh my memory.
6          When I say "this transaction," I mean
7    transaction No. 25 -- it looks like 2567. Let's
8    call it the Barry Postell transaction. The bank
9    sent the payment directly to Conrad. He had a three
10   hundred thousand some odd dollar check in his hand
11   made out to him and it was brought to my attention,
12   so naturally I got on the phone and I called him up.
13   Q.    And you called Warfield or you called
14   Conrad?
15   A.    Conrad.
16   Q.    And did you reach Conrad?
17   A.    Yes.
18   Q.    Can you describe what your discussion
19   was with Conrad.
20   A.    I implored him to immediately turn
21   over the check to my representative in Maryland. I
22   had an attorney that I'd worked with in the past and
23   he was minutes away from their location, so in order
24   to protect the bank's position, I -- I arranged for
25   a place where he could drop that check off

Sheinker - Doherty                                          55

1    immediately, alleviating the risk to the bank that
2    he would convert the money.
3    Q.    When you refer to the bank, you're
4    referring to National City?
5    A.    Mmm-hmm.
6    Q.    Who alerted you to the fact that Conrad
7    had a check in hand?
8    A.    I believe that Maria had either spoken
9    with him or had -- I don't remember. Somebody in my
10   office alerted me to the fact that Conrad has the
11   check.
12   Q.    And what did Conrad say in response
13   when you implored him to turn the check over to your
14   Maryland attorney?
15   A.    He complied immediately.
16   Q.    Did he say anything in the conversation
17   that you remember?
18   A.    No. I mean, shockingly, in
19   retrospect, I guess --
20   MR. KOBROFF: Don't discuss it.
21   A.    He complied.
22   Q.    Can you recall any other conversations
23   that you had with Conrad?
24   A.    After I realized that we'd been
25   defrauded, I did have a chance to speak to him.

Sheinker - Doherty                                          56

1    MR. GOLDSTEIN: Did or didn't?
2    THE WITNESS: I did.
3    Q.    So that would have been in January of
4    2008?
5    A.    Yes.
6    Q.    This was by telephone?
7    A.    Yeah.
8    Q.    And maybe it's not clear. The
9    conversation you had with Conrad about turning over
10   the check, was that by telephone as well?
11   A.    Yes.
12   Q.    What did you speak to Conrad about in
13   January?
14   A.    I told him that I learned that the --
15   I learned from Penn Lyon that the Pollydore invoice
16   was fictitious and if that's correct that would
17   represent a serious fraud upon our company, upon the
18   bank, and that there could be some dire consequences
19   if it's true.
20   Q.    And what did Conrad say to you?
21   A.    He dismissed it as being untrue.
22   Q.    Did he have any explanation?
23   A.    No.
24   Q.    Do you recall anything else about the
25   conversation with Conrad?

Sheinker - Doherty                                          57

1    A.    I think that was about my last
2    conversation with Conrad. No, I don't recall
3    anything else.
4    Q.    Did he say anything about getting back
5    to you to explain?
6    A.    Perhaps.
7    Q.    I believe you mentioned that you
8    learned from Penn Lyon that there was a fictitious
9    invoice?
10   A.    Correct.
11   Q.    When did that conversation with Penn
12   Lyon take place, and who did you speak to at Penn
13   Lyon?
14   A.    I spoke to David Reed, if that's his
15   name, David Reed. And according to my affidavit it
16   says that I spoke to him on or about January 11,
17   which sounds approximately correct; 2008, that is.
18   Q.    What caused you to speak to Mr. Reed of
19   Penn Lyon?
20   A.    Well, when we found out that Mrs.
21   Pollydore said that there is no house, given the
22   fact that we had sent money to Penn Lyon, we were
23   trying to find out how this could be.
24   Q.    Your conversation with Mrs. Pollydore,
25   the first one where you learned that the house had

Sheinker - Doherty                                    58

1  never been delivered, what prompted that
2  conversation?
3      A.      Somehow, and I don't recall, somebody
4  in my office told me that, if I recall, that they
5  had a conversation with -- if I recall, Michael
6  Conrad was rarely calling us back suddenly.  There
7  may have been some kind of a collection call, maybe
8  by Wilmer Russell, which might have tipped somebody
9  in my office off to the fact that there may have
10 been a fraud possibility and so -- but honestly I
11 don't recall, but there was something that -- that
12 made us concerned and suspicious, so our due
13 diligence led us to call the Polydores.
14     Q.      And from there you called Mr. Reed at
15 Penn Lyon?
16     A.      Mmm-hmm.  Yes.
17     Q.      Can you please describe for me what you
18 recall of your conversation with Mr. Reed of Penn
19 Lyon.
20     A.      He knew of Conrad, he knew of Westwood
21 Design/Build, and I explained to him that the money
22 we had sent him for the Pollydore residence -- he
23 told me that there was no such thing as a Pollydore
24 residence and that -- I said, Then are you telling
25 me I'm looking at a bogus invoice?  And he says --

Sheinker - Doherty                                    59

1  if I recall, he said, Well, fax it to me.  And I
2  faxed it to him.  And, indeed, I think he got back
3  to me that day, that evening, and said that it's
4  fictitious.
5      Q.      What made you reach out to Penn Lyon to
6  find out the status of a house for the Pollydores?
7  What was --
8      A.      I was calling anybody or anything
9  relating at that point to the transaction just to
10 try and get more information.
11     Q.      And what was Penn Lyon's role in the
12 transaction?
13     A.      Penn Lyon is the -- well, we now know
14 it to be the non-supplier of the Pollydore house,
15 but they were represented to us as being the
16 supplier of the Pollydore house and the person who
17 was going to be responsible for erecting the
18 Pollydore house; person, company.
19     Q.      And was any payment made to Penn Lyon
20 by Quantum?
21     A.      Yes.
22     Q.      Can you describe what the circumstances
23 were that led up to that payment and how much the
24 payment was?
25          MR. KOBROFF:  Objection to form.

Sheinker - Doherty                                    60

1          You can answer if you can.
2      A.      After the second transaction wherein
3  the check went to Michael Conrad and he turned it
4  over to us, I just had the idea that the next
5  go-round on the next advance, it would be advisable
6  to send the money, the portion of the money relating
7  to the Pollydore transaction, to Penn Lyon directly.
8  So he wasn't happy about it.  Conrad wasn't happy
9  about that, but I insisted and I asked him to see a
10 copy of the invoice from Penn Lyon so that we could
11 make our payment directly.  He provided a copy, and
12 we wired the money directly to Penn Lyon.
13     Q.      If I can ask, are you looking for a
14 copy of the Penn Lyon invoice?
15     A.      Yes.
16     Q.      And you're still -- now you're looking
17 at D-14, just so the record is clear.
18     A.      Yeah.
19          MR. KOBROFF:  It's 37.
20     Q.      Mr. Sheinker, have you found a copy of
21 the Penn Lyon invoice that you're referring to in
22 your testimony?
23     A.      Yes.
24     Q.      Am I correct that it's page -- it's
25 within D-14, page 37 of 70 according to the

Sheinker - Doherty                                    61

1  numbering up at the top right-hand corner?
2      A.      Yes.
3      Q.      And it's your understanding this
4  invoice was a document provided to Quantum by
5  Westwood?
6      A.      It's my understanding that this was
7  provided to us by Penn Lyon through Westwood.
8      Q.      And is this the invoice that you recall
9  faxing to Mr. Reed at Penn Lyon to verify whether it
10 was a real invoice?
11     A.      I believe so.
12     Q.      And did you hear back from Mr. Reed
13 regarding whether it was a real invoice?
14     A.      Yes.
15     Q.      Was it the same day of your first
16 conversation with him?
17     A.      I believe so.
18     Q.      And what did Mr. Reed tell you?
19     A.      He said the invoice was fictitious.
20     Q.      Do you remember anything else about
21 that call with Mr. Reed?
22     A.      I think I told him to please send us
23 back the money.
24     Q.      And what was Mr. Reed's response?
25     A.      I think that -- I think that my

Sheinker - Doherty                                62

1  request may have been in writing to send back the
2  money. I don't think I told him verbally to send
3  back the money. I think the request was in writing.
4      Q.     If you turn to the last page within
5  that Exhibit D-14 in front of you, does looking at
6  that last page, which, for the record, is numbered
7  41 of 70 in the upper right-hand corner, does that
8  refresh your recollection of having further
9  communication with Mr. Reed of Penn Lyon?
10     A.     Yes.
11     Q.     What is this document that's on the
12 last page of D-14?
13     A.     What is this document? This is my
14 e-mail to David Reed.
15     Q.     Did you receive a response from Mr.
16 Reed to this e-mail?
17     A.     I believe that my attorney might have
18 received -- my attorney Charles Shea (phonetic) may
19 have received a response either from their lawyer --
20 I think from their lawyer. But there was some money
21 that we would be pleasantly surprised, I think is
22 what they would -- we were told. I think my
23 attorney was told that we would be pleasantly
24 surprised with respect to some amount of money that
25 was available for us, and I believe that there was

Sheinker - Doherty                                63

1  also a subsequent written conversation which was
2  disappointing when it finally came in. So we were
3  never pleasantly surprised.
4      Q.     Can you estimate how many transactions
5  a year Quantum engages in?
6      A.     I think it's about --
7      MR. KOBROFF: We're talking about
8  factoring transactions?
9      A.     25 to 50 a week.
10     Q.     Are you referring to 25 to 50 factoring
11 agreements a week?
12     A.     You're talking about factoring
13 transactions, yeah.
14     Q.     Right, purchasing accounts receivable?
15     A.     Yeah.
16     Q.     Out of those 25 to 50 a week, can you
17 estimate what percentage turn out to have been
18 fraudulent or have fraud involved in them?
19     A.     You lose one half -- we usually
20 typically lose one half of one percent of invoices
21 purchased per year.
22     Q.     I believe earlier you indicated that
23 you had some e-mail communications with someone at
24 National City when you determined that the situation
25 with Westwood was fraudulent. Is that correct?

Sheinker - Doherty                                64

1      A.     Yes.
2      Q.     I'm going to show you a document that
3  was marked at yesterday's deposition as D-13 for
4  identification. Could you please look at that.
5             Do you recognize those pages?
6      A.     Yes.
7      Q.     What are those pages?
8      A.     A series of e-mails between my office
9  and Mr. Justice.
10     Q.     Did you ever receive a response from
11 Mr. Justice to the last one that looks like you sent
12 him on January 17 at 2:52 p.m.?
13     A.     I don't believe so.
14     Q.     After sending that e-mail on January 17
15 in the afternoon, did you have any phone
16 conversations with Mr. Justice or anyone at National
17 City?
18     A.     I don't recall.
19     Q.     I see that your January 17 e-mail was
20 sent to Timothy Justice, Joe Cartellone, and Larry
21 Spangler. Who are those last two individuals that
22 you sent your e-mail to?
23     A.     My recollection is that they were
24 high-level senior executives at the bank that I got
25 from the bank's Web site.

Sheinker - Doherty                                65

1      Q.     Did either one of those individuals
2  respond to your e-mail?
3      A.     Not that I can recall.
4      Q.     To your knowledge, did anyone at
5  Quantum explain to National City Mortgage that it
6  would be guaranteeing payment to Quantum even if
7  Westwood never delivered a house to the Pollydores?
8             MR. KOBROFF: Objection to form.
9             MR. GOLDSTEIN: I join in the
10 objection.
11     A.     I think that that estoppel speaks for
12 itself.
13     Q.     Besides your position as to what the
14 estoppel says, and I assume you're referring to the
15 page that was within D-14?
16     A.     Yes.
17     Q.     Besides that estoppel certificate, as
18 you refer to it, to your knowledge, did anyone from
19 Quantum explain either by telephone or separate
20 writing that National City would be guaranteeing
21 payment to Quantum even if Westwood never delivered
22 a house to the Pollydores?
23     A.     You mean in addition to what's set
24 forth on the estoppel?
25     Q.     Yes.

Sheinker - Doherty                                                66

1    A.    In that regard?

2    Q.    Yes, in addition to your interpretation

3 of the estoppel.

