UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

QUANTUM CORPORATE FUNDING, LTD

                Plaintiff,

-against-

WESTWOOD DESIGN/BUILD
INCORPORATED, DAVID R. WARFIELD,
NATIONAL CITY MORTGAGE, INC. and PENN
LYON HOMES CORPORATION

                Defendants.

Docket No. 08 CV 00539(LAK) (HP)

**REPLY DECLARATION IN FURTHER SUPPORT OF MOTION TO VACATE JUDGMENT, RECONSIDERATION AND FOR OTHER RELIEF AND ORDER TO SHOW CAUSE TO STAY ENFORCEMENT**

SCOTT GOLDSTEIN, duly affirms the following under penalty of perjury:

1. I am an Of Counsel with the law firm of BONNER KIERNAN TREBACH & CROCIATA, LLP, attorneys for Penn Lyon Homes Corporation ("PLH") in this action. I am fully familiar with the facts and circumstances of this case, the source of my knowledge being the file maintained by my office in the course of handling this matter.

2. We submit this reply declaration in further support of defendant Penn Lyon Homes Corporation's ("PLH") motion to vacate the summary judgment decision granted on default as a result of defendant PLH's purported failure to file an opposition to plaintiff's motion for summary judgment and for other relief.

3. A true copy of the estoppel certificate executed by defendant National, citing Westwood's Invoice is annexed hereto as Exhibit A.

4. Copies of selected pages from the August 7, 2008 deposition of Maria Luiza DeSouza are annexed hereto as Exhibit B.

5. Copies of selected pages from the August 8, 2008 deposition of Craig Sheinker are annexed hereto as Exhibit C.

WHEREFORE, we respectfully request that the within motions be granted, as well as such other and further relief as may be just and proper.

Dated: New York, New York
August 25, 2008

_____
Scott H. Goldstein

# EXHIBIT

# "A"

# Quantum Corporate Funding, Ltd.
1140 Avenue of the Americas, 16th Floor
New York, N.Y. 10036
Tel. 212 768-1200
800 352-2585
Fax 212 944-8216

12/18/07

Mr. Christopher Washburn
Branch Manager
National City Mortgage Company
7852 Walker Drive, Suite 400
Greebelt, MD 20770

Re: Our Transaction#   25914   Client: Westwood Design Build Incorporated
Our Debtor#: 32772.    Our Client#:   5999

| P.O.#/Contract# | Job# / Project# | Controllers# | Contract/ P.O.Date | Invoice# | Inv.Date | Terms | Invoice Amount |
|---|---|---|---|---|---|---|---|
| | Project: Pollydora Residence. Construction Draw, Pollydoro module delivery-#00005351534. | | | 10084 | 12/10/07 | 45 | ****$347,000.00 |

********$347,000.00

Dear Mr. Washburn:

We are the assignee of payment of the above captioned company. Attached is a letter from it authorizing all payments on the captioned invoices to be sent directly and solely to Quantum Corporate Funding, Ltd.

The undersigned Account Obligor acknowledges to Quantum Corporate Funding, Ltd. that the above invoice Amount(s) are correct and owing by us; that the work and or merchandise has been ordered from and completed by the captioned Client, and accepted by us; that there are not now, nor will there be, any claims, setoffs, or defenses beyond 20% of the Invoice Amount(s); Neither Quantum nor its agents made any representations except as herein set forth. This estoppel is not subject to modification. New York law, jurisdiction and venue shall apply hereto.

Very truly yours,

*[signature: Maria Luiza de Souza]*

Shelley Simmonds
Senior Account Exec.