4    A.    I wouldn't have personal knowledge of

5 that.

6    Q.    Has anyone at Quantum told you that

7 they provided such an explanation to National City?

8    A.    No.

9    Q.    Did National City receive any benefit

10 as a result of Mr. Washburn signing what you call

11 the estoppel?

12         MR. KOBROFF:  Objection to form.

13    A.    Yes.

14    Q.    What benefit do you believe National

15 City received from Quantum for Mr. Washburn signing

16 what you call the estoppel?

17         MR. KOBROFF:  Do you want the question

18 read back?

19    A.    In retrospect nobody received the

20 benefit, not myself, not the bank, but at the time

21 of the transaction, No. 2, for example, there was a

22 benefit to the bank, there was a benefit to

23 Westwood, and a benefit to the homeowner.

24         The third transaction turned out to be

25 fraudulent, unbeknownst to Quantum.

Sheinker - Doherty                                                67

1    Q.    When you say the third transaction, is

2 that the Pollydore transaction?

3    A.    The Pollydore transaction.

4    Q.    What benefit, if any, do you believe

5 National City received as a result of what you call

6 the estoppel letter in connection with the Pollydore

7 project?

8    A.    Well, rather than the bank having

9 advanced money for a vacant, uncleared piece of land

10 to the tune of two hundred and some odd thousand

11 dollars, the bank induced Quantum to advance such

12 funds, so the bank received a benefit to the tune of

13 two hundred and some odd thousand dollars.  Rather

14 than using their own money, they got us to put our

15 money out.

16    Q.    What leads you to believe that National

17 City would otherwise have advanced $240,000 to

18 Westwood for vacant property for the Pollydores?

19    A.    Well, unless the bank was in a

20 conspiracy to defraud me, my company, the bank was

21 telling us that the money was due and owing, so the

22 bank could have written that check themselves, but

23 rather they'd have Quantum write the check debts and

24 we did that, so therefore the bank was obligated to

25 make the payment, unless the bank was lying to me,

Sheinker - Doherty                                                68

1 which is a different story.  So if the bank was

2 truly obligated to make the payment, then the

3 benefit to the bank was that they didn't have to

4 make the payment then, I made the payment then.

5 There is consideration, therefore.

6    Q.    In connection with I think you

7 described it as the second deal or the second

8 contract, are you referring to Postell?

9    A.    Correct.

10    Q.    What benefit do you contend that

11 National City received in connection with signing

12 what you call the estoppel for the Postell project?

13         MR. KOBROFF:  Asked and answered.

14    A.    The benefit there is that, once again,

15 instead of the bank having to reach into their

16 pocket to make a current payment to their customers'

17 developer, that we were anticipating that payment so

18 as to enable the rapid construction, which benefits

19 the bank's customer and enables the bank to put on

20 more business, collect more interest, and I assume

21 enables them to do more business.

22    Q.    Do you know how much time passed from

23 when Westwood advanced money to -- when Quantum

24 advanced money to Westwood on the Postell project

25 and when a check was released from National City to

Sheinker - Doherty                                                69

1 Westwood on Postell?

2    A.    Not off the top of my head.

3    Q.    Do you think it was more than a week

4 that passed?

5    A.    Yes.

6    Q.    Do you think it was more than two

7 weeks?

8    A.    I don't know.

9         MR. DOHERTY:  Off the record.

10         (Recess taken.)

11         MR. DOHERTY:  I'm going to let Scott

12 continue.

13         MR. GOLDSTEIN:  My name is Scott

14 Goldstein --

15         THE WITNESS:  If you don't mind, can I

16 just add to my last answer?

17         MR. KOBROFF:  What was the last

18 question?

19         THE WITNESS:  The last question was

20 about what benefit there was to the bank.

21         MR. DOHERTY:  Okay.

22         THE WITNESS:  I also recall that the

23 bank really wanted to do a lot of business with

24 Michael Conrad's company.  I don't recall for sure,

25 but I think given that he was a minority they wanted

Sheinker - Doherty    70

1  to increase business with the local minority
2  businesses and they wanted him to succeed, so this
3  was another reason why he was able to get done these
4  transactions with the bank. They were motivated to
5  do a lot of business, that this was in their minds
6  going to result in a large quantity of business for
7  the bank to be able to do a lot more of those
8  mortgages and these modular homes. This was
9  something that they were looking forward to doing on
10  a more regular basis, and this, our financing,
11  helped bridge this gap, which was the fact that the
12  boxes get delivered and he's due money but that he
13  then has to pay Penn Lyon in order to get more
14  credit or to get the buildings erected. In this
15  particular case he needed the money, or we were
16  under the impression he needed the money, to get the
17  erection of the Pollydore house. So now it's either
18  I reach into my pocket or the bank reaches into his
19  pocket or he reaches into his pocket. He didn't
20  have the money, the bank didn't want to reach into
21  their pocket, so in comes Quantum Corporate Funding
22  and I solve everybody's problem. That is the
23  benefit to Westwood and the bank.
24  FURTHER EXAMINATION BY MR. DOHERTY:
25      Q.    What's the source of your claimed

Sheinker - Doherty    71

1  knowledge about National City wanting to do more
2  business with Mr. Conrad because of his race?
3      **A.    I didn't say it was because of his**
4  **race. I said because he was -- they wanted to do**
5  **more business with the minority -- local minority**
6  **business community. Local minority. I didn't say**
7  **just minority; I said local minority business**
8  **community.**
9      Q.    What's the source of your knowledge
10  that National City wanted to do more business with
11  the local minority business community?
12      **A.    He told me that he had a good**
13  **relationship with the people over there and that**
14  **this was the basis for that, that they were trying**
15  **to establish more business with the local**
16  **minority -- local and minority owned businesses,**
17  **contractor relationships.**
18      Q.    No one at National City told you that
19  was --
20      **A.    No, nobody at --**
21      Q.    -- something they desired?
22      **A.    Correct.**
23      Q.    Before the transactions with Westwood,
24  are you aware of Quantum having any other dealings
25  where National City Mortgage was involved?

Sheinker - Doherty    72

1      **A.    Quantum and National City Mortgage?**
2      Q.    Correct, prior to the Westwood
3  situation that you've been testifying to today.
4      **A.    Prior to Westwood, any other**
5  **transactions --**
6      Q.    Right.
7      **A.    No, I don't recall any.**
8      Q.    Since the Westwood transaction that you
9  were testifying about involving the Pollydores and
10  Postells, has Quantum done any deals where National
11  City is involved?
12      **A.    Not to my knowledge.**
13      Q.    If Westwood never furnished the work
14  and materials to the Pollydores, is it your
15  understanding that Westwood would still be due the
16  amount of the invoice?
17      **A.    Absolutely. As far as I was concerned**
18  **the materials were delivered, so I was therefore**
19  **advancing money for work services performed. So if,**
20  **in fact, there were no materials that had ever been**
21  **delivered, then I was fraudulently induced or -- and**
22  **that's how I would believe the bank would certainly**
23  **be responsible to us.**
24      Q.    Move to strike as nonresponsive.
25      What I was asking you is, if Westwood

Sheinker - Doherty    73

1  didn't furnish the work and materials to the
2  Pollydores, is it your understanding that Westwood
3  would still be entitled to the 347,000 that's on the
4  invoice?
5      MR. KOBROFF:    Objection to form.
6      If you understand it, try to answer.
7      **A.    No.**
8      Q.    "No" meaning Westwood would not be
9  entitled to that money?
10      **A.    If Westwood never performed, Westwood**
11  **would not be entitled. My entitlement is due to the**
12  **estoppel certificate, which was signed off, which**
13  **induced us to advance funds to Westwood.**
14      Q.    And are you aware of any conversations
15  that were had with Quantum's employees with National
16  City that would have given National City a different
17  understanding as to the meaning of what you call the
18  estoppel certificate?
19      **A.    I think the estoppel, the plain**
20  **wording of the estoppel speaks for itself, the**
21  **estoppel certificate.**
22      Q.    Move to strike.
23      What I was asking you is, are you aware
24  of conversations between Quantum employees and
25  National City that would have given National City a

Sheinker - Doherty                74

1    different understanding than what you claim the
2    estoppel certificate means?
3            MR. KOBROFF: Objection to form.
4        A.    **The estoppel certificate says neither**
5    **Quantum nor its agents made any representations**
6    **except as herein set forth.**
7        Q.    Move to strike as nonresponsive.
8            The question --
9            MR. KOBROFF: Just because you're not
10   getting the answer you want doesn't mean that it's
11   not responsive.
12           MR. GOLDSTEIN: Read back the
13   question.
14           MR. DOHERTY: Well, I disagree with
15   you.
16           MR. KOBROFF: Yeah, read back the
17   question. I objected to it. I'll object to it
18   again, but the witness can answer. Let him try to
19   answer. If not, rephrase it.
20           MR. GOLDSTEIN: Read back the question
21   and answer, see at least in your mind if it's
22   nonresponsive.
23           (Last question and answer are read
24   back by the court reporter.)
25           MR. KOBROFF: You're asking him to

Sheinker - Doherty                75

1    determine what somebody at National City might have
2    understood some conversation to have meant, all
3    right. This is an impossible kind of question for
4    him to answer other than to say my estoppel says
5    here's what the representations I made. You know,
6    you take whatever you want out of them, but he's
7    saying they're plain language to anybody who reads
8    them. You're asking what National City might have
9    thought, and I'm saying how can he know what
10   National City could have thought.
11           MR. DOHERTY: Actually, I'm asking a
12   different question, but maybe if you're not
13   understanding it correctly I'll try to ask it a
14   different way.
15       Q.    Has anybody at Quantum, any of your
16   employees at Quantum, told you that they had
17   conversations with National City employees where the
18   National City employees had a different
19   understanding than what you say the estoppel
20   certificate means?
21       A.    **Not according to the estoppel**
22   **certificate, which says explicitly that nobody from**
23   **Quantum has made any representations except as**
24   **herein set forth, so this could be the only**
25   **understanding that could have been conveyed to the**

Sheinker - Doherty                76

1    **people over at National City. I think that's pretty**
2    **clear.**
3        Q.    Move to strike as nonresponsive.
4            What I'm asking is -- I'm not asking
5    what your document says. I'm asking whether any
6    employees at Quantum have told you that they've had
7    any conversations with National City where the
8    National City employees had a different
9    understanding as to what your so-called estoppel
10   certificate means.
11       A.    **I think we're going in circles,**
12   **because I don't see the difference. I can't**
13   **understand the distinction, and I don't see the**
14   **difference. The fact is that this says right here**
15   **neither Quantum nor its agents made any**
16   **representations except as herein set forth. That's**
17   **what I understand.**
18       Q.    Move to strike --
19       A.    **That's what I understand.**
20       Q.    Move to strike as nonresponsive.
21       A.    **Okay.**
22       Q.    Did you have any conversations with any
23   of your Quantum employees about their discussions
24   with National City over the so-called estoppel
25   certificate?

Sheinker - Doherty                77

1        A.    **Yes.**
2        Q.    In any of those discussions that you
3    had with your employees, did any of your employees
4    tell you that based on what they heard from National
5    City employees, National City had an understanding
6    that was different than what's in that written
7    document?
8            MR. KOBROFF: I'm going to object. I
9    don't understand. What do you mean? Which part of
10   this written document did they not have an
11   understanding of? I mean, be more specific. If
12   you're going to be, you know, this -- you're
13   referring to a document. The guy reads the
14   document. You say it's not responsive. Which part
15   of the document are you saying -- directing his
16   attention to that they had a different understanding
17   about?
18           MR. DOHERTY: Any part of the
19   document.
20           MR. KOBROFF: Any part?
21           THE WITNESS: Can you read the
22   question again.
23           MR. GOLDSTEIN: Do you mean to be
24   referring to the Postell document or to the
25   Polydore?