Agreed & Accepted

Authorized Signature _____   Title _____
Account Obligor:   National City Mortgage Company
                   Print Name:

TOTAL P.02

# EXHIBIT

# "B"

**DeSouza - Doherty** 118

1  Q. Did you ever speak by phone with
2  Timothy at National City?
3  A. No.
4  Q. Did you have any further discussions
5  with Christopher Washburn of National City in late
6  December or in January of 2008?
7  A. No.
8  MR. DOHERTY: Please mark this as
9  D-13.
10  (Exhibit D-13, two page e-mail chain,
11  GF01 and GF02, is marked for identification.)
12  Q. Ms. DeSouza, I'm going to show you a
13  two-page document that's been marked for
14  identification as D-13. It's been labeled GF1 and
15  2. It was produced by Quantum's lawyer.
16  Would you please take a look through
17  these two pages and let me know if this is something
18  you recognize from prior to the filing of the
19  lawsuit.
20  A. Yes, I recognize it.
21  Q. What are these pages?
22  A. E-mail sended to Mr. Justice from
23  myself.
24  Q. The second page of D-13, you said you
25  sent it to Mr. Justice. Does that refresh your

**DeSouza - Doherty** 119

1  recollection as to who Timothy was?
2  A. Correct.
3  Q. Is that Timothy Justice at National
4  City?
5  A. Mmm-hmm.
6  Q. You sent it to him because Mr. Sheinker
7  told you to?
8  A. Correct.
9  Q. Had you had any prior dealings with Mr.
10  Justice before Mr. Sheinker told you to send an
11  e-mail to him in January of 2008?
12  A. No.
13  Q. Besides the e-mail exchange that's
14  reflected on these two pages of D-13, did you have
15  any other e-mail communications with Mr. Justice?
16  A. No.
17  MR. DOHERTY: Off the record.
18  (Discussion held off the record.)
19  EXAMINATION BY MR. GOLDSTEIN:
20  Q. Good afternoon, Mrs. DeSouza. My name
21  is Scott Goldstein. I was here earlier, I went
22  home, I came back, and now I'm going to ask you some
23  questions. I represent Penn Lyon.
24  I'm going to show you what has been
25  previously marked as D-9 for identification, which

**DeSouza - Goldstein** 120

1  is the December 18th letter to Mr. Washburn. Why
2  does Quantum send this letter out?
3  A. This is verification letter to -- for
4  the debtors, which in this case is National City
5  Mortgage, for them to have something in writing
6  letting us know that, yeah, in fact, the merchandise
7  has been delivered, the amount shown on the letter
8  along with the invoice is okay and it's due and owed
9  and will be paid to Quantum Corporate Funding within
10  the terms that shows on the letter.
11  Q. And why do you have National sign the
12  letter?
13  A. Because they were the one that owed
14  Quantum the money.
15  Q. And if you didn't get someone from
16  National to sign the letter, what would you do with
17  respect to the agreement with Westwood?
18  A. Not fund them.
19  Q. You'd not fund the agreement?
20  A. Correct.
21  Q. Is there any way that you would fund
22  that agreement without a signature on this letter?
23  A. No.
24  Q. And why is that?
25  A. Because we need someone with an

**DeSouza - Goldstein** 121

1  authority to let -- to verify to Quantum that, in
2  fact, merchandise has been delivered and, in fact,
3  we will receive the money.
4  Q. When was -- getting back to -- I'm
5  going to show you what's been marked as D-11 for
6  identification.
7  A. Okay.
8  Q. Now, what was the date that that
9  agreement was entered into?
10  A. This was in December.
11  Q. I think it's on page 2 of the
12  agreement.
13  A. December 20.
14  Q. And when this agreement was signed by
15  -- who was the agreement signed by?
16  A. David.
17  Q. And who else?
18  A. Just David and Shelley Simmonds.
19  Q. Shelley Simmonds is with Quantum?
20  A. Correct.
21  Q. Did you have Defendant's Exhibit 9 in
22  your hands when Defendant's Exhibit 11 was signed by
23  all parties?
24  A. Yes. Yes.
25  Q. The factoring agreement that you talked