Sheinker - Doherty                                                                78

1    MR. DOHERTY: I'm referring
2 specifically to the Pollydore one, but I believe
3 that the text --
4    MR. GOLDSTEIN: It's not exactly the
5 same. I mean, the stuff you're talking about is
6 probably the same, but the text of the two documents
7 are not exactly the same.
8    Q.    If you could open D-14 to page 28 of
9 70, my question was, not what does this page 28 of
10 70 say within D-14, what I'm asking you is, did any
11 of your employees at Quantum tell you that based on
12 their talks with people at National City, that
13 National City had a different understanding than
14 what your understanding is of the estoppel
15 certificate?
16    A.    No.
17 EXAMINATION BY MR. GOLDSTEIN:
18    Q.    Again, I'm Scott Goldstein. I
19 represent Penn Lyon Homes. I'm going to ask you
20 some questions today.
21    I'm going to show you what's been
22 marked at Ms. DeSouza's deposition as D-11. Do you
23 recognize that document?
24    A.    I recognize the form.
25    Q.    Have you ever seen that document prior

Sheinker - Goldstein                                                                79

1 to today?
2    A.    I believe so.
3    Q.    When did you first see that document?
4    A.    After -- in compiling this lawsuit.
5    Q.    Did you participate in any way in the
6 preparation of that document?
7    A.    No.
8    Q.    Do you know what this document -- what
9 the purpose of this document is for, marked as D-11?
10    A.    It's a purchase and sale agreement.
11    Q.    And what were you purchasing?
12    A.    In retrospect, it was a bogus invoice.
13    Q.    Move to strike as nonresponsive.
14    What did you purchase?
15    A.    That's what I purchased, a bogus
16 invoice.
17    MR. KOBROFF: Are you saying it's a
18 good invoice?
19    A.    A counterfeited bogus invoice.
20    Q.    Which invoice was counterfeit and
21 bogus, because there's invoices that have been
22 referred to in this case. You've referred to an
23 invoice given to you from Penn Lyon. You've
24 referred to an invoice you received from National.
25    MR. KOBROFF: Do you have the original

Sheinker - Goldstein                                                                80

1 Exhibit 14? Let him look at that. I mean, if we're
2 going to be referring to a specific exhibit, let him
3 look at the specific exhibit.
4    All right, now you're directing him to
5 somewhere else. I want him to see the original
6 D-14. I'm sorry, D-11.
7    MR. GOLDSTEIN: I gave him my copy.
8    MR. KOBROFF: You keep your copy. Let
9 him look at that, the one that's been marked.
10    Okay, fine. Ask questions.
11 BY MR. GOLDSTEIN:
12    Q.    You say that you purchased a fraudulent
13 invoice. When you say you purchased a fraudulent
14 invoice, what invoice do you mean?
15    A.    Right here.
16    MR. KOBROFF: The witness is referring
17 to page 26 of 70 of D-14.
18    Q.    And could you describe what page 26 of
19 70 in D-14 is? What's that document?
20    A.    It's a Westwood Design/Build invoice
21 to National City Mortgage, National City Bank,
22 Christopher Washburn, vice-president, for a
23 construction draw in the amount of $347,000
24 representing completed curbside delivery of modular
25 pre-fabricated home.

Sheinker - Goldstein                                                                81

1    Q.    Before you entered into the agreement
2 marked as D-11 --
3    A.    For Pollydore?
4    Q.    For Pollydore.
5    MR. KOBROFF: Pollydore modular
6 delivery number -- it gives a number.
7    Q.    Before you agreed to purchase what you
8 now call a fraudulent invoice, which is page 26 of
9 70 in Exhibit D-14, what steps did you take to
10 verify that it was a valid invoice?
11    A.    Well, firstly let me -- you said that
12 I agreed to purchase a fraudulent invoice.
13    Q.    No, you said that.
14    A.    No. No, I said I purchased a
15 fraudulent invoice.
16    Q.    No, you said -- correct. You said you
17 purchased a fraudulent invoice.
18    A.    I didn't agree to purchase a
19 fraudulent invoice. I was defrauded into purchasing
20 a fraudulent invoice.
21    Q.    And who were you defrauded by?
22    A.    I was defrauded -- that's a good
23 question. Certainly I was defrauded by Westwood
24 Design/Build and perhaps maybe even the bank,
25 National City Mortgage, National City Bank. I don't

Sheinker - Goldstein                82

1  know.

2  Q.    What steps did you take to verify that

3  the invoice that you were purchasing in the purchase

4  and sale agreement marked as D-11 was valid?

5  A.    Me personally?

6  Q.    Correct, or your company.

7  MR. KOBROFF:  Objection to form.

8  A.    All right, you personally and then your

9  company separate, two separate questions.

10  A.    Well, I wasn't personally involved in

11  the verification process.

12  Q.    Are you aware of the verification

13  process that took place with respect to this

14  transaction?

15  A.    Yes.

16  Q.    Who advised you of what steps were

17  taken to verify this transaction?

18  A.    I can't recall who, but I'm looking at

19  the signed estoppel certificate, which is

20  representative of a verification.

21  Q.    Who at your company advised you?

22  A.    I can't remember who advised me that

23  we had verified the invoice.

24  Q.    Prior to the verification of the

25  invoice, were you ever consulted about the

Sheinker - Goldstein                83

1  verification process with respect to the Pollydore

2  invoice?

3  A.    Tangentially.

4  Q.    And by tangentially, what do you mean?

5  A.    I can't recall the specifics of

6  conversations, but the general understanding was

7  that we were to get an estoppel certificate, that my

8  operations department were to get estoppel

9  certificates or we wouldn't fund.

10  Q.    How often do you use estoppel

11  certificates? When I say "you" I'm referring to

12  your company, Quantum. How often does Quantum use

13  estoppel certificates in connection with a

14  transaction similar to the one you did, that Quantum

15  did, in the Pollydore case?

16  MR. KOBROFF:  Objection to form.

17  A.    Frequently with respect to

18  construction contractor projects.

19  Q.    And I think you testified that you do

20  25 to 50 similar type transactions per week?

21  MR. KOBROFF:  Objection to form.

22  Q.    Or is that incorrect?

23  A.    Yeah, about -- closer to 25.

24  Q.    And if you could estimate what

25  percentage you would use -- you meaning Quantum

Sheinker - Goldstein                84

1  again, would use an estoppel certificate to

2  effectuate those transactions, what percentage would

3  that be?

4  MR. KOBROFF:  Objection to form.

5  A.    At least 30 percent, maybe 40 percent.

6  Q.    And I show you what's been marked -- it

7  was previously marked, if you want to use the

8  original exhibit.

9  MR. KOBROFF:  Yeah, that way you keep

10  yours.

11  Q.    -- as D-9 for identification. I'm not

12  going to give you mine. He's going to give you the

13  original. The second page of that.

14  A.    Okay.

15  Q.    If you could take a look at the

16  language in the second page of D-9 --

17  A.    Mmm-hmm.

18  Q.    -- in the estoppel certificates that

19  you use in 30 to 40 percent of these similar

20  transactions --

21  MR. KOBROFF:  Objection to form.

22  Q.    -- is the language similar to what's

23  set forth in D-9?

24  A.    That I can't tell you. We've got

25  multiple different estoppels.

Sheinker - Goldstein                85

1  Q.    How many different estoppel

2  certificates do you use, does Quantum use?

3  A.    We have quite a few.

4  Q.    More than three?

5  A.    Yes.

6  Q.    More than five?

7  A.    Yes. If you'd like, I'll explain.

8  Q.    Sure.

9  A.    You see this offset variable in there

10  beyond 20 percent of the invoice amounts?

11  Q.    Yes.

12  A.    That could be changed to 30 percent,

13  40 percent, 50 percent, 55 percent, 60 percent, 62

14  percent, 68 percent so you really have a tremendous

15  amount of versions of estoppels. We also have other

16  types of estoppels. We have negotiated estoppels.

17  We have -- you know, sometimes a particular account

18  debtor wishes to have specific wording. We

19  negotiate them. So there's many different estoppel

20  types.

21  Q.    And who do you usually -- who does

22  Quantum usually obtain signatures on estoppel

23  certificates from?

24  A.    Authorized individuals.

25  Q.    And authorized individuals, in your

Sheinker - Goldstein                                                                86

1   experience in this business, who does that usually
2   refer to?
3        A.      It depends upon the entity.
4        Q.      What type of entities are examples of
5   this?
6        A.      I don't know what you mean.
7        Q.      What type of entities usually authorize
8   these type of certificates?
9        A.      What type of entities? We've got --
10  we've been in business 18 years. All different
11  types of entities.
12       Q.      Give me a couple of them.
13       A.      General contractors, retailers. You
14  got a couple there. That's two.
15       Q.      Do you present them to banks sometimes?
16               Let me rephrase. Do you ask banks to
17  sign estoppel certificates?
18       A.      I believe so.
19       Q.      Do you ask mortgage lending companies
20  to sign estoppel certificates on occasion, "you"
21  meaning Quantum again?
22       A.      I believe so, but it's been -- you
23  know, has been awhile since that has happened, so I
24  can't recall specifically.
25       Q.      And what does Quantum use the estoppel

Sheinker - Goldstein                                                                87

1   certificate for in connection with these
2   transactions?
3        A.      Which transactions?
4        Q.      In connection with this transaction,
5   the Pollydore transaction?
6        A.      Quantum is not at the job location and
7   can't possibly know without going through monumental
8   efforts to determine whether or not the work has
9   been performed, completed, and accepted to
10  specifications and levels of acceptance of the
11  account debtor. So where we have concentrations, we
12  are inclined to use an estoppel certificate.
13       Q.      What does the estoppel certificate do
14  for Quantum?
15       A.      It creates a binding obligation upon
16  the account debtor to make payment.
17       Q.      In cases where Quantum is requesting
18  that an account debtor sign an estoppel certificate,
19  if the estoppel certificate is not signed, will
20  Quantum typically enter into the transaction?
21       A.      It depends upon the circumstances.
22       Q.      Let's go with the Pollydore transaction
23  circumstances.
24       A.      You want me to answer a hypothetical
25  question as to whether or not --

Sheinker - Goldstein                                                                88

1               MR. KOBROFF: You're asking --
2        A.      -- I would have done this without the
3   estoppel certificate?
4        Q.      Yes.
5               THE WITNESS: Am I supposed to answer
6   hypothetical questions?
7               MR. KOBROFF: Objection to form. If
8   you can answer.
9        A.      I would not have done this
10  transaction, in my hypothetical opinion, had I not
11  gotten the estoppel certificate, in response to your
12  hypothetical question.
13       Q.      Was Quantum ever presented with a
14  transaction called the Harris project by Westwood?
15       A.      I'm not sure.
16       Q.      Have you ever heard of a transaction
17  called the Harris project?
18       A.      Yes.
19       Q.      What is your understanding of what the
20  Harris project was?
21       A.      I believe that -- well, my
22  understanding is it was another modular project of
23  Westwood.
24       Q.      Did Westwood ever request that Quantum
25  fund or purchase an invoice with respect to the

Sheinker - Goldstein                                                                89

1   Harris project?
2        A.      I wouldn't have direct knowledge of
3   that.
4        Q.      Who would have direct knowledge of
5   that?
6        A.      Either Maria or Shelley.
7        Q.      By Shelley you mean Shelley Simmonds?
8        A.      Yes.
9        Q.      And Maria is Maria DeSouza?
10       A.      Right.
11       Q.      Who has the final say at Quantum
12  whether Quantum enters into a purchase and sale
13  agreement?
14               MR. KOBROFF: Objection to form.
15       Q.      I'll ask it a different way. Who has
16  final approval over all transactions that Quantum
17  enters into?
18               MR. KOBROFF: Objection to form.
19       A.      I approve the wires or my
20  brother-in-law Howard Chernin approves the wires.
21  Transactions are generally generated by the
22  operations staff, and provided that everything is
23  proper the wires will go out. So we spot-check
24  transactions. I say "we" meaning myself or Howard
25  will spot-check the transactions before they're sent

Sheinker - Goldstein                90

1  out.
2      Q.    So the Pollydore transaction, the
3  purchase of the invoice in the Pollydore case, the
4  agreement was signed by Shelley Simmonds. Is that
5  correct?
6      A.    Right.
7      Q.    Did Shelley Simmonds sign the agreement
8  without checking with you? And when I say "you" I
9  mean you, personally.
10     A.    She regularly signs purchase and sale
11 agreements.
12     Q.    My question was, does she check with
13 you before signing the agreements to approve it or
14 does she just sign them and then afterwards you deal
15 with it?
16     A.    She has certain leeway with respect to
17 signing the purchase and sale agreements.
18     Q.    What type of leeway?
19     A.    When she has what she needs to make
20 the transaction, she can sign the transaction.
21     Q.    So you're saying that she does not need
22 to obtain your approval before signing the
23 transactions?
24     A.    Before signing the purchase and sale
25 agreement, no.