DeSouza - Goldstein                                             122

1  about earlier, was that signed by somebody?
2     A.   No.
3     Q.   How do you enter into the factoring
4  agreement?
5     A.   **I don't -- I don't recall anything on**
6  **the factoring agreement on the legal folder. That's**
7  **done by someone else.**
8     Q.   But is that something that's verbally
9  done? How does the process work?
10    A.   **It's in writing.**
11    Q.   Does the factoring agreement require a
12 signature?
13    A.   **Yes.**
14    Q.   Is it a separate document than what's
15 been marked as Defendant's Exhibit 11?
16    A.   **Yes.**
17    Q.   Is there any way -- is the -- strike
18 that.
19         Does the factoring agreement end the
20 transaction?
21    A.   **No.**
22    Q.   Is there a way for Quantum to get out
23 of the transaction after the factoring agreement has
24 been entered into?
25    A.   **Yes.**

DeSouza - Goldstein                                             123

1     Q.   How dos that happen?
2     A.   **If we never get an authorization**
3  **signature from the debtor, which is National City**
4  **Mortgage.**
5     Q.   How many transactions had Quantum
6  entered into with Westwood prior to this one?
7          MR. KOBROFF: If she knows.
8          MR. GOLDSTEIN: To the extent she
9  knows. Everything is understood to mean if she
10 knows.
11         MR. KOBROFF: Okay.
12 BY MR. GOLDSTEIN:
13    A.   **Westwood and National is one prior to**
14 **the Pollydore.**
15    Q.   One prior?
16    A.   **For the Postell.**
17    Q.   And did they also do an agreement for
18 Harris?
19    A.   **For Harris, which we never fund,**
20 **correct.**
21    Q.   You never funded the Harris agreement?
22    A.   **Correct.**
23    Q.   With respect to the Harris agreement,
24 why didn't you fund the Harris agreement?
25    A.   **Because Christopher never authorized**

DeSouza - Goldstein                                             124

1  the letter.
2     Q.   Is there any reason why Christopher
3  never authorized the letter -- do you know why
4  Christopher didn't authorize the letter in the
5  Harris case?
6     A.   **No, I don't.**
7     Q.   Based on the fact that Christopher did
8  not sign the letter, is it your testimony that
9  that's the reason why you didn't enter into an
10 agreement on the Harris project?
11    A.   **Correct.**
12    Q.   Who approached Quantum with the Harris
13 project? Did Quantum approach Westwood, or did
14 Westwood approach Quantum?
15    A.   **Westwood approached Quantum.**
16    Q.   When was the Postell agreement?
17    A.   **It was on late October, beginning of**
18 **November.**
19    Q.   Had you ever heard -- had you ever
20 heard of Westwood prior to dealing with them on the
21 Postell agreement?
22    A.   **No.**
23    Q.   And on the Postell agreement, who
24 contacted who? Was it Westwood contacted Quantum or
25 vice versa?

DeSouza - Goldstein                                             125

1     A.   **Westwood contacted Quantum.**
2     Q.   On any of the other -- any of these
3  projects that Westwood did with Quantum, were funds
4  wired to -- other than the Pollydore one, were funds
5  wired to anyone other than Quantum? I'm sorry, to
6  Westwood. Sorry.
7     A.   **No.**
8          MR. GOLDSTEIN: Can you mark this as
9  Penn Lyon-1.
10         (Exhibit Penn Lyon-1, one-page letter
11 dated December 20, 2007 to Quantum Corporate Funding
12 from David R. Warfield, is marked for
13 identification.)
14    Q.   I show you what's been marked as Penn
15 Lyon-1. Have you ever seen this document before?
16    A.   **I have seen it, yes.**
17    Q.   When did you last see this document?
18    A.   **Like I said, when I came back from the**
19 **day that I was out.**
20    Q.   Do you know what that document is?
21    A.   **From what I can read here, it's David**
22 **Warfield from Westwood giving permission to Quantum**
23 **to forward 112,168.21 to Penn Lyon.**
24    Q.   Why would you need permission from
25 Westwood to send money to Penn Lyon?