Sheinker - Goldstein                91

1      Q.    How about Ms. DeSouza, does she have
2  the same type of authority?
3      A.    No.
4      Q.    Who does she need to obtain approval
5  from before finalizing a purchase and sale
6  agreement?
7      MR. KOBROFF: Objection to form.
8      A.    She doesn't finalize purchase and sale
9  agreements.
10     Q.    Does anyone else besides Shelley
11 Simmonds finalize purchase and sale agreements?
12     A.    Occasionally I'll sign the purchase
13 and sale agreement.
14     Q.    Anyone else besides you and Shelley
15 Simmonds?
16     A.    I suppose occasionally Howard Chernin
17 will sign a purchase and sale agreement.
18     Q.    Anyone else?
19     A.    No.
20     Q.    Does Quantum have any written
21 procedures for verifying invoices before entering
22 into a purchase and sale agreement.
23     A.    No.
24     Q.    Is there an oral procedure?
25     A.    No, because every transaction -- I

Sheinker - Goldstein                92

1  shouldn't say every transaction, but the nature of
2  transactions based upon the risks, collateral,
3  client, are all different, so each one is
4  underwritten differently.
5      Q.    After you've entered into a purchase
6  and sale agreement, is there any way that you --
7  when I say "you" again I mean Quantum -- is there
8  any way that Quantum can get out of that agreement?
9      MR. KOBROFF: Objection to form.
10     MR. GOLDSTEIN: What was wrong with
11 the question, just for --
12     MR. KOBROFF: You're asking for a
13 legal conclusion? He's a lawyer? You're saying I
14 got a contract, how can I get out of this contract?
15     MR. GOLDSTEIN: To be fair, he's
16 offered opinions on consideration.
17     MR. KOBROFF: And I've objected to
18 those questions as well.
19     MR. GOLDSTEIN: But I don't think
20 that's a form objection. I think a form objection
21 is to the actual form of the question.
22     MR. KOBROFF: To me if you ask a
23 hypothetical question --
24     MR. GOLDSTEIN: That's a substantive
25 trial objection, --

Sheinker - Goldstein                93

1      MR. KOBROFF: -- that's a form
2  objection. If you ask a person --
3      MR. GOLDSTEIN: -- which is not
4  permissible in a deposition.
5      MR. KOBROFF: If you ask a person who
6  is not a legal authority of any kind, you know, a
7  question like how do I get out of a contract --
8      MR. GOLDSTEIN: Well, let's repeat the
9  question.
10     (Last question is read back by the
11 court reporter as follows:
12     After you've entered into a purchase
13 and sale agreement, is there any way that you --
14 when I say "you" again I mean Quantum -- is there
15 any way that Quantum can get out of that agreement?)
16     A.    I don't know what entered into a
17 purchase and sale agreement means.
18     MR. KOBROFF: Objection to form.
19     A.    Executed? Delivered? What are you
20 talking about?
21     Q.    Executed a purchase and sale agreement
22 signed by both parties.
23     A.    Executed and delivered?
24     Q.    Signed by both parties.
25     A.    And delivered?

1    Q.    And delivered, sure.

2         MR. KOBROFF:  Objection to form.

3    A.    **Executed, delivered, and consideration**

4 **paid, can we get out of the transaction?**

5    Q.    Yes.

6    A.    **No.  Except, of course, if it is a**

7 **fraudulent transaction and then we could, I believe,**

8 **I'd have to ask my attorney this, but I believe that**

9 **the transaction is voidable where it's counterfeit**

10 **or a bogus invoice, such as in this case.**

11   Q.    Okay.

12   A.    **Well, that is a legal conclusion that**

13 **I'm not really qualified to answer.**

14   Q.    But you are in the business of asset

15 purchase, correct?

16   A.    **But I'm not an attorney.**

17   Q.    But this is your business, is it not?

18   A.    **This is my business, yeah.**

19   Q.    And you know how to conduct your

20 business, correct?

21   A.    **I hope so.**

22   Q.    So once you became aware that you --

23 that the invoice was fraudulent, did you try to

24 contact Westwood?

25   A.    **Yes.  I believe I've already stated**

1 **that.**

2    Q.    Correct.

3         MR. KOBROFF:  He's entitled to ask his

4 own questions.

5    Q.    I can ask all the same questions if I

6 want to.

7         MR. KOBROFF:  He's going to share in

8 the cost of the transcript, so he gets to ask all

9 the questions he wants.

10   Q.    Did you ask Westwood or did you advise

11 Westwood that you were going to void the contract?

12        MR. KOBROFF:  Objection to form.

13   A.    **No.**

14        MR. GOLDSTEIN:  And I'm going to ask

15 you to state the basis of your objection beyond

16 form.  If you're going to say it's a legal

17 conclusion, I just want you to make that statement

18 for the record.

19        MR. KOBROFF:  Void in the context

20 you're using it is a legal term and you're asking

21 this witness for a legal conclusion.  I don't think

22 the witness ever used the word void.

23        MR. GOLDSTEIN:  He used the word

24 voidable.

25        MR. KOBROFF:  That's a different word,

1 you see, and it has legal consequences.

2         MR. GOLDSTEIN:  If he doesn't

3 understand it then he can say, "I don't understand."

4         MR. KOBROFF:  Right.

5    A.    **I told him I was going to exercise all**

6 **my legal remedies is what I told him.**

7    Q.    My question is, did you ever tell

8 Westwood, "I'm canceling this contract"?

9         MR. KOBROFF:  Those words.

10   A.    **No, I --**

11        MR. GOLDSTEIN:  Or words similar

12 thereof.

13   A.    **I told him I was going to exercise all**

14 **legal remedies.**

15   Q.    Do you know mate what it means to

16 cancel a contract?

17        MR. KOBROFF:  Objection to form.

18   A.    **Why don't you tell me what it means.**

19   Q.    I'm not the deponent here.  You're the

20 deponent here.

21        MR. KOBROFF:  So rephrase the

22 question.  The witness doesn't understand what

23 "cancel contract" means.

24   Q.    That is my question.  Do you

25 understands what it means to cancel a contract?

1    A.    **In a legal -- you're talking about a**

2 **legal definition.**

3    Q.    What does it mean to you?

4    A.    **What does it mean to me to cancel a**

5 **contract?**

6    Q.    Yes.

7    A.    **To cancel the contract, that's what it**

8 **means.**

9    Q.    And what does that mean?  Does that

10 mean that you can still collect on the contract?

11 Does it mean that the contract is over and you get

12 your money back?  What does it mean to you?

13        MR. KOBROFF:  Objection to form.

14   Q.    And I ask this question as a layman.

15 What does it mean to you as a layman?

16        MR. KOBROFF:  Objection to form.

17   A.    **Why is that relevant here?**

18   Q.    Again, I'm not the deponent.  There's a

19 question pending.  I need an answer.

20        MR. KOBROFF:  If you can answer it,

21 answer it.  If you can't, say you can't.  If you

22 can't understand it, ask --

23   A.    **I'll tell you what, let me go to the**

24 **bathroom and then I'll --**

25   Q.    No, you can't.

1      MR. KOBROFF: You can't go to the
2  bathroom while a question is pending.
3      THE WITNESS: I've gotta go to the
4  bathroom.
5      MR. KOBROFF: You can't go while the
6  question is pending. You've gotta answer it or do
7  something. You can't go to the bathroom.
8      THE WITNESS: What is the question
9  again?
10     MR. KOBROFF: Read it back.
11     (Last two questions are read back by
12  the court reporter.)
13     MR. KOBROFF: Objection to form.
14     MR. DOHERTY: You object to the
15  read-back?
16     MR. KOBROFF: Oh, I didn't realize I
17  already objected.
18     A.  What does it mean to me to cancel a
19  contract?
20     Q.  Mmm-hmm.
21     A.  Are you talking about a unilateral
22  cancellation?
23     Q.  No, I'm --
24     A.  Or a bilateral cancellation?
25     Q.  I'm asking the question that I asked.

1      MR. KOBROFF: Do you understand the
2  question?
3      THE WITNESS: I don't understand the
4  question.
5      MR. KOBROFF: The witness doesn't
6  understand it. Rephrase it.
7      Wait. Go to the bathroom.
8      (Recess taken.)
9      MR. KOBROFF: I want to put something
10 on the record. I believe what's confusing the
11 witness here is that you're asking him -- he's not
12 sure I believe if you're talking about the specific
13 transaction with the Pollydores or you're talking in
14 general about contracts.
15     MR. GOLDSTEIN: Fair enough. I'll
16 talk about the specific instance with the
17 Pollydores.
18     A.  What's the question?
19     MR. GOLDSTEIN: Could you read back
20 the question.
21     (Record read.)
22     MR. KOBROFF: Why don't you just
23 rephrase, ask a question. Say you're asking about
24 Pollydore. Let's be specific. Or you're not.
25     Q.  Did you ever advise Westwood that you

1  wanted to cancel the Pollydore contract when you
2  learned that it was -- that the invoice was
3  fraudulent?
4      A.  I told Westwood he better give me my
5  money back.
6      Q.  Move to strike as nonresponsive.
7      Did you ever tell Westwood that you
8  wanted to cancel the contract?
9      A.  I didn't use those words. I told him
10 to give me my money back.
11     Q.  Did you ever notify Westwood in writing
12 that you wanted to cancel the contract or something
13 similar to canceling the contract, end the contract?
14     A.  I believe we sent him a demand letter
15 prior to the initiation of this lawsuit.
16     Q.  And has this demand letter been
17 produced in discovery in this action?
18     A.  I don't know. I don't know whether we
19 did or didn't provide a demand letter.
20     Q.  Who sent the demand letter, if there
21 was one?
22     A.  It would have been my attorney.
23     Q.  And in the context of the Pollydore
24 action, if you were to cancel the contract -- do you
25 believe that you have the right to cancel the

1  contract?
2      MR. KOBROFF: Objection to form.
3      Q.  Based on the fraudulent invoice.
4      A.  I have a right to get my money back.
5      Q.  From who?
6      MR. KOBROFF: Objection to form.
7      A.  From you, Penn Lyon.
8      Q.  From Penn Lyon?
9      A.  And from all the parties here,
10 actually.
11     Q.  Do you have a right to also collect on
12 the invoice?
13     MR. KOBROFF: Objection to form.
14     Q.  In your opinion as a layman.
15     A.  You mean collect twice?
16     Q.  Yes.
17     A.  No.
18     Q.  If you're able to collect on the
19 invoice, was the invoice fraudulent?
20     MR. KOBROFF: Objection to form.
21     A.  Yes.
22     Q.  How so?
23     A.  The invoice was fraudulent. Now, I
24 have an independent contractual estoppel certificate
25 that I relied upon and have a separate cause of

Sheinker - Goldstein                                    102

1    action against the bank, so I still am allowed to
2    collect from the bank even though the invoice was
3    fraudulent pursuant to an independent agreement with
4    the bank.
5        Q.    Was that responsive to my -- move to
6    strike as nonresponsive, the last statement.  I
7    don't know if it was responsive to the last
8    question.
9            MR. DOHERTY:  I'll join in that motion
10   to strike.
11           MR. KOBROFF:  I would have expected
12   you to make it, not him, assuming it was
13   nonresponsive.
14       Q.    If the invoice is fraudulent, do you
15   still own the invoice?
16           MR. KOBROFF:  Objection to form.
17       Q.    I'll rephrase.
18       A.    This is a legal conclusion that I have
19   no way of answering.
20           MR. KOBROFF:  It's also speculative.
21       Q.    I'll withdraw the question and
22   rephrase.
23           I'm going to skip that question.
24           You previously testified that you
25   insisted that in connection with the Pollydore

Sheinker - Goldstein                                    103

1    project you insisted that money be sent directly to
2    Penn Lyon.  Was that your testimony?
3        A.    Yes.
4        Q.    It was not -- is it also fair to say
5    that it was not at Westwood's direction?
6        A.    That's correct.
7        Q.    I show you what's been marked as D-14,
8    which is your affidavit in support of summary
9    judgment.  I direct your attention to Paragraph 11.
10   In Paragraph 11 it states that pursuant to the
11   agreement Quantum paid defendant Westwood $242,900.
12           MR. KOBROFF:  On December 21.  If
13   you're going to read it, read the whole thing.
14           MR. GOLDSTEIN:  Did I not say --
15           MR. KOBROFF:  Yes.
16           MR. GOLDSTEIN:  Then I misspoke.
17           MR. KOBROFF:  You left out --
18           MR. GOLDSTEIN:  It was totally
19   unintentional.  Sorry.
20           MR. KOBROFF:  All right, go on.
21       Q.    "Pursuant to the agreement on December
22   21, 2007, Quantum paid Westwood $242,000" --
23           MR. KOBROFF:  Objection.  You left out
24   another word.
25           MR. GOLDSTEIN:  I did?