DeSouza - Goldstein   126

1   A.   Because the whole money that was to be
2   wired was to be going to Westwood. Therefore, they
3   need to give us the permission to send you whatever
4   it is to be sent to you, Penn Lyon.
5       MR. GOLDSTEIN: Okay, I have nothing
6   further.
7       MR. DOHERTY: Mrs. DeSouza, just a
8   couple more.
9   EXAMINATION BY MR. DOHERTY:
10  Q.   To your knowledge, does Quantum have
11  written factoring agreements between Westwood and
12  Quantum for the Pollydore and Postell projects?
13  A.   I don't know.
14      MR. DOHERTY: (R) I'll follow up with
15  a letter, but to the extent there is such a written
16  agreement called a factoring agreement between
17  Westwood and Quantum, I'd like to get a copy of
18  that.
19  Q.   Ms. DeSouza, are you aware of any
20  representations made by Mr. Conrad to Christopher
21  Washburn in order to get Mr. Washburn to sign the
22  Quantum authorization letter?
23  A.   I don't know.
24  Q.   What did Quantum provide to National
25  City in exchange for Mr. Washburn signing the

DeSouza - Doherty   127

1   Quantum authorization letter?
2   A.   Can you please rephrase that.
3   Q.   What did National City get out of
4   signing the authorization letter in connection with
5   the Pollydore project?
6       MR. KOBROFF: I'm going to object to
7   the form. I mean, that's a question that's best
8   asked of National City than my client.
9       MR. DOHERTY: Well, I'm entitled to
10  ask it and see what she answers.
11      MR. KOBROFF: If you know, what did
12  National City get out of this?
13      THE WITNESS: I don't know.
14  Q.   Did Quantum provide any kind of benefit
15  to National City in exchange for Mr. Washburn
16  signing a Quantum authorization letter?
17  A.   No.
18      MR. KOBROFF: Can you read that back
19  for me.
20      (Last question and answer are read
21  back by the court reporter.)
22      MR. KOBROFF: I'm going to object to
23  the form of that. You're calling for a legal
24  conclusion, and I object to the question and I ask
25  that the witness's answer be noted as being objected

DeSouza - Doherty   128

1   to.
2   Q.   Did Quantum provide National City with
3   any kind of money in exchange for Mr. Washburn
4   signing a Quantum authorization letter in connection
5   with the Pollydore project?
6   A.   No.
7   Q.   Have you described in your testimony up
8   to now all of the conversations that you can
9   remember having with Christopher Washburn from
10  National City?
11  A.   I'm sorry, can you repeat that.
12  Q.   Let me try to rephrase it.
13      When I was asking you about
14  conversations that you had with Christopher
15  Washburn, is there any that I didn't ask you about
16  that you can remember?
17  A.   No.
18  Q.   So what you testified to before is all
19  you remember about conversations that you had with
20  Mr. Washburn?
21  A.   Yes.
22  Q.   Were there any details that you
23  remember that I didn't ask you about that you want
24  to tell me now?
25  A.   No.

DeSouza - Doherty   129

1   Q.   Did you tell me about all the details
2   you can remember about any conversations you had
3   with Heather Stackhouse?
4   A.   Yes.
5   Q.   Are there any details of any discussion
6   you had with David Long of National City that you
7   haven't told me about yet?
8   A.   No.
9   Q.   Are there any e-mail communications
10  that you had with Christopher Washburn that you
11  haven't described today in response to my questions
12  this morning and earlier this afternoon?
13  A.   Not that I can recall, no.
14  Q.   Do you have a computer folder where you
15  save e-mail communications regarding the Pollydore
16  project?
17  A.   I don't have a specific place where I
18  put my deleted folders for Pollydore, no, I don't.
19  Q.   Do you have a procedure or a policy
20  that you follow for saving e-mail that relates to
21  individual projects that Quantum does?
22  A.   No.
23  Q.   Is it your practice to print out and
24  put a paper copy of all your e-mail communications
25  in the folder that pertains to a particular