Sheinker - Goldstein                                    104

1            MR. KOBROFF:  Yes, you left out
2    "defendant."
3            MR. GOLDSTEIN:  I said "defendant
4    Westwood."
5            MR. KOBROFF:  No, you didn't, but go
6    on.
7        Q.    "Paid defendant Westwood $242,900 for
8    the invoice pursuant to Westwood's, by defendant
9    Warfield's, specific instructions, by wiring:  (a)
10   $130,731.72 to Westwood and; (b) wiring $112,168.28
11   to defendant Penn, in payment of Penn's invoice No.
12   850 representing the balance outstanding on its
13   shipment of the 'Pollydore residence,'" in quotes
14   Pollydore residence.
15           The portion of that that says that you
16   paid it pursuant to defendant Warfield's specific
17   instructions, is that not accurate?
18       A.    It's completely accurate.  We told him
19   that we insist that the money go to Penn Lyon, and
20   he provided us with the appropriate instructions.
21       Q.    So whose instructions was payment made
22   on?  Was it on Penn Lyon's instructions or was it --
23   I mean on Quantum's instructions?
24       A.    He instructed us --
25       Q.    May I finish the question, sir.

Sheinker - Goldstein                                    105

1        A.    Okay.
2        Q.    Was it Quantum's instructions or was it
3    Warfield's instructions that the money was paid to
4    Penn Lyon?
5            MR. KOBROFF:  Objection to form.
6    You're mis -- fine.
7            If you can answer it answer it, but
8    that's not your first question.  It's not what
9    you're saying, but, all right, go on.
10           MR. GOLDSTEIN:  I want to know whose
11   instructions it was.
12           MR. KOBROFF:  Are you talking about
13   wiring instructions or payment instructions?
14       A.    How to pay.
15       Q.    It says "paid."  What do you mean by
16   paid Westwood?
17           MR. KOBROFF:  If you understand it,
18   answer it as best you can.
19       A.    What was the question?  I don't
20   understand the question.
21           (Last three questions read back.)
22       A.    It was Quantum's instructions that
23   Penn Lyon had to get paid, but we needed their
24   instruction as to how to pay Penn Lyon.  Paragraph
25   11 is referring to the instructions of how to pay

Sheinker - Goldstein                                106

1  Penn Lyon.

2      Q.      Why did you need Warfield's

3  instructions, meaning Quantum, to pay Penn Lyon?

4      A.      How to pay Penn Lyon?

5      Q.      Does it say how to pay Penn Lyon in

6  Paragraph 11 of the affidavit?

7      A.      It says specific instructions.  To me

8  specific instructions is the detail of how to make

9  the payment.

10     Q.      But does that say that in the

11 affidavit?

12     A.      That's what I meant.

13     Q.      I'm asking a specific question.

14             MR. KOBROFF:  And I'm saying this is

15 argumentative.  The document will speak for --

16             MR. GOLDSTEIN:  That's not a proper

17 objection.

18             MR. KOBROFF:  It is certainly, too, a

19 proper objection.

20             MR. GOLDSTEIN:  Maybe at trial it is.

21             MR. KOBROFF:  No, it's an objection to

22 form.

23             MR. GOLDSTEIN:  Since when?

24             MR. KOBROFF:  It's argumentative.

25             Since I just say so.  If you really

Sheinker - Goldstein                                107

1  want me to go get a brief on it, I'll put a brief in

2  on it and you can put one in, but I say

3  argumentative is objectionable to form.

4             I'm not directing the witness not to

5  answer, but that's what you're doing here.  The

6  document speaks for itself.  Ask the witness a

7  question.

8             MR. GOLDSTEIN:  If you're not

9  instructing him not to answer, then make the record.

10            MR. KOBROFF:  Okay.  I've made my

11 record.  I've objected to form, argumentative.

12            MR. GOLDSTEIN:  Fair enough.  I

13 thought you were instructing him not to answer.  If

14 you're not doing that --

15            MR. KOBROFF:  You'll know when I

16 instruct him not to answer.

17            If you can understand the question.

18     A.      I think I answered it.

19            (Record read back as follows:

20            Question:  Does it say how to pay Penn

21 Lyon in Paragraph 11 of the affidavit?

22            Answer:  It says specific instructions.

23 To me specific instructions is the detail of how to

24 make the payment.

25            Question:  But does that say that in

Sheinker - Goldstein                                108

1  the affidavit?

2            Answer:  That's what I meant.)

3            MR. GOLDSTEIN:  Move to strike as

4  nonresponsive.

5      Q.      The question was, does it say in

6  Paragraph 11 that the instruction -- that Westwood's

7  instructions was how to pay Penn Lyon?

8      A.      Yes.

9      Q.      Where?

10     A.      The next phrase says by wiring

11 $130,000 to Westwood and, B, wiring 112,000 to

12 defendant Penn Lyon.

13            MR. GOLDSTEIN:  Move to strike as

14 nonresponsive.

15            MR. KOBROFF:  I would also add that

16 the rest of Paragraph 11, which has not been read,

17 says, "A copy of Westwood's wiring instructions to

18 Quantum is annexed hereto as Exhibit F."

19            MR. GOLDSTEIN:  Could you pull out

20 Penn Lyon 1 from the originals.

21     Q.      I show you what's been marked as Penn

22 Lyon Exhibit 1.  Have you ever seen this document

23 before?

24     A.      No, not that I can recall.

25     Q.      Never at all?

Sheinker - Goldstein                                109

1      A.      I said not that I can recall.

2      Q.      Were you ever told by anyone at Quantum

3  that you obtained authorization from Westwood to

4  forward money to Penn Lyon?

5      A.      Well, we insisted that the money go to

6  Penn Lyon and that's when he sent us his wiring

7  instructions.  I think that that basically -- he

8  didn't want to do it.  He objected to sending the

9  money to Penn Lyon.  We insisted upon it, and then

10 he eventually sent us the wiring instructions.  At

11 that point I was told that he relented and we are

12 sending the money to Penn Lyon.

13            MR. GOLDSTEIN:  Move to strike as

14 nonresponsive.

15     Q.      My question was, were you ever told

16 that you were authorized to send money to Penn Lyon

17 by Westwood?

18            MR. KOBROFF:  "You" meaning him

19 personally or Quantum?

20            MR. GOLDSTEIN:  No, Quantum.

21            MR. KOBROFF:  And you're saying his

22 last answer was objectionable?

23     A.      Can I see the purchase and sale

24 agreement?

25            Right there.  It says it right there.

Sheinker - Goldstein                    110

1      MR. KOBROFF:  The witness is referring
2   to Defendant's 11, the first page thereof, which
3   says in consideration of the sum and gives a
4   breakdown of the numbers.
5      Q.   Do you remember being told that you
6   received a separate letter, "you" meaning Quantum,
7   did anyone at Quantum ever tell you, personally,
8   whether Westwood provided you with a -- "you" being
9   Quantum, a separate authorization letter authorizing
10  the money, $112,168, to be sent to Penn Lyon?
11     A.   Yes, we were told that he relented and
12  gave us his wiring instructions.  Here are a copy of
13  the wiring instructions.
14     Q.   That's not a letter though.  I'm
15  talking about a letter.  Were you ever told that a
16  letter --
17     A.   If that's not a letter, I don't know
18  what a letter is.  I mean, that's a written
19  communication.  I apologize.
20     Q.   It's wiring instructions.  I --
21     A.   It's a written communication.  It's
22  the same thing as a letter.
23     Q.   It's a simple question.  The question
24  is, did you ever receive a letter, did Quantum ever
25  receive a letter from Warfield or Westwood Design

Sheinker - Goldstein                    111

1   authorizing Quantum to make payment to Penn Lyon?
2      A.   Can you please explain to me what the
3   difference between a written communication and a
4   letter is.  I don't know the difference.  Does it
5   have to say dear Mr. So and So on it in order for it
6   to be a letter?
7      Q.   Sure.
8      A.   In other words, something that has to
9   say, "Dear Mr. Sheinker"?
10     Q.   Generally a letter is something that
11  says, "Dear Mr. Sheinker."
12     A.   If it doesn't have that --
13     Q.   If it's an e-mail correspondence,
14  sometimes it says that, sometimes it doesn't.  If
15  it's just a sheet of --
16     A.   Is an e-mail a letter?  Is an e-mail a
17  letter?  Because I'm trying to figure this out.
18  Because you said a letter.  If it's not an e-mail
19  and if it's a letter, but it doesn't say, "Dear Mr.
20  Sheinker," is that a letter or is that a written
21  communication?
22     Q.   Would you like to swear me in?
23     A.   If that's what you'd like to do.  I'm
24  trying to understand.
25     MR. KOBROFF:  Do you want to testify

Sheinker - Goldstein                    112

1   here?
2      MR. GOLDSTEIN:  No, I want an answer
3   to my question.
4      MR. KOBROFF:  The witness has answered
5   the question.  You don't seem to like the answer.
6   He says a written communication, he's treating it as
7   a letter.  Do you have a problem with that?
8      MR. GOLDSTEIN:  I'm not denying what
9   he said previously is a written communication.
10     Q.   I'll ask the question this way.  Is
11  there another -- was there another written
12  authorization letter that you were aware of --
13     A.   I don't believe --
14     Q.   -- besides the one that you're calling
15  a letter?
16     A.   I don't believe that there was.  I
17  don't recall there being any additional written
18  communication providing the instructions on how to
19  pay Penn Lyon other than these wiring instructions,
20  which were sent to us contemporaneously.
21     Q.   Is there any reason why Quantum would
22  need authorization from Westwood to pay Penn Lyon?
23     MR. KOBROFF:  I'll object to form.
24  You can answer.
25     A.   Once again, you're asking me a legal

Sheinker - Goldstein                    113

1   question.  Is that what you're asking me, a legal
2   opinion.  You want my legal opinion, is that what
3   you want?
4      Q.   I want you to answer the question.
5      A.   For my legal opinion on something?
6      Q.   However you understand it.  You tell me
7   how you want to answer the question.
8      A.   Okay.  You want to know my opinion as
9   to what?
10     Q.   I want an answer to the question.
11     MR. KOBROFF:  He wants to know your
12  opinion, as I understand it, whether Quantum legally
13  needs the authorization from --
14     MR. GOLDSTEIN:  No, that's not my
15  question.  We'll read back the question.  I did not
16  say legally.  I said whatever the question says.
17     (Question read back as follows:
18     Is there any reason why Quantum would
19  need authorization from Westwood to pay Penn Lyon?)
20     A.   In my legal opinion, for what it's
21  worth, when two parties enter into a contract, such
22  as a purchase and sale agreement, that if party A
23  refuses to accept the terms and conditions of party
24  B then you don't have a meeting of the minds, so the
25  meeting of the minds in this particular transaction