# EXHIBIT

# "C"

## Page 86

Sheinker - Goldstein

1  experience in this business, who does that usually
2  refer to?
3      A.    It depends upon the entity.
4      Q.    What type of entities are examples of
5  this?
6      A.    I don't know what you mean.
7      Q.    What type of entities usually authorize
8  these type of certificates?
9      A.    What type of entities? We've got --
10 we've been in business 18 years. All different
11 types of entities.
12     Q.    Give me a couple of them.
13     A.    General contractors, retailers. You
14 got a couple there. That's two.
15     Q.    Do you present them to banks sometimes?
16           Let me rephrase. Do you ask banks to
17 sign estoppel certificates?
18     A.    I believe so.
19     Q.    Do you ask mortgage lending companies
20 to sign estoppel certificates on occasion, "you"
21 meaning Quantum again?
22     A.    I believe so, but it's been -- you
23 know, has been awhile since that has happened, so I
24 can't recall specifically.
25     Q.    And what does Quantum use the estoppel

## Page 87

Sheinker - Goldstein

1  certificate for in connection with these
2  transactions?
3      A.    Which transactions?
4      Q.    In connection with this transaction,
5  the Pollydore transaction?
6      A.    Quantum is not at the job location and
7  can't possibly know without going through monumental
8  efforts to determine whether or not the work has
9  been performed, completed, and accepted to
10 specifications and levels of acceptance of the
11 account debtor. So where we have concentrations, we
12 are inclined to use an estoppel certificate.
13     Q.    What does the estoppel certificate do
14 for Quantum?
15     A.    It creates a binding obligation upon
16 the account debtor to make payment.
17     Q.    In cases where Quantum is requesting
18 that an account debtor sign an estoppel certificate,
19 if the estoppel certificate is not signed, will
20 Quantum typically enter into the transaction?
21     A.    It depends upon the circumstances.
22     Q.    Let's go with the Pollydore transaction
23 circumstances.
24     A.    You want me to answer a hypothetical
25 question as to whether or not --

## Page 88

Sheinker - Goldstein

1           MR. KOBROFF: You're asking --
2      A.    -- I would have done this without the
3  estoppel certificate?
4      Q.    Yes.
5           THE WITNESS: Am I supposed to answer
6  hypothetical questions?
7           MR. KOBROFF: Objection to form. If
8  you can answer.
9      A.    I would not have done this
10 transaction, in my hypothetical opinion, had I not
11 gotten the estoppel certificate, in response to your
12 hypothetical question.
13     Q.    Was Quantum ever presented with a
14 transaction called the Harris project by Westwood?
15     A.    I'm not sure.
16     Q.    Have you ever heard of a transaction
17 called the Harris project?
18     A.    Yes.
19     Q.    What is your understanding of what the
20 Harris project was?
21     A.    I believe that -- well, my
22 understanding is it was another modular project of
23 Westwood.
24     Q.    Did Westwood ever request that Quantum
25 fund or purchase an invoice with respect to the

## Page 89

Sheinker - Goldstein

1  Harris project?
2      A.    I wouldn't have direct knowledge of
3  that.
4      Q.    Who would have direct knowledge of
5  that?
6      A.    Either Maria or Shelley.
7      Q.    By Shelley you mean Shelley Simmonds?
8      A.    Yes.
9      Q.    And Maria is Maria DeSouza?
10     A.    Right.
11     Q.    Who has the final say at Quantum
12 whether Quantum enters into a purchase and sale
13 agreement?
14          MR. KOBROFF: Objection to form.
15     Q.    I'll ask it a different way. Who has
16 final approval over all transactions that Quantum
17 enters into?
18          MR. KOBROFF: Objection to form.
19     A.    I approve the wires or my
20 brother-in-law Howard Chernin approves the wires.
21 Transactions are generally generated by the
22 operations staff, and provided that everything is
23 proper the wires will go out. So we spot-check
24 transactions. I say "we" meaning myself or Howard
25 will spot-check the transactions before they're sent