Sheinker - Goldstein                114

1   was that Westwood had relented and agreed that our
2   payment was going to go partially to Penn Lyon,
3   partially to Westwood.  This was at our insistence.
4              MR. GOLDSTEIN:  Move to strike as
5   nonresponsive.
6        Q.    Is there any reason why you would need,
7   "you" meaning Quantum, Westwood's authorization to
8   pay Penn Lyon?  Do you understand what authorization
9   means?
10       A.    If I want to write a check to Penn
11  Lyon tomorrow, I can write a check to Penn Lyon
12  tomorrow.  I can write a check to Penn Lyon every
13  day for the next 20 years if I want to write -- I
14  don't need their authorization to do that.
15       Q.    Okay.  Do you think that you --
16       A.    In the context of my purchase and sale
17  agreement -- you want to continue, go ahead.
18       Q.    No, no, please continue.
19       A.    In the context of this purchase and
20  sale agreement, we insisted that a portion of this
21  money was to go to Penn Lyon, and when they agreed,
22  we had a meeting of the minds.  If you're asking me
23  about authority, these are legal conclusions that I
24  really don't know.
25       Q.    I asked you --

Sheinker - Goldstein                115

1        A.    I'd have to ask a lawyer.
2        Q.    I asked you do you know what it means
3   -- do you know what the word "authorization" means?
4        A.    Legally?
5        Q.    No, what the word -- go get the
6   Webster's dictionary, what authorization means.
7        A.    Do you have a dictionary here?
8        Q.    Do you know what it means?
9              MR. KOBROFF:  Oh, stop.  To me you're
10  being very argumentative and I'm really allowing you
11  to go ahead and do a lot of this, but we're about to
12  be making a call to Magistrate Pitman very soon.
13             MR. GOLDSTEIN:  If you want to bust
14  the deposition and brief the issue --
15             MR. KOBROFF:  I'm not gonna bust the
16  deposition.  I'm simply gonna ask advice.
17             Go ask your questions.  Just because
18  you don't like the answer --
19             MR. GOLDSTEIN:  I asked him a question
20  what does authorization mean.
21             MR. KOBROFF:  So this is now a
22  different question that has to do --
23             MR. GOLDSTEIN:  He's saying that it
24  calls for a legal conclusion.
25             MR. KOBROFF:  Because you were talking

Sheinker - Goldstein                116

1   in the context of the Pollydore transaction.  I
2   thought we agreed on that, that that's what we were
3   talking about here.
4              MR. GOLDSTEIN:  We are.  I said, why
5   would you need Westwood's authorization?
6              MR. KOBROFF:  And the witness said --
7              MR. GOLDSTEIN:  He's not answered the
8   question once.  He's answered the question five
9   times, none of which answered the question of, why
10  do you need their authorization.  And he can --
11             MR. KOBROFF:  That was a term of the
12  contract.  Did you miss that?
13             THE WITNESS:  I said that was part of
14  the meeting of the minds.  Did I not say that?
15       Q.    A term of the contract that Westwood --
16       A.    That they agreed to.  That was the
17  condition of the bargain.
18       Q.    That Westwood --
19       A.    That part of the money was going to go
20  to Penn Lyon.
21       Q.    Did you ask Westwood -- did someone
22  from Quantum ask Westwood to sign a separate letter
23  authorizing payment to Penn Lyon?
24       A.    Yes, we asked them to sign the
25  purchase and sale agreement.

Sheinker - Goldstein                117

1        Q.    Beyond the purchase and sale agreement?
2        A.    No, that's the general --
3        Q.    Did you ever -- okay.
4        A.    That was, right here, the section of
5   the purchase and sale agreement wherein they agreed
6   that the money was going to go as follows.  This was
7   the benefit of both of our bargains.  I insisted
8   that the money go to Penn Lyon and that they wanted
9   the balance to go to them.
10       Q.    Did you ever receive a separate letter
11  from Westwood providing authorization to Quantum to
12  pay Penn Lyon?
13       A.    Not that I'm aware of.
14       Q.    Okay.  Were you ever told that such a
15  letter exists by anyone at your company?
16             MR. KOBROFF:  At any time?  Prior to
17  the payment?  After the payment?
18             MR. GOLDSTEIN:  Let's start with
19  prior.
20       A.    Not that I'm aware of.
21       Q.    How about at the time of payment?
22       A.    At the time of payment, was I aware of
23  a separate letter besides the purchase and sale
24  agreement wherein both parties agree that the
25  money --

Sheinker - Goldstein                118

1    Q.    No, that's not my question.  My
2  question is, was there a separate letter?
3    A.    That's not your question.  I'm giving
4  you my answer.
5          Wherein both parties agree that the
6  money shall be paid as follows:  112,000 to Penn
7  Lyon and 130,000 approximately to Westwood.  This
8  was the, at the time of the transaction, the only,
9  to my recollection, the only written reference to
10 that besides the wiring, specific wiring
11 instructions, that were provided upon my demand of
12 Westwood.
13   Q.    Is that true before, during, and after
14 the transaction?
15         MR. KOBROFF:  Objection to form.
16   A.    It's just true.  That's just true.
17   Q.    So at no time did you ever hear of a
18 separate letter from Westwood authorizing payment of
19 $112,168.28 to Penn Lyon?
20   A.    I'm not aware, as I think I mentioned,
21 I'm not aware of any such additional communication
22 besides the purchase and sale agreement which
23 specifically memorializes the agreement between the
24 parties that 112,000 approximately was going to go
25 to Penn Lyon and $130,000 was going to go to

Sheinker - Goldstein                119

1  Westwood.  This was the agreement, and it came
2  part -- as a result of our negotiation and bargain.
3    Q.    When you talked to Penn Lyon on January
4  11, you stated earlier that you did not demand
5  return of the money on that occasion.  Is that
6  correct?
7    A.    I said I didn't recall.  I believe I
8  said I didn't recall.  I'd have to -- I don't
9  recall.
10   Q.    Do you recall ever making an oral
11 demand to Penn Lyon for the return of the money in
12 connection with the Polydore project?
13         MR. KOBROFF:  You being him personally
14 not Quantum?
15         MR. GOLDSTEIN:  Him personally, since
16 he had the conversation.
17   A.    You mean aside from the written
18 communication and the communications that my
19 attorney had with Penn Lyon?
20   Q.    I said oral, oral communications.
21   A.    You're talking about my oral
22 communications?
23   Q.    Your verbal communications with --
24   A.    Limited to me?
25   Q.    Limited to you.

Sheinker - Goldstein                120

1    A.    I don't currently recall.
2    Q.    Do you know if any representative of
3  Quantum -- when I say representative I mean employee
4  of your company, principal of your company, or
5  attorneys, agents of your company -- ever made an
6  oral demand to Penn Lyon for the return of the
7  112,168.28?
8    A.    I believe that Charles Shea of my law
9  firm made such a demand, but I don't recall.  I'd
10 have to ask him.
11   Q.    Did you ever make a written demand to
12 Penn Lyon, "you" meaning you personally, make a
13 written demand to Penn Lyon for the return of the
14 monies that your company wired to Penn Lyon?
15   A.    Yes.
16   Q.    When did you send that written
17 communication to Penn Lyon?
18         MR. KOBROFF:  Objection to form.
19 You're implying that there's only one.
20   Q.    Were there more than one?
21         MR. GOLDSTEIN:  I'm asking him.
22   A.    There may be, but I specifically
23 recall at least one.
24   Q.    Did you send any letters on Quantum
25 letterhead to Penn Lyon after January 11, 2008?

Sheinker - Goldstein                121

1    A.    Okay, I sent an e-mail.  Is that what
2  you're talking about?
3    Q.    No, I'm asking you --
4    A.    Besides an e-mail, I don't recall
5  having sent a written letter.
6    Q.    Do you know how many written e-mails
7  that you sent to Penn Lyon after January 11, 2008?
8    A.    I think I said that I recall at least
9  one.
10   Q.    So when you say at least one, can that
11 mean that there was more than one?
12   A.    It could mean that.
13   Q.    What was the sum and substance of your
14 e-mail to Penn Lyon?
15   A.    Would you prefer that I read you the
16 letter?
17   Q.    No, I prefer you tell me in your own
18 words.
19   A.    I told him that -- I told David Reed
20 that now that it appears -- inasmuch as it appears
21 that we have been defrauded, that we demand
22 immediate return of the payment that we made to his
23 firm due to a total lack of consideration for such
24 payment.
25   Q.    When you use the term "consideration,"

1   what do you mean by that?

2        A.    Having been defrauded, there was no

3   consideration for the transaction.

4        Q.    Did you have a contract with Penn Lyon?

5        A.    Once again, is this a legal test or is

6   this a deposition?

7        Q.    Did you have any sort of agreement in

8   any way, shape or form with Penn Lyon, whether it be

9   contractual or anything else, that caused you to

10  make the payment to Penn Lyon?

11       MR. KOBROFF:  Objection to form.

12       A.    Did I have a written agreement with

13  Penn Lyon?

14       MR. GOLDSTEIN:  Read back the

15  question, please.

16       (Last question is read back by the

17  court reporter.)

18       A.    No, I didn't have a direct contract

19  with Penn Lyon.

20       Q.    I asked you what you meant by

21  consideration.  What is your understanding of the

22  term "consideration" as you used it in the January

23  15 e-mail?

24       A.    Penn Lyon did not give us any value

25  for that advance that we made to Penn Lyon.  There

1   was no consideration given.

2        Q.    But you just testified that there was

3   no agreement with Penn Lyon.

4        A.    Right.

5        Q.    Is that correct?

6        A.    Right.

7        Q.    Okay.  So for what reason would Penn

8   Lyon be giving Quantum consideration as you defined

9   it?

10       MR. KOBROFF:  I'm going to object to

11  the form.  I mean, are you implying that you can

12  only get consideration in a contract?

13       MR. GOLDSTEIN:  You're not allowed to

14  give speaking objections.  I've given you a lot of

15  latitude.

16       MR. KOBROFF:  I've given you a lot of

17  latitude.

18       MR. GOLDSTEIN:  I can't ask what it

19  says in his e-mail?  This is his e-mail.

20       MR. KOBROFF:  No, you're asking him a

21  different question.  Ask him then what he meant by

22  consideration.  He answered it.

23       MR. GOLDSTEIN:  I'll ask him what I

24  asked.

25       MR. KOBROFF:  Go ahead.  If he

1   understands it --

2        MR. GOLDSTEIN:  Could you repeat the

3   question that I asked.

4        MR. KOBROFF:  Note my objection.

5        MR. GOLDSTEIN:  It's noted.

6        (Last question is read back by the

7   court reporter.)

8        A.    There was a lack of consideration not

9   only from Penn Lyon, but from Westwood.  There was

10  no consideration for our advance here.  This was a

11  voidable transaction.  We wanted our money back.

12  That's what I meant.

13       MR. GOLDSTEIN:  So it doesn't -- move

14  to strike to the extent that it's nonresponsive.

15       MR. KOBROFF:  Which part of that was

16  not responsive?

17       MR. GOLDSTEIN:  My question was not

18  answered.

19       MR. KOBROFF:  Well, I disagree with

20  you.  Which part?  Specify to me which part wasn't

21  responsive.

22       MR. GOLDSTEIN:  May I repeat my

23  question?

24       MR. KOBROFF:  You can certainly repeat

25  it.

1        Q.    My question is, why did Penn Lyon owe

2   Quantum any consideration?

3        MR. KOBROFF:  That's a different

4   question.

5        MR. GOLDSTEIN:  It's substantially

6   similar, but I'll have her read back the previous

7   question.

8        MR. KOBROFF:  No, go with whatever one

9   you like.

10       MR. GOLDSTEIN:  I'll go with the one

11  that I asked.

12       MR. KOBROFF:  Okay, he answered that.

13       MR. GOLDSTEIN:  No, I'd like to read

14  it back so we can have the exact wording.

15       (Last question and answer are read

16  back:

17       Question:  So for what reason would

18  Penn Lyon be giving Quantum consideration as you

19  defined it?

20       Answer:  There was a lack of

21  consideration not only from Penn Lyon, but from

22  Westwood.  There was no consideration for our

23  advance here.  This was a voidable transaction.  We

24  wanted our money back.  That's what I meant.)

25       Q.    I'm asking as pertains to Penn Lyon

Sheinker - Goldstein                    126

1  only, what consideration did Penn Lyon owe to
2  Quantum?
3      A.    **Well, after I sent them $112,000**
4  **without any consideration, therefore, they owe me**
5  **back the money.**
6      Q.    Consideration to who? From who?
7      A.    **To either Penn Lyon or to -- there was**
8  **no consideration from either Penn Lyon or from**
9  **Westwood.**
10     Q.    And I'm saying you're answering in
11 circles. You're not answering why Penn Lyon
12 specifically owes consideration to Quantum.
13     A.    **I didn't say that they owe me**
14 **consideration, but now that they have my money for**
15 **which no consideration was given, they have an**
16 **obligation to return the money.**
17     Q.    Fair enough. No consideration from
18 who?
19     A.    **There has been no consideration given**
20 **to Quantum by either Penn Lyon or Westwood, and**
21 **since Penn Lyon is holding my money I was asking for**
22 **my money back because there has been no**
23 **consideration for the money that I have given.**
24     Q.    In D-11, which was marked at Ms.
25 DeSouza's deposition, the purchase and sale

Sheinker - Goldstein                    127

1  agreement, is there any reference to the Penn Lyon
2  invoice in there?
3          MR. KOBROFF: The document speaks for
4  itself. Thank you. Would you like to direct the
5  witness's attention to any part of that document?
6          MR. GOLDSTEIN: No.
7          MR. KOBROFF: Okay. Thank you. Then
8  the document speaks for itself. Next question.
9          MR. GOLDSTEIN: Are you detecting him
10 not to answer?
11         MR. KOBROFF: It's answered.
12         MR. GOLDSTEIN: You answered it. We
13 didn't swear you in.
14         MR. KOBROFF: You asked him whether
15 there was anything in here regarding the Penn Lyon
16 invoice.
17         MR. GOLDSTEIN: We haven't sworn you
18 in.
19         MR. KOBROFF: The witness is pointing
20 to the fact that the document shows on the first
21 page that 112,168 is payable to Penn Lyon. The
22 witness is also referring to Exhibit A, which says
23 that as part of this agreement, we're talking about
24 the Pollydore project, etcetera.
25     Q.    Is that your answer or is he answering

Sheinker - Goldstein                    128

1  the question for you?
2      A.    **That's his answer.**
3      Q.    It's his answer?
4      A.    **Yeah.**
5          MR. GOLDSTEIN: Would you like to be
6  sworn in? I asked you before.
7          MR. KOBROFF: Only if you're sworn in
8  as well.
9          MR. GOLDSTEIN: If you don't like the
10 question, that doesn't mean --
11         MR. KOBROFF: Look, I don't mind the
12 question. What I mind is your continuously arguing
13 with the witness. Okay, you don't like the
14 witness's answer and you're continuously arguing
15 with him. This is beginning to annoy me.
16         MR. GOLDSTEIN: I'd have to say that
17 it's quite the opposite. I believe the witness is
18 constantly arguing with me, continuously questioning
19 me, and I believe that I'm only trying to elicit
20 responses to certain questions.
21         MR. KOBROFF: Go. Go. We'll do it
22 again, even though I believe the witness has
23 answered your question several times.
24         MR. GOLDSTEIN: We'll agree to
25 disagree on that.

Sheinker - Goldstein                    129

1          MR. KOBROFF: Go ahead.
2      Q.    Do you have a receipt of the wire
3  transfer to Penn Lyon?
4      A.    **From Penn Lyon?**
5      Q.    Yeah.
6      A.    **Did Penn Lyon ever sends me a receipt,**
7  **is that your question?**
8      Q.    No, did your bank ever give you a
9  receipt for the wire transfer?
10     A.    **Yes.**
11     Q.    On the wire transfer to Penn Lyon, did
12 Quantum denote the invoice, the specific invoice
13 number to Penn Lyon that the payment was for?
14     A.    **On the wire transfer instructions?**
15     Q.    No, no, on the wire transfer to Penn
16 Lyon.
17     A.    **No, but the wire transfer instructions**
18 **did contain the transaction number, which referenced**
19 **the purchase and sale agreement in question.**
20     Q.    The transaction to the purchase and
21 sale agreement?
22     A.    **Yes.**
23     Q.    But did it refer to the Penn Lyon
24 specific invoice that you were sending money for?
25         MR. KOBROFF: Objection. You're

Sheinker - Goldstein                                     130

1 asking him if the wire confirmation that he received
2 back from his bank, is that what you're asking him?
3          MR. GOLDSTEIN: You're correct. I was
4 not specific. He was talking about the wire
5 instructions and so I'm referring to the wire
6 instructions.
7     A.    My wiring instructions contained a
8 transaction number, which relates to a purchase and
9 sale agreement.
10    Q.    Okay. But did it --
11    A.    Which is the particular purchase and
12 sale agreement.
13    Q.    Did it refer to the Penn Lyon invoice?
14    A.    Yes, inasmuch as the Penn Lyon is part
15 of -- it's identified on the purchase and sale
16 agreement.
17    Q.    Is there an invoice number that was
18 referred to in the wiring instructions to Penn Lyon?
19    A.    As I mentioned, there's a transaction
20 number which relates back to the purchase and sale
21 agreement, which contains the requirement that we
22 imposed that money be sent to Penn Lyon.
23    Q.    I understand you've answered that
24 already and I'll move to strike as nonresponsive.
25          My question is, simple question, does

Sheinker - Goldstein                                     131

1 it refer to any Penn Lyon invoice, not the
2 agreement, not the agreement, the Penn Lyon invoice?
3          MR. KOBROFF: I would ask you to show
4 the witness the document you are referring to and
5 we'll see what it says.
6          MR. GOLDSTEIN: Sure. He can ask me
7 to look at it and I'll let him.
8          MR. KOBROFF: Okay, I'm asking you to
9 show it to him so we don't keep wasting our time.
10         MR. GOLDSTEIN: I don't have the exact
11 exhibit number, if you've got it over there, but I'm
12 referring to this document. D-12.
13         MR. KOBROFF: His attention is
14 directed to page 2 of Exhibit D-12, and the question
15 as I understand it is, is a Penn Lyon invoice number
16 set forth on this document?
17         MR. GOLDSTEIN: Correct.
18         THE WITNESS: I don't see an invoice
19 number on this document.
20         MR. GOLDSTEIN: I don't know if this
21 was marked at the last one. Was this?
22         MR. DOHERTY: I don't think so.
23         MR. GOLDSTEIN: May I have this marked
24 as Penn Lyon 2.
25          (Exhibit Penn Lyon-2, one-page

Sheinker - Goldstein                                     132

1 document from Sterling National Bank, is marked for
2 identification.)
3     Q.    Do you recognize what's been marked as
4 Penn Lyon 2?
5     A.    Yeah.
6     Q.    What is this document?
7     A.    It's part of our bank statement.
8     Q.    What is referenced in Penn Lyon 2?
9     A.    There's a lot of things referenced in
10 this. What specifically are you talking about?
11    Q.    The transactions marked at the bottom
12 of the page.
13    A.    Those are referring to two wire
14 transfers, one is to Penn Lyon and one is to Design
15 Build, Westwood Design/Build.
16    Q.    Does this document reference any Penn
17 Lyon invoice number?
18    A.    No, not in this document.
19    Q.    Does this document reference the
20 Pollydore project?
21    A.    By inference only.
22    Q.    This is a document that your company
23 receives?
24    A.    Yeah.
25    Q.    I'm going to show you what's been -- GF

Sheinker - Goldstein                                     133

1 130. This is stapled together. I don't want to rip
2 it apart.
3          MR. GOLDSTEIN: Can I mark that as
4 Penn Lyon 3.
5          (Exhibit Penn Lyon 3, one-page
6 check/wire request, is marked for identification.)
7     Q.    Do you recognize that document?
8     A.    The form I recognize.
9     Q.    Did you prepare this document?
10    A.    No.
11    Q.    Nothing further with that document.
12         Who prepared that document, sorry, if
13 you know?
14    A.    Someone in my office.
15    Q.    Is your answer you don't know?
16    A.    I don't know specifically who prepared
17 that document.
18         MR. GOLDSTEIN: I need to review my
19 notes. I've gone a little bit off back and forth.
20         MR. DOHERTY: I have a couple
21 follow-up that I can fill the time while you're
22 looking at your notes.
23         MR. KOBROFF: Sure, back to you.
24 EXAMINATION BY MR. DOHERTY:
25    Q.    Mr. Sheinker, thanks for your time. I

Sheinker - Doherty                                                    134

1   have a couple follow-up questions while Penn Lyon's
2   counsel is reviewing his notes.
3           You had mentioned earlier that you or
4   your brother-in-law would spot-check transactions.
5   Is that correct?
6           When I say "transactions" I mean
7   Quantum transactions, not any old transaction, I
8   mean in your business.
9       A.      **Me and my brother-in-law can sign the**
10  **wires. That's the final authorization to let the**
11  **money go and execute the transaction, and we will**
12  **spot-check the supporting documents.**
13      Q.      Did you spot-check any of the
14  supporting documents in any of the Westwood
15  transactions?
16      A.      **I don't believe so.**
17      Q.      And in particular the Pollydore
18  transaction.
19      A.      **I don't believe so.**
20      Q.      Do you know if your brother-in-law
21  spot-checked any of the Westwood transactions?
22      A.      **I don't know.**
23      Q.      Would there be any notation made on a
24  file if you or your brother-in-law spot-checked the
25  underlying transaction documents?

Sheinker - Doherty                                                    135

1       A.      **Probably not.**
2       Q.      As of October, November, and December
3   2007, is it fair to say that Ms. DeSouza was a new
4   employee?
5       A.      **Relatively.**
6       Q.      Was anybody spot-checking the
7   transactions that Ms. DeSouza was working on? And I
8   mean during that time frame October, November,
9   December 2007.
10      A.      **Shelley Simmonds, I would believe that**
11  **she was spot-checking her transactions. She was her**
12  **direct supervisor.**
13      Q.      Do you know for a fact that Ms.
14  Simmonds was spot-checking, or are you just kind of
15  assuming that she would have as the direct
16  supervisor?
17      A.      **The latter.**
18      Q.      In any of your discussions with Michael
19  Conrad, including when he was physically present in
20  your former conference room, did he tell you what he
21  was explaining to National City in order to get a
22  signature on what you call the estoppel certificate?
23      A.      **No.**
24      Q.      Have you been told by any of your
25  employees at Quantum if they're aware of what Conrad

Sheinker - Doherty                                                    136

1   was telling National City in order to get a
2   signature on the estoppel form?
3           THE WITNESS:  Could you repeat the
4   question.
5           (Last question is read back by the
6   court reporter.)
7       A.      **No.**
8       Q.      To your knowledge, was National City
9   made aware by Quantum that money would be wired by
10  Quantum to Westwood in reliance on what you call the
11  estoppel certificate?
12          MR. KOBROFF:  Can you read that back.
13          (Last question is read back by the
14  court reporter.)
15      A.      **Repeat the question.**
16          MR. DOHERTY:  Before you answer that
17  question, let me just change the word "wired" to
18  "sent," money sent, so that we're not just limiting
19  it to a wire.
20          THE WITNESS:  Repeat the question
21  again.
22          (Last two questions are read back by
23  the court reporter.)
24      A.      **I think that the estoppel certificate**
25  **makes that clear.**

Sheinker - Doherty                                                    137

1       Q.      So your answer to that question is yes
2   or no?
3       A.      **If you're asking if I'm aware of all**
4   **the conversations that other people in my office**
5   **have had with representatives of Westwood, the**
6   **answer is I'm not aware of all -- with**
7   **representatives, excuse me, of the bank, National**
8   **City, I'm not aware of all those communications.**
9   **And, furthermore, the estoppel certificate is pretty**
10  **clear that the mere fact that it's an estoppel**
11  **certificate is indicative of the fact that we're**
12  **relying upon this document in becoming the assignee**
13  **of payment of the captioned invoices.**
14      Q.      You're looking at a document. Can you
15  tell me what exhibit number you're looking at?
16      A.      **D-9.**
17      Q.      Can you point to me in D-9 what
18  language you believe conveys the information to
19  National City that would make it aware that Quantum
20  would be sending money to Westwood in reliance on
21  that document?
22      A.      **This is a standard assignment for a**
23  **factor, which basically is notification of the sale**
24  **and assignment of the invoice.**
25          THE WITNESS:  Do you have a copy of

Sheinker - Doherty 138

1  the invoice, Bernie?
2       MR. GOLDSTEIN:  Here's a copy.  It's
3  not a marked one.
4       A.    The invoice has been sold to Quantum
5  Corporate Funding.
6       Q.    You're not referring to the estoppel
7  certificate, you're referring to another document?
8       A.    The document that went with it, which
9  is the invoice, which has been stamped as having
10 been sold, which by definition implies that a
11 payment is made.
12      Q.    Was National City made aware by Quantum
13 of the amount that Quantum would be sending to
14 Westwood in reliance upon what you call the estoppel
15 certificate?
16      A.    Not that I'm aware of.
17      Q.    Was National City made aware by Quantum
18 of the fact that money would be sent to Penn Lyon
19 based on the signing of any estoppel certificate?
20      A.    Not that I'm aware of.
21      Q.    Concerning your insistence on having
22 part of the wire transfer to Westwood on the
23 Pollydore project, that part of that money would go
24 to Penn Lyon, did Quantum and Westwood reach some
25 kind of agreement that that payment to be sent to

Sheinker - Doherty 139

1  Penn Lyon would relate to a modular home intended
2  for the Pollydores, or would it be for any debt that
3  happened to be owed by Westwood to Penn Lyon?
4       A.    It was for the Pollydores.
5       Q.    And that was an agreement that Quantum
6  had with Westwood?
7       A.    Yes.
8       Q.    Earlier I was asking you about if you
9  could estimate how many transactions per year, and I
10 think you gave me an estimate of transactions per
11 week, and I asked you how many -- what percentage
12 would be marked by fraud I think is how I phrased
13 it, and you gave an answer.  Just so I'm clear, out
14 of the number you do per week, how many wind up
15 going bad, meaning Quantum doesn't get paid, for any
16 reason, including fraud?
17      A.    The total number, our average typical
18 annual loss for any reason, that includes fraud, is
19 less -- is between one and one half percent of
20 invoices purchased.
21      Q.    When I asked you earlier about
22 Quantum's process for trying to ferret out fraud, I
23 think you identified the estoppel certificate but I
24 may have moved on before I let you finish answering.
25 Are there other things that Quantum does to detect

Sheinker - Doherty 140

1  fraud besides issuing what you call an estoppel
2  certificate?
3       MR. KOBROFF:  Objection to form.
4       A.    In each instance or just general?
5       Q.    In general.
6       A.    We have a whole bunch of tools.  The
7  estoppel certificate is the most severe of all forms
8  that we use, and it -- there are times where we go
9  without estoppel certificates where we have less
10 riskier transactions, as I mentioned to you where
11 you've got wide diversification, where you've got --
12 for example, if I had Bill Gates as my client I
13 don't think I would need the estoppel certificate
14 from First National City Bank.  So there are
15 definitely different standards for different
16 transactions.
17      Q.    Could you describe some of the other
18 tools that you use to ferret out fraud?
19      A.    Phone verification, just notification,
20 stamping invoices and sending them out, collection
21 review, you know, the rate of collection, estoppel
22 certificates, on rare occasion we have audits of the
23 client's books.  On rare occasion in the past we've
24 looked at bank deposits from the client's books.  So
25 there are other methods that we employ.  Credit

Sheinker - Doherty 141

1  reports, personal credit reports, etcetera.  It's
2  just a wide range of tools that you use.  That would
3  be like asking an attorney what does he use to
4  develop a strategy for defending or prosecuting a
5  lawsuit.  There's a whole host of tools that you
6  employ, and sometimes you use certain tools and
7  sometimes you use other tools.
8       Q.    Well, I don't know your business.  It's
9  That's why I'm asking.
10           What tools were used in assessing
11 whether to proceed with the transactions with
12 Westwood?
13      A.    The estoppel certificate, which is the
14 most severe form of verification that we can get.
15 We employ that when the transaction is highly
16 concentrated on one account and our -- in
17 instances such as this.
18      Q.    Were any of the other tools that you
19 described used by Quantum in assessing whether to
20 proceed with the Westwood transactions?
21      A.    As I mentioned, this is the most
22 severe tool, so to take a -- other measures, which
23 really this is the most significant.
24      MR. KOBROFF:  The witness pointed to
25 the estoppel certificate which had been previously

Sheinker - Doherty                                                          142

1    marked as part of Defendant's 9.

2         A.    In the pyramid it would be at the top

3    of the pyramid, so something down here, you may get

4    it, but at the end of the day if you get what's at

5    the top of the pyramid, it's superior to all

6    other -- an estoppel certificate from a creditworthy

7    account debtor is superior to all other forms of

8    verification.

9         Q.    Did Quantum try any of the other tools

10   at the lower part of the pyramid that you're

11   describing before going to the estoppel certificate?

12        A.    I believe we had some credit report

13   information I think on Warfield. I'm not sure.

14        Q.    Do you remember whether any other tools

15   were used in assessing the Westwood transactions

16   besides the credit report and what you described at

17   the top of the pyramid.

18        A.    Well, one risk-mitigating factor that

19   we employed here was sending the payment on the

20   Pollydore directly to Penn Lyon. That was a tool,

21   not a verification tool, but a risk-mitigation tool

22   that we employed.

23        Q.    And you employed that on the Pollydore

24   transaction because you had concerns about whether

25   Westwood could be trusted to distribute the money it

Sheinker - Doherty                                                          143

1    received from Quantum --

2              MR. KOBROFF: Objection to form.

3              MR. GOLDSTEIN: Objection.

4         Q.    -- in an appropriate fashion?

5              MR. GOLDSTEIN: We agree on something.

6              THE WITNESS: Should I answer?

7              MR. KOBROFF: If you can answer. If

8    you want the question read back, we'll read it back.

9    I object to the form.

10             MR. GOLDSTEIN: As did I.

11        A.    If I trusted my clients I wouldn't

12   need to do any verification. The whole purpose of

13   the verification is to verify, so your question

14   is -- well, do you want to ask me the question

15   again?

16        Q.    Maybe I'll ask it a little bit

17   different, although I'm happy to see I had counsel

18   agree on one thing today so I feel like I brought a

19   little bit of peace to the table.

20             What was it about Westwood or what was

21   it about Quantum's view of Westwood as of late

22   December of 2007 that made you feel that it was

23   important to have Quantum send payment directly to

24   Penn Lyon rather than sending the entire

25   distribution to Westwood?

Sheinker - Doherty                                                          144

1         A.    It wasn't so much about Westwood; it

2    was about the idea that this will mitigate our risks

3    and that our client Westwood should have no

4    objection, so therefore we -- we decided to employ

5    that tool.

6         Q.    What was the risk that you perceived if

7    you didn't send a wire transfer directly to Penn

8    Lyon?

9         A.    We wanted to make sure that Penn Lyon,

10   because we were told that they were going to be

11   putting the house, the final erection of the house

12   up, so we wanted to make sure that they were going

13   to do it, not that our payment hereunder was

14   conditioned upon that, but rather than ending up

15   with somebody like -- you know, rather than having

16   National City unhappy about making a payment, we

17   were trying to make sure that everything went

18   smoothly, and that would include making sure that

19   the house eventually got up and everybody was happy.

20   We could have rightfully not insisted that the money

21   go to Penn Lyon and in the end the house may never

22   have been erected and then people at National City

23   might be less inclined to want to send the payment

24   despite the fact that they were legally obligated to

25   do so anyway. So this was just a risk-mitigation

Sheinker - Goldstein                                                        145

1    factor.

2              MR. DOHERTY: Thank you.

3              MR. GOLDSTEIN: Just a couple

4    questions.

5    EXAMINATION BY MR. GOLDSTEIN:

6         Q.    The conversation that you were just

7    referring to about employing the risk-mitigation

8    factor, when was this?

9         A.    What date?

10        Q.    Yeah.

11        A.    It was on or about the date of the

12   advance. It was the same day as the advance.

13        Q.    December 21, is it?

14        A.    Do you have the wire instruction here?

15   Yeah, December 21.

16        Q.    Who was present during the

17   conversation?

18        A.    What conversation?

19        Q.    The one that you had to --

20        A.    I told Toby to tell what's his name,

21   Conrad, that that was a quid pro quo to our next

22   advance.

23        Q.    So you didn't personally have the

24   conversation with Westwood?

25        A.    No.

Sheinker - Goldstein                146

1    Q.    Toby did?

2    A.    Yes.

3    Q.    Did Toby tell you how the conversation

4    went?

5    A.    He wasn't happy.

6    Q.    Who wasn't happy?

7    A.    Conrad.

8    Q.    Did she tell you why he wasn't happy?

9    A.    He wanted the money to go to him.

10   Q.    When you told Toby to have this

11   conversation with Mr. Conrad, what were your

12   instructions to her to convey to him?

13   A.    Tell him that the payment -- I'm

14   requiring that the payment go to Penn Lyon.

15         MR. GOLDSTEIN:  Nothing further.

16         MR. DOHERTY:  I'm done subject to if

17   there's something in the interrogatory answers, as I

18   stated earlier.

19         MR. GOLDSTEIN:  Likewise.

20         MR. KOBROFF:  I have no questions.

21         (Deposition concluded at 2:25 p.m.)

22

23

24

25

---

147

1              C E R T I F I C A T E

2

3       I, LEA A. CRUZ, a Certified Court Reporter

4    and Registered Professional Reporter, DO HEREBY

5    CERTIFY that, prior to the commencement of the

6    examination, CRAIG SHEINKER was duly sworn by me to

7    testify the truth, the whole truth, and nothing but

8    the truth.

9       I DO FURTHER CERTIFY that the foregoing is a

10   true and accurate transcript of the testimony as

11   taken stenographically by and before me at the time

12   and place and on the date hereinbefore set forth.

13      I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of

15   any of the parties to this action and that I am

16   neither a relative nor employee of such attorney or

17   counsel and that I am not financially interested in

18   this action.

19

20

21   _____

     LEA A. CRUZ, C.C.R. 30X100164300

22

23

24

25

---

148

1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
2

3

4

5    QUANTUM CORPORATE FUNDING,    Civil Action No.
     LTD,                         08CV00539(LAK)(HBP)
6          Plaintiff(s),

7        -v-
                                   DEPOSITION UPON
8    WESTWOOD DESIGN/BUILD         ORAL EXAMINATION
     INCORPORATED, DAVID R.              OF
9    WARFIELD, NATIONAL CITY       CRAIG SHEINKER
     MORTGAGE, INC., and Penn
10   Lyon Homes CORPORATION,
           Defendant(s).
11

12   NATIONAL CITY MORTGAGE, INC.,
             Third-Party
13           Plaintiff(s),

14       -v-

15   MICHAEL CONRAD a/k/a MICHAEL
     CONRAD BROWN,
16           Third-Party
             Defendant(s).

17

18

19      I, CRAIG SHEINKER, hereby certify that I have
     read the transcript of my testimony taken under oath
20   on the 8th day of August, 2008, and that the
     transcript is a true and complete record of the
21   deposition as given by me, except as noted in the
     errata sheet.
22

23   _____

24         CRAIG SHEINKER
25

---

149

1                   ERRATA SHEET

2

3    PAGE/LINE NO.          CORRECTION

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____